**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AON RISK SERVICES COMPANIES, INC. and AON RISK SERVICES NORTHEAST, INC., | Case No. _____ |
| Plaintiffs, | |
| v. | |
| ANTHONY RAMPERSAUD, NANCY MONTALVO, and HOWDEN US SERVICES, LLC, | |
| Defendants. | |

**VERIFIED COMPLAINT FOR**
**INJUNCTIVE AND OTHER RELIEF**

**INTRODUCTION**

1.     This case is about a calculated and egregious scheme of trade secret theft, contractual breaches, breach of fiduciary duty, tortious interference, and unfair competition. In sum:

- **Coordinated poaching on Aon's dime:** Howden US Services, LLC ("Howden"), a new market entrant, conspired with Aon's New York-based Managing Director, Anthony Rampersaud ("Rampersaud"), to solicit a group of New York-based Aon employees to bolster Howden's New York operations—despite Rampersaud's clear fiduciary duties and contractual non-solicitation obligations to Aon. Rampersaud met personally with David Howden, Howden's founder and CEO, during an Aon-funded trip to London. Thereafter, Rampersaud approached at least one Aon employee, asked him for his personal email address, and told him to expect an offer of employment from Howden. The employee received an unsolicited job offer from Howden, without ever applying or having spoken to a single Howden employee.

- **Mass resignation in lockstep:** Shortly after Rampersaud's London meeting with Howden, six Aon colleagues reporting to Rampersaud and/or who had long-supported Rampersaud resigned on the same day—most within minutes of each other—underscoring the deliberate and coordinated nature of this raid.

- **Misappropriation of thousands of pages of trade secrets:** Although Aon's investigation continues, its preliminary investigation reveals that in the days leading up to this exodus, Rampersaud directed his assistant to ship boxes filled with Aon's confidential and proprietary information to his home address. These boxes contained historical client documents, client strategies, business opportunity lists, financial data,

and other trade secrets—precisely the materials and information needed to replicate Aon's brokerage operations at Howden. In addition, the day before she resigned, Nancy Montalvo ("Montalvo") emailed a customer list to her personal email address. These takings are believed to be just the tip of the iceberg, as Aon's forensic investigation is still underway.

- **Deception and concealment:** When questioned about his suspicious activities by his manager and his manager's manager, Rampersaud lied to them and stated that he was packing boxes to move to another employee's office (located closely nearby on the same floor). Other employees who reported to Rampersaud, including Paige Stapleton ("Stapleton"), denied knowledge of any departures. When asked by Aon, Stapleton affirmed her commitment to Aon—only to resign minutes later.

- **Retention of Company property:** When Aon demanded the return of its confidential and trade secret information and Company-issued devices, Rampersaud refused, retaining his Aon-issued cell phone. Upon information and belief, Rampersaud continues to possess additional boxes of Aon's trade secret materials. Montalvo similarly never returned the client list she transferred to her personal email address.

- **Client solicitation:** Rampersaud and his cohorts are now actively contacting and calling upon Aon clients they previously serviced, in a plain attempt to lure them to Howden.

2.     An injunction is imperative to halt the misuse and further dissemination of Aon's confidential and trade secret information, ensure its prompt return, mitigate the harm already inflicted by Defendants, and stop the ongoing unlawful solicitation of Aon colleagues and clients.

3.     Aon is a leading global professional services firm providing insurance brokerage, risk, retirement and health solutions to its clients. Aon has a long-standing presence in the United States (U.S.), where it has operated for decades.

4.     In contrast, before this year, Howden was (admittedly) not an active participant in the U.S. retail insurance brokerage market. According to a Howden "pitch book": "We've always said we would enter the US market when the time was right. That time is now. And we want you to join us."

5.     Howden is not, however, "entering" the U.S. market through lawful means. Instead, as this case demonstrates, it is attempting to gain a foothold in the U.S. market by poaching

employees and clients from established U.S.-operating brokerages by encouraging disloyal employees to solicit entire teams to abandon their positions and replicate the same work for Howden. This scheme involves not only orchestrating coordinated group departures, but also misappropriating trade secret and confidential information—obtained through these recruited employees—concerning competitor personnel and clients.

6.      Howden's actions have given rise to at least five lawsuits by other insurance brokerages since July 29, 2025, with facts eerily similar to those present here.

7.      In *Marsh USA LLC, v. Parrish et al.*, No. 25-cv-6208, Dkt. No. 1 (S.D.N.Y. July 29, 2025), for example, Marsh USA LLC sued four former employees, Michael Parrish, Giselle Lugones, Robert Lynn, and Julie Layton, alleging "a coordinated and concealed scheme… to lift out nearly an entire region of employees from Marsh" to benefit Howden, resulting in the "departure of over 100 employees of Marsh" and many clients. *Id.* ¶ 2. Marsh further alleged that Defendants exfiltrated "key client documents," including a "team chart" (showing Marsh employees working on client accounts), "account financial trackers" (showing key financial information for the account), and "schedules of insurance" (showing key events on the account, including renewals). *Id.* ¶ 94. Marsh further alleged that Defendants funneled confidential information "about their Marsh team's employees and other Marsh colleagues to Howden" so Howden could prepare employment offers for those employees to incentivize them to leave Marsh. *Id.* ¶ 95. One of the Defendants, Parrish, is now Howden's CEO of its U.S. business operations.

8.      On August 1, 2025, a related lawsuit was filed against Howden in *Marsh & McLennan Cos., Inc., v. Howden US Servs., LLC*, No. 2025-0877, Dkt. No. 1 (Del. Ch. Aug. 1, 2025) arising out of Howden's initial raid on Marsh, described above.

9.      On October 2, 2025, a third lawsuit was filed against Howden by another brokerage, Willis Towers Watson, accusing Howden of working with a (now) former Willis employee to

coordinate the departures of, and "poach" a "team" of, Willis employees, as well as Willis clients. *See Willis Americas Administration, Inc. and Willis Towers Watson Northeast, Inc. v. Danielle Lombardo and Howden US Services, LLC*, No. 3:25-cv-16217, Dkt. 1 (D.N.J. Oct. 2, 2025).

10.     Weeks later, on October 31, 2025, Marsh filed another lawsuit against a former Marsh, now Howden, employee captioned *Marsh & McLennan Agency LLC v. Charles Baxter Southern III,* No. 1:25-cv-09080, Dkt. 1 (S.D.N.Y. October 31, 2025). In that case, Marsh sued a former managing executive, Charles Baxter Southern, for working with Howden to orchestrate a mass exodus using confidential information related to Marsh employee compensation and diverting 30 clients to Howden, representing over $4 million in annual recurring revenue. Marsh alleged that offer letters transmitted to its employees were prepared using its confidential compensation information, provided by its defecting employee to Howden so that Howden could solicit other Marsh colleagues.

11.     Days later, on November 3, 2025, Marsh filed another lawsuit against (former) employees in its "Florida zone," alleging these individuals helped Parrish and others solicit coworkers and clients, as well as exfiltrate confidential and trade secret information. On November 10, 2025, Marsh amended the Complaint to add Howden US Specialty LLC and Howden US Services, LLC as Defendants, alleging that Howden had now poached over 100 Marsh employees and 60 Marsh clients. Marsh alleged that its former employees gave Howden certain information (e.g., employees to contact and employee compensation information) to allow Howden to target key Marsh employees and coordinate *en masse* resignations. *See Marsh USA LLC v. Alfred Gronovius, Andrea Amodeo, Carlos Serio, Giovanni Perez, Janette Wilcox, Nathan Collins, Richard Lennerth, Howden US Specialty LLC, Howden US Services, LLC*, Case No. 1:25-cv-9130 (S.D.N.Y. Nov. 3, 2025).

12.     As a result of their conduct, Howden's U.S. CEO and other defecting employees were enjoined. *See Marsh USA LLC, v. Parrish et al.*, 2025 WL 2676389, *1–3 (S.D.N.Y. Sept. 18, 2025). Specifically, this Court entered an injunction as follows:

(1) Each Defendant is prohibited from doing the following with respect to any employee of Marsh or its affiliates with whom such Defendant came into contact for the purpose of soliciting or servicing business or about whom Defendant obtained Confidential Information and Trade Secrets during the last two (2) years of his or her employment with Marsh: (a) Directly, or through others, soliciting such employees to leave employment with Marsh or Marsh's affiliates or regarding employment with Howden US Services, LLC.

(2) Each Defendant is prohibited from doing the following with Marsh clients that existed during the last two (2) years of his or her employment with Marsh: Directly, or through others, soliciting such clients or prospective clients for the purpose of selling or providing services or products by Howden.

(3) Each Defendant is further prohibited from directly or indirectly using, disseminating, or disclosing to any third party (including any other person, organization, or entity, including but not limited to Howden and its employees and agents) Confidential Information and Trade Secrets. Defendants must return all Marsh property, including Confidential Information and Trade Secrets, on the last date of his or her employment or within five (5) days of this Order, whichever date is later.

*Id.* at Dkt. No. 129, at 2-3 (Sept. 18, 2025).

13.     The *Marsh* Court found evidence that Defendants solicited Marsh employees, including by methods similar to those utilized here: "contacting Marsh colleagues to announce their departure to Howden, sharing higher compensation and promotions being offered by Howden, and offering to connect them to Howden." *Marsh USA LLC*, 2025 WL 2676389, at *2. The Court also cited declarations supporting that Defendants "misused in their solicitation efforts" confidential information, such as "pricing models, renewal timelines, growth strategies, and detailed employee compensation and benefits." *Id.* The Court found that actions by a Defendant that were "never before taken" bolstered Marsh's likelihood of success in showing breach of its confidentiality agreement. *Id.* The Court also found that Marsh presented evidence of "coordinated employee resignations." *Id.*

14.    Thereafter, Marsh moved the Court for a contempt order. *Id.* at Dkt. 163. According to Marsh, the Defendants represented to Marsh at the "Court's deadline" that they had "nothing to return," but then after that deadline, "produced a combined 440 documents (and counting) from their personal electronic devices" which are "replete with Marsh's Confidential Information and include proposals for prospective Marsh clients, business strategy presentations… and details of existing Marsh clients' insurance policies, limits, and premiums…". Dkt. 163, at 6. As discussed further below, the Defendants in this case took this exact same type of information. The Court has not yet ruled on Marsh's request.

15.    In *Willis,* the District of New Jersey also recently entered a Consent Order, which provided:

- "Defendant [former employee] will not directly or indirectly solicit, accept broker of record letters ('BORs') from, transact business with and/or service 'Restricted Clients' and/or 'Restricted Prospective Clients,' or solicit employees, as set forth in her Non-Solicitation Agreement that was attached to the Complaint," except for six clients;

- "Non-parties [on the former employees' team] will not directly or indirectly solicit, accept BORs from, transact business with and/or service 'Restricted Clients' and/or 'Restricted Prospective Clients,' or solicit employees, as set forth in their respective Non-Solicitation Agreements," except for six clients;

- "Defendant Howden will not accept BORs from any of the 5 clients whose identities have been exchanged and agreed to by the Parties if the BORs were obtained through solicitation by [former employees]";

- "Defendant Howden will not directly or indirectly solicit any WTW employees who worked with Lombardo or the Lombardo Team at WTW";

- "[T]o the extent that [former employees] retain possession of any Confidential Information, [former employees] shall not disclose or use Confidential Information, if any, and counsel for the Defendants will cooperate with counsel for Plaintiffs to segregate and preserve such Confidential Information, if any"; and

- "[T]o the extent Defendant Howden is in possession of any Confidential Information that was furnished to Howden by [former employees], counsel for the Defendants will cooperate with counsel for Plaintiffs to segregate and preserve such Confidential Information, if any."

*Willis,* 3:25-cv-16217-GC-RLS, Dkt. No. 38 (dated October 29, 2025), Dkt. No. 45 (holding that Consent Order entered on October 29, 2025 "shall remain in effect pending further order of the Court").

16.     As set forth below, the facts here reflect Howden's troubling and well-established pattern of unlawfully poaching competitors' employees and misappropriating confidential information (including detailed client and employee information)—conduct that warrants injunctive relief against Defendants. Here, as in the *Marsh* and *Willis* cases, Howden conspired with a senior Aon employee, Rampersaud, to orchestrate a coordinated resignation of an entire team of Aon employees on the same afternoon. After accepting Howden's offer of employment, and acting as its agent, Rampersaud directed his assistant to transfer multiple boxes of Aon's confidential and trade secret materials to his home address, concealing these actions through deliberate misrepresentations to Aon. Montalvo likewise transferred to her personal email a client list. Immediately following their resignations, Rampersaud and others began calling upon Aon clients—clients whose information Rampersaud had earlier attempted to send to his home address—in an obvious attempt to persuade the clients to move their business to Howden.

## PARTIES

17.     Plaintiff Aon Risk Services Companies, Inc. is a Maryland corporation.

18.     Plaintiff Aon Risk Services Northeast, Inc. is a New York corporation.

19.     Defendant Anthony Rampersaud is a natural person who lives in New York. Rampersaud was a Managing Director at Aon until November 25, 2025, when he resigned to work for Howden.

20.     Defendant Nancy Montalvo is a natural person who lives, upon information and belief, in New Jersey. Montalvo was an Account Executive at Aon (reporting to Rampersaud) who

worked out of Aon's New York office until November 25, 2025, when she resigned to work for Howden.

21.     Defendant Howden US Services, LLC is a Delaware limited liability company, formed on March 12, 2025.

## JURISDICTION AND VENUE

22.     The Court has federal subject matter jurisdiction over Count I, a claim under the Federal Defend Trade Secrets Act, 18 U.S.C. §§ 1836 et seq. ("DTSA"). *See* 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the other counts because they form part of the same case or controversy as Count I. *See* 28 U.S.C. § 1367.

23.     This Court has personal jurisdiction over Howden because Howden does business in New York; hired Rampersaud in New York; and engaged in tortious and other suit-related conduct in New York, as described in this Complaint.

24.     This Court has personal jurisdiction over Rampersaud and Montalvo because they live in New York and/or work or worked in New York, maintain continuous contacts with New York, and engaged in other unlawful and suit-related conduct in New York, as described in this Complaint.

25.     Venue is appropriate in this judicial district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims in this lawsuit occurred in this judicial district, and because Defendants are subject to the Court's personal jurisdiction in New York.

## FACTUAL ALLEGATIONS

### Aon, Howden, and the Insurance Brokerage & Consulting Industry

26.     Aon is a leading global professional services firm providing risk capital and human capital solutions. Aon provides insurance brokerage and consulting services to help clients develop,

improve, and implement their risk management strategies. Aon has decades of continuous operating experience in the U.S., providing tailored services to clients ranging from small businesses to Fortune 500 corporations. Aon serves as a trusted advisor to its clients on structuring insurance coverage, claims, loss prevention, regulatory compliance, and employee health and benefits programs.

27.    In material contrast, Howden formed Howden US Services, LLC only this year, in March 2025. In late July 2025, Howden launched its U.S. retail brokerage operation by staffing its newly-formed entity, seemingly overnight, with employees who all simultaneously resigned from a rival brokerage, Marsh.

28.    The insurance brokerage and consulting industry is highly-competitive and relationship-driven. Aon and Howden are now direct competitors. Aon's success depends on maintaining client trust, cohesive employee teams to service clients, and delivering tailored and high-quality client solutions. As such, Aon heavily invests in its employees, as well as its client relationships which it develops through its employees.

29.    Aon invests in its business, clients, and employees in many respects, at significant cost to Aon, including by:

- Generous employee expense reimbursements to develop client relationships.

- Client-development and client service support and resources, to help colleagues better serve Aon clients.

- Providing comfortable office space for colleagues to gather and work collaboratively.

- Investing in significant organizational resources, such as technology and proprietary tools, including data and analytics to provide client solutions. This includes proprietary peer benchmarking data.

- Generous employee compensation packages, as well as significant investments in colleague development, engagement, training, relationship-building and well-being.

## The "Rampersaud Team"

30.     Rampersaud commenced employment with Aon over two decades ago, in 2002, as a Client Specialist in the Client Account Services department.

31.     Rampersaud is based in New York, New York.

32.     Through Aon's significant investment in Rampersaud—including training, client introductions, expense reimbursements, mentoring, ongoing support, and access to Aon's confidential and trade secret information—Rampersaud advanced in his career, ultimately to the role of Managing Director. Rampersaud and his reports delivered sophisticated risk advisory, risk transfer, and structured solutions across diverse industries, enabling clients to identify, quantify, and effectively manage their risk exposures. Indeed, in 2025, Aon reimbursed Rampersaud over $100,000 in expenses for activities including client meetings, meals, and entertainment.

33.     Aon provided Rampersaud with a book of clients to service. Aon also provided Rampersaud with the support of other employees to help him service the clients, as well as develop and grow client relationships on behalf of Aon. Those employees included his assistant, Dawn Crabb ("Crabb"), and the following Account Executives who reported directly to Rampersaud: Martha Blackman ("Blackman"), Michael Kovach ("Kovach"), Nancy Montalvo ("Montalvo"), Mathew Gelman ("Gelman"), and Paige Stapleton ("Stapleton") (all, collectively, the "Defecting Employees").

34.     Montalvo was a twenty-five year Aon employee. She too was based in New York, New York. In a resume that she forwarded to her personal email address on November 24, 2025, Montalvo described her position as managing and growing a $4 million book of business, and "develop[ing] long-term client relationships of 15-20 years while maintaining an extensive understanding of each client's risk profile to ensure all needs are met." She also described her role as

"identif[ing] client needs and requirements and deliver[ing] tailored coverage options during the renewal, at cost-effective pricing."

35.     Indeed, Rampersaud and the Account Executives that reported to him, including Montalvo, were responsible for a book of business, and the day-to-day account management of client accounts. They were responsible for building, expanding, and solidifying Aon's relationship with these clients, and addressing the client's risk/capital management needs. They were expected to secure existing business for Aon and drive the sale of additional services and coverages across solution lines, working to strategically cultivate client relationships. Given their job duties, they were necessarily exposed to extensive amounts of Aon confidential and trade secret information.

36.     Immediately before his resignation, Rampersaud pitched his supervisors to provide him with a specific compensation plan. The below illustrates Rampersaud's desired reporting structure based on an organizational chart that Rampersaud himself prepared before his resignation:



37.     According to Rampersaud's organizational chart, all but one of the referenced Aon employees were long-term Aon employees of 5 or more years. Aon trained, compensated, and developed these employees. The Account Executives were each client-facing, as described above. Aon provided the Account Executives with thousands of dollars in generous expense

reimbursements to develop and support Aon's client relationships, through client meetings, meals and entertainment. For example, in 2025, Aon provided Blackman, Kovach, Montalvo, Gelman, and Stapleton with collectively over $200,000 in expense reimbursements, including for client meetings, drinks, meals, and entertainment.

38.    Aon ultimately did not agree to offer Rampersaud the exact compensation deal he demanded, but did offer him a thoughtful and incredibly lucrative alternative that substantially increased Rampersaud's incentive to drive and generate new business revenue. In doing so, Aon illustrated to Rampersaud that, were his proposed go-forward 2026 incentive rates applied in 2023 and 2024, he would have made even more money than on his current incentive rates. This is significant considering that in 2023 and 2024, Aon paid Rampersaud over $900,000 for each year.

39.    Despite Aon's generous offer, Rampersaud instead opted to violate his covenants by working with Howden to gut the entire group. On November 25, 2025, Rampersaud along with all of the Defecting Employees pictured on his own organizational chart resigned from Aon *en masse* to join Howden.

40.    Throughout their employment, Rampersaud, Montalvo, and the Defecting Employees had access to extensive amounts of Aon's confidential and trade secret information, including (without limitation):

- Client-specific information, including without limitation renewal information, peer benchmarking data, client strategy information, and new business opportunities;

- Financial information, including without limitation the revenue attributable to clients, and client service fee arrangements; and

- Employee information, including without limitation confidential employee compensation information and information about which employees were strategically important to certain client relationships and accounts.

41.    Aon protects this information in many ways, including (without limitation):

- By training employees on Aon's confidentiality and data privacy policies. For example, Rampersaud completed data privacy training as recently as September 14, 2025 and Montalvo completed data privacy training on August 26, 2025. This training specifically addresses protecting Aon's confidential information. As stated in the training, "competitors who access our confidential information could use it for their own benefit and cause later financial and competitive harm." One of the scenarios in the training even addresses an employee engaging in a "long-overdue spring cleaning" of her office, and how to dispose of documents "the right way" under company policy, for example by shredding the documents – not shipping them to your home address after having accepted an offer of employment from a competitor.

- By promulgating data security policies, including policies which expressly state: "The use of personal or other third-party email accounts or messaging platforms… to conduct Aon business is strictly prohibited. Aon personnel must not forward or otherwise transfer Aon information from Aon's messaging systems to personal email or storage accounts. Aon data must be stored and managed in Aon-approved systems."

- Through robust IT security measures, including password-protection on Aon-issued devices, disabling the transfer of data from Aon-issued laptops to external devices such as USB drives, and restricting access to cloud storage platforms like Dropbox.

- Through stringent physical security measures, including securing all locations where confidential information is stored and implementing tracked, badge-only access to Aon office spaces containing sensitive materials.

- Through rigorous end-of-employment procedures, such as immediately terminating colleague access to Aon confidential and trade secret information upon their resignation or termination of employment, and requiring colleagues to immediately return all such information to Aon.

- By requiring employees to execute confidentiality agreements that expressly prohibit the use or disclosure of Aon's confidential and trade secret information and mandate the return of all such materials upon the termination of employment. (*See, e.g.,* Exhibits A and B).

- As demonstrated herein and detailed further below, by acting swiftly to recover its confidential and trade secret information when theft is detected or suspected.

### Aon Covenants

42.     In 2017, Aon more than doubled Rampersaud's base salary, and provided him with a

large, six-figure guaranteed bonus (among other consideration), in exchange for Rampersaud signing

a Confidentiality, Non-Competition and Non-Solicitation Agreement ("CNSA Agreement"). *See*

Exhibit A.

43.    The CNSA Agreement, signed by Rampersaud, provides protections for Aon's

investment in its employee and client relationships, confidential information, and the stability of

Aon's workforce, as follows:

> The Employee … agrees, for the duration of [twenty-four (24) months after the end of employment], not to, directly or indirectly, solicit or induce, or to cause any person or other entity to solicit or induce, any employee of Aon to work for the Employee or for any third party or entity, or to leave the employ of Aon. [*See* Exhibit A, §1(c).]

44.    The CNSA Agreement also provides protections for Aon's investment in its client

relationships and goodwill, and confidential information, developed by Aon employees at Aon's

expense:

> The Employee hereby covenants and agrees that…the Employee (on the Employee's own behalf or on behalf of any other person or entity) will not, during the course of employment, and for twenty-four (24) months after the end of employment, directly or indirectly, call upon, solicit, accept, engage in, service or perform, other than on behalf of Aon, any business of the same type or kind as the business performed by Aon from or with respect to (i) clients of Aon with respect to whom the Employee provided services, either alone or with others, or had a business relationship, or on whose account he worked or became familiar, or supervised directly or indirectly the servicing activities related to such clients, during the twenty-four (24) months prior to the termination of the Employee's employment with the Company and, further provided, such clients were clients of Aon either on the date of the termination of Employee's employment with the Company or within twelve (12) months prior to such termination and (ii) prospective clients of Aon which the Employee alone, in combination with others, or in a supervisory capacity, solicited during the six (6) months prior to the end of employment and to which a proposal for services was rendered by the Company during the six (6) months prior to the end of the Employee's employment with the Company. "Client" means any person or entity listed on the books of Aon as such. [*See* Exhibit A, § 1(b).]

45.    The CNSA Agreement further provides protections for Aon's investment in,

development of, and provision of confidential and trade secret information:

> The Employee acknowledges that Aon's business depends to a significant degree upon the possession of confidential, proprietary and trade secret information which is not generally known to others, and that the profitability of the Business of Aon

requires that this information remain proprietary to Aon. The Employee recognizes that, by virtue of his employment by the Company, and to assist him in the solicitation, production and servicing of client business, he will be granted otherwise prohibited access to such information. This information (hereinafter referred to as "Confidential Information") includes, without limitation: **lists of clients** and prospective clients; contract terms and conditions; **client information relating to services, insurance, benefits programs, employees, finances, and compensation**; copyrighted materials; **corporate, management and business plans and strategies**; **compensation and revenues**; methods and strategies of marketing; market research and data; technical know-how; computer software and manuals; policies and procedures; and the conduct of the affairs of Aon.

The Employee shall not, except as required in the course of employment hereunder, disclose or use during or subsequent to the course of employment, any Confidential Information which has not been publicly disclosed....

Upon termination of employment, the Employee shall promptly return to the Company all Confidential Information and all materials and all copies or tangible embodiments of materials involving Confidential Information in the Employee's possession or control. The Employee agrees to represent in writing to the Company upon termination of employment that he has complied with the provisions of this Section 3. [*See* Exhibit A, § 3(a) (emphasis added).]

46.    Rampersaud acknowledged that the services he provided to Aon "are of a unique character which gives them special value" to Aon, "the loss of which cannot reasonably or adequately be compensated in damages in an action at law." He agreed that a breach of his covenants "will result in irreparable and continuing harm" to Aon, and "that therefore, in addition to any other remedy which [Aon] may have at law or in equity, [Aon] shall be entitled to injunctive relief for a breach of this Agreement by the Employee." [*See* Exhibit A, § 2.]

47.    The Rampersaud CNSA Agreement is governed by the law of the state where Rampersaud resides, here New York. [*See* Exhibit A, § 5(c).]

48.    Montalvo and the other Account Executive Defecting Employees signed similar agreements. *See* Exhibit B.

49.     The Rampersaud CNSA Agreement (and other Aon agreements, *see* Exhibit B) are similar to those Howden asks its new hires to sign, as depicted in the below chart and as attached hereto as Exhibit C:

| AON COVENANTS | HOWDEN COVENANTS |
|---|---|
| **Employee Non-Solicit**<br><br>"The Employee hereby also agrees, for [course of employment and 24-months after the end of his employment], not to, **directly or indirectly, solicit or induce, or to cause any person or other entity to solicit or induce**, any employee of Aon to work for the Employee or for any third party or entity, or to leave the employ of Aon." [Exhibit A, § 1(c).] | **Employee Non-Solicit**<br><br>"During the… [24 months following Employee's termination], Employee shall not, whether on Employee's own behalf or on behalf of or in concert with any other person or entity, **directly or indirectly** (i) **induce**, encourage, canvass, or enable any [Howden employee] … to leave, depart, or cease rendering services to any of the Company Entities, or interfere in any way with the relationship between any of the Company Entities and any [Howden employee]; (ii) **solicit**, recruit, retain, or hire any person or entity who was a [Howden employee] of any of the Company Entities at any time during the twelve (12) months preceding such solicitation, recruitment, retention, or hiring… or (vii) aid, assist, direct, or encourage any other person or entity to do any of the foregoing…." [Exhibit C, § 4(a).] |
| **Customer Non-Solicit**<br><br>"The Employee hereby covenants and agrees that… the Employee (on the Employee's own behalf or on behalf of any other person or entity) will not, during the course of employment, and for twenty-four (24) months after the end of employment, directly or indirectly, call upon, **solicit, accept, engage in, service** or **perform**, other than on behalf of Aon, **any business** of the same type or kind as the business performed by Aon from or with respect to (i) clients of Aon with respect to **whom the Employee provided services**, either alone or with others, or **had a business relationship…..**" [Exhibit A, § 1(b).] | **Customer Non-Solicit**<br><br>"During the [24 months following Employee's termination] … Employee shall not, whether on Employee's own behalf or on behalf of or in concert with any other person or entity, directly or indirectly… (iii) **solicit**, induce, or encourage any [Client the Employee has had **business-related contact** with] … to cease doing business (or reduce its volume of business) with any of the Company Entities, or interfere in any way with the relationship between any [Client the Employee has had business-related contact with],… on the one hand, and any Company Entity, on the other hand…; (iv) **service**, **engage in business with**, or **provide any products or services to** any [Client the Employee has had business-related contact with] to the extent that such products or services are similar to any product or service that any of the Company Entities provided, rendered, or marketed to such [Client], or are then actively planning to provide, render, or market to such [Client];… or (vii) aid, assist, direct, or encourage any other person or entity to do any of the foregoing…." [Exhibit C, § 4(a).] |
| **Confidential Information** | **Confidential Information** |

| "The Employee shall not, except as required in the course of employment … **disclose or use** during or subsequent to the course of employment, any Confidential Information which had not been publicly disclosed…." [Exhibit A, § 3(a).] | "Employee agrees that, both during Employee's employment with the Company and at all times following the termination of such employment… Employee will maintain all Confidential Information as confidential, and shall not **use** any Confidential Information or **disclose** any Confidential Information to any other person or entity ….." [Exhibit C, § 2(b).] |
|---|---|

50.     Howden's own agreements acknowledge that Howden considers the following to be confidential information in the insurance-brokerage industry:

- "information relating to personnel"
- "financial information"
- "financial projections"
- "business plans"
- "recruiting plans"
- "strategic plans"
- "lists of potential recruits or hires"
- "existing and potential business opportunities"
- "confidential reports"
- "information about… clients and customers… such as the identity of the… Clients, the amount of revenue derived from such Clients, specific Client needs and requirements, and lists of actual or potential Clients…."

[Exhibit C, § 2(b).]

### **Howden Raid on Aon; Coordination with Rampersaud**

51.     Despite instructing its own employees not to solicit Howden personnel or clients, and not to use or disclose Howden's confidential information, Howden fails to hold itself to these same standards. In fact, the very information Howden acknowledges is "confidential" is the same type of information its newly hired employees—acting as Howden's agents—unlawfully exfiltrated, or attempted to exfiltrate, from Aon here.

52.     Specifically, between approximately September 28, 2025 and October 2, 2025, Rampersaud traveled to London at Aon's expense for client meetings. Yet, during this trip, Rampersaud met with David Howden, the founder of Howden. Upon information and belief, this

London meeting marked the beginning of Rampersaud's efforts to collaborate with Howden—at it's highest levels—in orchestrating a coordinated group departure of individuals from Aon to Howden.

53.     Beginning in early November 2025—while actively discussing with Howden the transfer of an entire group of Aon employees, including conversations with Michael Landa, Howden's US Vice Chairman and Member of the US Executive Committee[1]—Rampersaud engaged in irregular printing activity. Despite a limited prior history of printing, Rampersaud suddenly began printing documents containing Aon's confidential and trade secret information.

54.     For example, on November 4, 2025, Rampersaud created 19 print jobs for documents and email messages, including an Excel spreadsheet entitled "Book Deal Discussion Pipeline_.xlsx," which contained highly confidential and trade secret information, including without limitation a client account list, opportunity with the client, projected income, estimated close date, and team member responsible for the client opportunity (specifically referencing one or more of the Defecting Employees as the "TEAM MEMBER"). The document was saved on a local drive on Rampersaud's computer entitled "TOP SECRET."

55.     That same day, Rampersaud also accessed historical data concerning his team's compensation (e.g., a document entitled "Team Comp Review 2022-23.xlsx"). The following day, November 5, 2025, Rampersaud accessed another document concerning his team's compensation information, entitled "2025 Projected Team bonuses.xlsx." Upon information and belief, Rampersaud accessed these confidential compensation documents in order to feed information to Howden to allow it to prepare offer letters for Rampersaud's "team."

56.     On November 13, 2025, Rampersaud emailed his supervisors a detailed PowerPoint presentation in supposed support of his request for a specific compensation arrangement with Aon.

---

[1] *See* Michael Landa joins Howden US as Vice Chairman and Member of the US Executive Committee (last visited December 2, 2025).

The presentation contained an extraordinary level of detail that was not requested and was out of the ordinary, including: "team production" over "25 years"; an organizational chart; historical new business and renewal revenue dating back to 2022; a list of client accounts and opportunities; "notable" clients; and "team member" 2024 bonuses and "projected" 2025 bonuses. The inclusion of the extensive team-related information was perplexing, as Rampersaud's supervisors were already familiar with the team and their compensation, and there was no legitimate business reason to provide such detail. Upon information and belief, Rampersaud prepared this presentation not just for Aon's purposes, but in order to collect information to share with Howden—using his discussions with Aon as pretext to prepare the presentation and conceal his true intent.

57.    Five days later, on Tuesday, November 18, 2025, just days before his resignation, Rampersaud created 23 print jobs for documents, including the following among them:

- "Copy of Copy of [CLIENT A[2]] Aon Relationship Overview Draft 2024.09.23v2.xls";
- "Aon-[CLIENT B] Service Agreement signed 08.14.25.pdf";
- "[CLIENT C] 2024-2025 Schedule of Insurance@01.08.2025 – AP Edits.xlsx"; and
- "New_York_City_Other_Rampersaud_July_2025_Forecast.xlsx."

58.    That same day, November 18, 2025, Crabb, Rampersaud's Executive Assistant, not coincidentally created print jobs for the following:

- *Five shipping labels*; and
- Client lists (including compilations of client names, companies, mailing addresses, and contact email addresses) (*see, e.g.,* "2024 RIMS Client list.xlsx"; "2024 Holiday Client List – Mailing Labels.xls"; "2025 Property Symposium Client list.xlsx").

59.    The next day, Wednesday, November 19, 2025, Rampersaud emailed from his Aon email address to his personal email address a detailed PowerPoint presentation (dated October 8, 2025) containing the employee organizational chart, historical and projected revenue from 2022 through 2028, a client account list (identify opportunities, projected income, and responsible team

---

[2] Client names are redacted to protect confidentiality.

members), and 2026 projected revenue itemized by account and line of business. There was no legitimate Aon-related business reason for Rampersaud to email this document to his personal email address.

60.     That same day, at approximately 3:01 pm EST, Rampersaud searched on his Chrome web browser on Yahoo.com for "fedex store." One minute later, Rampersaud continued his atypical printing activity, printing additional documents between 3:02 pm EST and 3:04 pm EST, including the following:

- "2025 and 2026 Revenue Projections.xlsx" – an excel spreadsheet containing account name, opportunity with that client account, projected income for the client account, estimated close date, and team member responsible (referencing Blackman, Kovach, Stapleton, Gelman, and Montalvo); this document was saved in Rampersaud's "TOP SECRET" folder;
- "Book Deal Discussion Pipeline_.xlsx" – a spreadsheet containing revenue project information as described in the bullet above; this document was saved in Rampersaud's "TOP SECRET" folder;
- "Revenue Summary by Year.xlsx" – a spreadsheet containing actual and projected new business and renewal business from 2022 through 2028; this document was saved in Rampersaud's "TOP SECRET" folder; and
- "Tony Rampersaud TL invite-2024.xlsx" – a spreadsheet listing client names and email addresses.

61.     Also on that same day, November 19, 2025, Rampersaud's assistant, Crabb, created print jobs for additional documents, including (among other things):

- *Nine more shipping labels*; and
- An excel spreadsheet entitled: "2025 New Business Pipeline 01.xlsx."

62.     Throughout Rampersaud's printing spree, Rampersaud was also, upon information and belief, actively communicating with Aon colleagues—including Christopher Cogan ("Cogan"), Blackman, Kovach, Stapleton, Gelman, and Montalvo—about an "opportunity" (as he called it) to leave Aon and work for Howden.

63.     For example, on or around November 18 or 19, 2025, Rampersaud had a call with Cogan and informed him about an "opportunity" related to a potential job offer from Howden to

Cogan. During the call, Rampersaud asked Cogan for his personal email address, and advised him to monitor it because Cogan might receive "an offer" that he might "be impressed with" in his personal email that week, despite Cogan never having applied for a job at Howden. Rampersaud explained to Cogan that, at Howden, Cogan would do the same job that he does for Aon, but with more client-facing responsibilities, because Hogan "always got great reviews by our clients." Rampersaud told Cogan to "let him know" what he thought of the offer.

64.     Following Rampersaud's call to Cogan, on Thursday, November 20, 2025, Howden extended an unsolicited job offer to Cogan with a "target start date" of December 15, 2025. The original offer specified that Cogan would be "based in New York" but would "work remotely until an office is established." The offer is signed by Michael Parrish, Howden's U.S. CEO. Notably, Cogan had never applied for, interviewed for, or initiated any discussions regarding, a position with Howden prior to receiving this job offer. In fact, Cogan had never spoken to anyone employed by Howden prior to receiving this unsolicited job offer. The offer was sent to Cogan's personal email address (that Howden plainly obtained from Rampersaud) and exceeded Cogan's Aon base salary (information, again, that Howden must have obtained from Rampersaud). After receiving the offer, Cogan called Rampersaud (as he requested). Rampersaud asked Cogan what he thought of the offer. Cogan told him that he would have to "think about the offer," to which Rampersaud replied, "we would love to have you." Rampersaud also mentioned that if Cogan were "part of the team" then Cogan would receive a 3-year salary guarantee from Howden. Cogan initially accepted the offer but later rescinded his acceptance.

65.     Rampersaud also solicited long-time Aon employee Regina Degnan-Steinborn to join Howden, asking Degnan-Steinborn if she would consider being a consultant with Howden.

66.     Upon information and belief, Rampersaud—acting as Howden's agent—was having these exact same discussions with the other Defecting Employees.

67.     By lunchtime Thursday, November 20, 2025, and unbeknownst to Rampersaud's Aon supervisors, Rampersaud, Blackman, Kovach, Stapleton, Gelman, Montalvo, and Crabb had each accepted offers of employment from Howden—and only after Rampersaud talked to his team about going to Howden.

68.     That same day, November 20, 2025, and while still an Aon employee, Blackman, an Account Executive, uncharacteristically generated *three shipping labels* and emailed them to Rampersaud. The shipping labels were addressed to a personal address for Rampersaud: "Tony Rampersaud, 235 E 40th Street, Apt. 27I, New York, NY 10016." The shipping labels state "BILL SENDER," indicating Aon paid for the shipments.

69.     Then, on the morning of Friday, November 21, 2025, despite having already accepted employment with Howden, Rampersaud, Crabb, Stapleton, and Blackman were observed in Aon's New York City office. Rampersaud and Crabb were further observed suspiciously packing large shipping boxes.

70.     Rampersaud's, Crabb's, and Blackman's presence in the office on a Friday was unusual. Over the past three months, neither Blackman nor Crabb had once reported to the office on a Friday, and Rampersaud had only reported to the office on one prior Friday.

71.     When confronted by his manager and his manager's manager regarding the boxes, Rampersaud falsely claimed that he was packing in preparation to move into Ms. Degnan-Steinborn's office given that she was retiring. This was nonsensical, as Rampersaud's manager had never authorized such a move, and Ms. Degnan-Steinborn continued to occupy and use her office. Moreover, FedEx labels would not be needed to ship boxes if it was just to move into an office on the same floor nearby. In reality, Rampersaud had already accepted an offer from Howden and was packaging documents to take with him when he left.

72.     That same day, November 21, 2025, Crabb generated print jobs for at least *eight more shipping labels*.

73.     Following the confrontation with his manager, Rampersaud and Crabb left Aon's offices around lunchtime and never returned. Rampersaud's manager searched for the boxes but was unable to locate them. Unsurprisingly, they were not in Ms. Degnan-Steinborn's office as Rampersaud had claimed. Upon contacting building security, she confirmed that boxes had not exited through the building's turnstiles. Further inquiry with the mailroom revealed that Crabb had delivered a cart of boxes to be shipped outside of Aon's offices. Below is a still image showing Crabb depositing the cart of boxes with the Aon mailroom (Crabb is pictured in the far left):



74.     By the time Rampersaud's manager traced the boxes to the mailroom, they had already shipped. Aon reviewed the shipping records and discovered that seven (7) boxes were sent to Rampersaud's home address at "15 Merritt Ave, Eastchester, NY 10709." The shipping labels again stated "BILL SENDER," indicating that Aon was charged for the shipment.

75.     Five (5) of the shipping labels inexplicably listed "Regina Steinborn" as the recipient, yet directed the boxes to Rampersaud's personal home address. This strongly suggests that Crabb and Rampersaud deliberately attempted to conceal the true destination of the boxes by mislabeling them under another Aon employee's name. One example is as follows:



Ms. Degnan-Steinborn did not authorize, request, or approve of these shipments under her name.

76.    Concerned that Rampersaud and Crabb were exfiltrating Aon confidential and trade secret information, Aon immediately contacted FedEx to intercept the shipment. The boxes were successfully recovered at a FedEx distribution center before reaching Rampersaud's home address. Upon inspection, Aon's concerns were confirmed: several of the boxes contained a substantial volume of Aon's confidential and trade secret materials, including by way of non-exhaustive example only:

- [CLIENT D] Schedule of Insurance, as of 3/5/2024, an excel spreadsheet including client information such as coverage type, insurer, policy period, policy number, limit, deductible/SIR, and total premium;

- [CLIENT C] Schedule of Insurance, as of 9/14/2023, an excel spreadsheet including client information such as coverage type, insurer, policy period, policy number, limits, loss deductible, base premium, taxes/fees, total premium, and Aon assigned broker;

- [CLIENT C] Property & Casualty… Combinability Overview, as of 1/21/2025, an excel spreadsheet listing client information such as coverage, insurer, major limits, total premium, and "combinability considerations" and recommendations;

- [CLIENT A] Schedule of Insurance, as of 8/17/23, an excel spreadsheet including client information such as policy number, policy type, effective and expiration date, underwriting company, carrier, limits, AM Best Rating, retention/deductible, premium, taxes, and total cost;

- [CLIENT D] Stewardship Meeting presentation, dated 3/7/2024, marked "Proprietary & Confidential," including information on the client's insurance program structure and renewal notes;

- [CLIENT E] Schedule of Insurance, as of 1/8/2025, an excel spreadsheet including client information such as coverage type, carrier, policy period, policy number, limit, loss deductible, policy term premium, policy term taxes/fees, total policy term premium, and average annual policy premium;

- Lists of "2025 New Business Opportunities," including account name, opportunity, and projected income;

- "[CLIENT F] Renewal Strategy Proposal," dated August 6, 2024, containing a list of the client's schedule of insurance, property and casualty program summary, premium and coverage comparison from prior years, renewal strategy, loss summary, peer benchmarking, and renewal results – all marked "Proprietary & Confidential Renewal Strategy Plan";

- "[CLIENT G] Renewal Strategy Meeting" presentation, dated April 3, 2024, marked "Proprietary & Confidential," and containing client information such as the client's schedule of insurance, an overview of the client's insurance programs, renewal notes and strategy, and Aon's "proprietary peer benchmarking data";

- "[CLIENT H] Operational All Risk Property Program 5/31/24-5/31/25" packet, including notes about client renewal results/strategies, and recommendations made to the client;

- "[CLIENT H] Casualty Insurance Renewal" packet, dated March 29, 2024, and labeled "Proprietary & Confidential Renewal Strategy Plan," including insurance program overview, loss summary, and other client-specific information;

- "Renewal Strategy Presentation to [CLIENT A] – Agents E&O Professional Liability Plan," dated March 13, 2024, marked "Proprietary & Confidential," and including client information such as insurance program observations, insurance program summary, historical data, key renewal strategy recommendations, claims analysis, and benchmarking data;

- A 4-page document entitled "Strategy for Continuous Improvement to Administration of [CLIENT A's] Agent E&O Insurance Program," dated July 23, 2025, including information about the client's 2026/2027 renewal and Aon's fee structure;

- "Shaping the Future Together [CLIENT H] – Insurance Brokerage and Risk Advisory Services" presentation, dated October 2025, including 2026-2027 renewal considerations, casualty program summary and renewal highlights, D&O and crime program, summary and renewal highlights, peer benchmarking data, cyber liability program summary and renewal highlights, and other client-specific information;

- A document (dated 2025) showing AE/AAE Account Assignments and 2024 revenue for over 80 client accounts;

- An "[CLIENT I] Cyber Liability Renewal Strategy Discussion" booklet, dated March 26, 2025, marked "Proprietary & Confidential," including client renewal strategy, expiring program overview, historical program overview, peer benchmarking analysis, and other client-specific information; and

- Countless other documents referencing Aon's client information, marked as confidential and proprietary.

77. While Aon's forensic investigation is ongoing, it is already clear that Rampersaud was not the only Aon employee who attempted to exfiltrate Aon confidential information after signing an offer with Howden. On November 24, 2025, Montalvo emailed a document entitled "2023 Client Holiday List -Tony Rampersaud.xlsx" from her Aon email address to her personal email address. The Excel spreadsheet contained a compilation of 55 names of client contact persons for key clients (including for clients whose information was in the boxes shipped to Rampersaud's home address), along with the mailing addresses for the contacts and, in a few cases, notes about the contact.

78. After shipping substantial volumes of Aon's confidential and trade secret information to himself and accepting an offer of employment from Howden (and all the while ignoring and refusing to return Aon's numerous calls to address the removal of its information), Rampersaud resigned from Aon on Tuesday, November 25, 2025, at 12:02 pm. He emailed his manager stating that he was resigning from his position "effective November 25th, 2025." Approximately one hour later, Rampersaud's reports all simultaneously resigned from their employment with Aon, most within minutes of each other:

- Nancy Montalvo resigned at 1:08 pm, after having emailed herself Rampersaud's client list the day before, writing: "I am resigning from my current position at Aon, Account Executive I, effective immediately. This decision was not made lightly as I have been a dedicated Aon employee for 26 years. I would like to express my sincere gratitude for the opportunity you gave me to grow and develop professionally. I have truly valued my tenure at this firm and all the wonderful relationships I have gained throughout the years."

- Mathew Gelman resigned at 1:17 pm, "effective 11/25/2025." He wrote: "Thank you for the opportunity to work with the Aon Team."

- Michael Kovach also resigned at 1:17 pm, "effective today, November 25th 2025." He wrote: "I have valued my time here at Aon and the opportunities the company has provided me, making this a very tough decision."

- Paige Stapleton resigned at 1:19 pm, "with my last day being 11/25/25. I'm grateful for the opportunities and support I've received during my time here."

- Martha Blackman resigned at 1:59 pm, "effective immediately." She wrote: "This decision was not made lightly as I have been a dedicated Aon employee for 20 years. I would like to express my sincere gratitude for the opportunity you gave me to grow and develop professionally. I have truly valued my tenure at this firm and all the wonderful relationships I have gained throughout the years."

- Dawn Crabb resigned at 5:15 pm.

79.    On November 25, 2025—the same day Rampersaud resigned—Aon sent Rampersaud a letter demanding the immediate return of its confidential information and company property, including his Aon-issued mobile device. Aon also told Rampersaud that he needed to comply with his CNSA Agreement. While Aon successfully intercepted the boxes that Rampersaud, through Crabb, attempted to ship to his home address on November 21, 2025, it was unable to recover the boxes shipped on November 20, 2025, using the shipping labels provided by Blackman. Aon also could not determine if any other of the many shipping labels apparently printed by Crabb in her final days of employment were used to ship Aon confidential information to Rampersaud's home address. Nor could Aon retrieve the documents Rampersaud suspiciously and atypically printed during his discussions with Howden and in the days leading up to his resignation, or the document that he emailed to his personal email address. In its letter, Aon demanded that Rampersaud return his Aon-issued devices to Aon, including his Aon-issued mobile phone, and provide the passcode for the phone. Aon stated that it would dispatch a messenger to collect its property. Rampersaud responded that he was traveling for the Thanksgiving holiday and would return on Monday, December 1, 2025.

80.     On December 1, 2025, Aon sent a courier to Rampersaud's apartment to retrieve its property. In advance, Aon informed Rampersaud that the courier would collect all Aon assets, "including, but not limited to your Aon computer, mobile phone, AmEx badge, etc., as well as any hard copy documents you have. We understand you used Aon's FedEx services to ship yourself 3 boxes to this address on Thursday 11/20, we will also need to understand the contents of those boxes." Rampersaud did not respond to Aon's email. When the courier arrived, Rampersaud did not turn over any Aon documents and did not surrender his Company-issued mobile phone or its passcode.

81.     Aon also sent Montalvo a letter, demanding that she too return Aon's property, including its confidential and trade secret information. Montalvo did not return the Aon client list, despite Aon's request and her contractual obligation to do so. Montalvo also was untruthful with Aon, and said she only forwarded personal information to her personal email address.

82.     Throughout their interactions with Aon, Rampersaud and his reports repeatedly and intentionally misrepresented their plans, actions and intentions. For example, while employed by Aon:

- Rampersaud falsely stated that boxes he and Crabb were packing contained items being relocated to another employee's office down the hall. In reality, those boxes included Aon documents sent to his home address, some even disguised to look like they were going somewhere else—at Aon's expense.

- Crabb similarly informed Aon that she was packing boxes to move Rampersaud's materials into a different employee's office. However, photographic evidence shows Crabb transporting the boxes—later confirmed to contain Aon confidential and trade secret information—to Aon's mailroom for shipment to Rampersaud's home address. Further, when questioned by Aon's People Matters (i.e., HR) on November 24, 2025, despite having already accepted employment with Howden days earlier, Crabb assured Aon that Rampersaud was not looking elsewhere.

- On the morning of November 25, 2025, despite having already accepted an offer with Howden, Stapleton told Aon she was not seeking other employment and had not received an offer from Howden, stating she was staying with Aon. Stapleton resigned 10 minutes later.

- That same morning, November 25, 2025, Kovach—who had already accepted an offer from Howden days earlier—told Aon he was not intending to leave Aon. Kovach resigned approximately 1 hour later.

83. Since then, Rampersaud called upon at least three Aon clients with whom he formerly worked, and about whom he and Crabb exfiltrated Aon confidential and trade secret information. Contacts for these clients were included in the client list that Montalvo sent to her personal email address the day before her resignation. Stapleton likewise called upon an Aon client. Upon information and belief, during these calls, Rampersaud and Stapleton talked to the client about Howden.

## Injunction Necessary

84. Rampersaud and Montalvo must be enjoined from continuing to misappropriate Aon's trade secrets and breaches of their agreements with Aon. If not enjoined, Aon will suffer irreparable harm from damage to its client relationships, employee relationships, and the use and/or disclosure of its confidential and trade secret information. In addition to the employees who Rampersaud and Howden successfully solicited to leave Aon and join Howden, there is evidence that Rampersaud solicited other Aon employees. In addition, since resigning from Aon, Rampersaud called upon Aon clients with whom he formerly worked at Aon, and whose information he and Montalvo misappropriated.

85. In addition, if Howden is not enjoined from misappropriating Aon's trade secrets, and tortiously interfering with Aon's contractual and business relationships with its employees, and aiding and abetting Aon employees' breaches of fiduciary duty, Aon will be irreparably harmed by the damage to its client relationships, employee relationships, and the use and/or disclosure of its confidential and trade secret information. Besides the 7 employees who simultaneously resigned from Aon as part of this group departure, since September 2025, *over 45 other Aon employees*

have also resigned from their employment with Aon under similarly suspicious circumstances—as groups—to join Howden. Aon's investigation into Howden's broader, systematic raid on Aon is continuing. However, as set forth above, Howden has a demonstrated track record of ignoring its new hire's covenants and working with them to use competitor confidential and trade secret information to hire away employees.

86.    Moreover, and upon information and belief, Howden is offering to indemnify the new Aon hires to entice them to breach their agreements with Aon, as well as offering them three-year salary guarantees (thus insulating them from legal repercussions arising from their breaches and legal violations). The enticement appears to be working.

87.    The ongoing threat of continuing irreparable harm can be addressed only by immediate injunctive relief. Aon has no adequate remedy at law to compensate it for the harm Defendants' unlawful conduct has caused, and is continuing to cause, to Aon's business.

88.    An order enjoining Defendants from misappropriating Aon's trade secrets, breaching and/or interfering with Aon's employee agreements, and restraining Howden from aiding and abetting Aon employee fiduciary breaches, does not harm Defendants. Instead, it simply serves to preserve the status quo.

<u>**COUNT I**</u>
<u>**VIOLATION OF FEDERAL DEFEND TRADE SECRETS ACT**</u>
<u>**(AGAINST HOWDEN, RAMPERSAUD, MONTALVO)**</u>

89.    Aon repeats and re-alleges Paragraphs 1-88 above as though set forth herein.

90.    Aon has developed trade secrets of significant value to its business, including without limitation, the above-described financial and business information, including its historical client knowledge, the renewal plans discussed above, compilations of client information, business strategies developed for its clients, employee business information, client lists, and business opportunities. *See, e.g.,* Paragraphs 54-61, 76, and 77, above.

91.     Aon has taken reasonable, affirmative measures to keep its above-described information secret, through employee agreements, trainings, information security policies and practices (including password-protection for Aon devices and disabling employee ability to use external storage devices and accounts), physical security policies and practices, and steps taken by Aon to recover its information when theft is discovered, including, here, intercepting FedEx boxes shipped outside of its office (without its authorization) containing its proprietary and confidential information.

92.     The above-described trade secret information derives independent economic value to Aon, from not being generally known to, or readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. Indeed, through its own agreements, Howden describes the same type of information as that at-issue here to be "confidential" information. *See* Exhibit C. The above-referenced trade secrets provide Aon with a competitive advantage over its competitors.

93.     Aon expended substantial resources, ingenuity, and significant amounts of time and money collecting, compiling, developing, and protecting this information. For example, Aon spent years and countless dollars developing its historical client knowledge, client relationships with key client personnel, strategies, and the proprietary peer benchmarking data referenced and cited in the misappropriated documents. Exposing the above referenced information to Aon's competitors would enable competitors to use Aon's data and information to divert customers.

94.     The above-described trade secrets are related to Aon's products and services used in, or intended for use in, interstate foreign commerce. The trade secrets relate to Aon's services provided to clients located across the United States.

95.     Through the above conduct, Defendants misappropriated, threaten to misappropriate, or inevitably will misappropriate Aon's trade secrets. Howden acquired Aon's trade

secrets, knowing or having reason to know that they were acquired by improper means, including Rampersaud's breaches of his CNSA Agreement with Aon and duties to Aon. Howden nevertheless secretly worked with Rampersaud to obtain Aon employee information and then target those employees for solicitation. Through Rampersaud, its agent, Howden is now in possession of Aon trade secret information concerning clients, as well. In addition, upon information and belief, Rampersaud provided Howden Aon's trade secret information concerning clients, which Howden has in its possession and control. Rampersaud and Montalvo acquired and retain Aon's trade secrets, knowing or having reason to know that they were acquired by improper means. With respect to Rampersaud, Rampersaud printed dozens of documents with Aon's trade secret information, as well as instructed Crabb to remove the trade secrets from Aon's premises and ship them to his home address. Rampersaud also emailed Aon trade secret information to his personal email address. Montalvo similarly emailed Aon trade secret information to her personal email address. Upon information and belief, Rampersaud also disclosed and used Aon's trade secrets, which Howden then also used, without Aon's consent, to solicit Aon employees. Rampersaud is now also calling upon Aon clients whose information he and Montalvo misappropriated. Rampersaud, Montalvo and Howden used improper means to acquire the trade secrets, as described above, and at the time of their disclosures and use, knew or had reason to know that the knowledge of the trade secret was derived using improper means to acquire the trade secrets. With respect to Rampersaud and Montalvo, the trade secrets were also acquired under circumstances giving rise to a duty to maintain their secrecy, and Rampersaud and Montalvo owed a duty to Aon to maintain their secrecy (as set forth in, among other things, Rampersaud's and Montalvo's agreements with Aon, *see* Exhibits A, B).

96.    Aon provided the trade secrets to Rampersaud and Montalvo in confidence and for use exclusively in connection with the work they performed for Aon, for Aon's benefit. The above

referenced trade secret information was only available to Rampersaud and Montalvo by virtue of their Aon employment. Aon did not authorize Rampersaud or Montalvo to retain, use or disclose Aon's trade secrets after resigning from their employment with Aon. Aon did not give Rampersaud permission to ship its trade secret information to his personal home address. Aon did not authorize Montalvo or Rampersaud to print, email, retain, or use its trade secret information, including in the solicitation of clients. Aon (of course) did not (and would not) authorize Howden, a direct competitor, to use Aon's trade secrets.

97.     Defendants can obtain economic value from the disclosure or use of Aon's trade secrets, for example, by avoiding the years, and millions of dollars invested, to develop the trade secrets (including the historical client knowledge, information, client contacts, strategies, and preferences), and to convert Aon clients and employees to Howden for their own financial gain. Such information gives Defendants an advantage by not having to expend the time and resources to develop the customer relationships or information as Aon has, and by allowing them to unfairly compete against Aon by having access to such information, such as customer history, renewal strategies, revenue information, and business opportunities.

98.     As a direct and proximate result of Defendants' conduct, Aon has suffered and will continue to suffer irreparable harm, injury, and loss that cannot be remedied through monetary damages. Unless enjoined, Defendants will continue to retain, use and disclose Aon's trade secret information to unfairly compete with Aon, including by continuing to target Aon employees and clients, and Aon will continue to suffer irreparable harm—including harm to Aon's reputation and goodwill with its clients.

99.     Under the DTSA, actual or threatened misappropriation of trade secrets may be enjoined. Rampersaud also agreed in his agreement with Aon that breach of the trade secret provision would "result in irreparable and continuing harm" to Aon, and that in addition to any

other remedy which Aon may be entitled to, Aon is also "entitled to injunctive relief for a breach of this Agreement." *See* Exhibit A.

100.      As a direct and proximate result of Defendants' willful and malicious conduct, Aon also suffered direct and consequential damages, and is entitled to recover compensatory damages, exemplary damages, attorneys' fees, and others damages in amounts to be proven at trial.

**COUNT II**
**BREACH OF CONTRACT**
**(AGAINST RAMPERSAUD AND MONTALVO)**

101.      Aon repeats and re-alleges Paragraphs 1-100 above as though set forth herein.

102.      The Rampersaud CNSA Agreement is a valid, binding, and enforceable contract between Aon and Rampersaud. *See* Exhibit A.

103.      Montalvo entered into a similar, valid, binding, and enforceable contract with Aon. *See* Exhibit B.

104.      In their agreements with Aon, Rampersaud and Montalvo agreed not to disclose or use Aon confidential information, including client information, employee information, business strategies, and financial information. The above-referenced agreements further required Rampersaud and Montalvo to return all confidential information to Aon upon the termination of their employment with Aon, along with Aon property/materials. *See* Exhibit A, Exhibit B. Howden's own agreements have similar provisions.

105.      In addition, in the CNSA Agreement, Rampersaud agreed not to, directly or indirectly, solicit or induce, or to cause any other person or other entity (which would include Howden) to solicit or induce, any employee of Aon to work for a competitor. Again, Howden's own agreements have materially similar terms.

106.    Aon performed all of its duties and obligations due to Rampersaud and Montalvo under their agreements with Aon (*see* Exhibit A, Exhibit B), including by providing them with substantial compensation and access to Aon confidential and trade secret information.

107.    Rampersaud breached his CNSA Agreement with Aon in many respects. Knowing he was resigning to work for Howden, Rampersaud took Aon confidential information to use to compete against Aon at Howden. Rampersaud did not return to Aon the information that he took and blatantly ignored Aon's requests for return of the information. Since resigning from Aon, Rampersaud called upon clients whose materials he took from Aon. Rampersaud also provided Aon confidential information to Howden to use to solicit Aon employees to terminate their employment with Aon, and join Howden, Aon's direct competitor. In addition, Rampersaud worked with Howden to solicit other Aon employees to terminate their employment with Aon and join Howden. As a direct and proximate result of Rampersaud's contractual breaches, Aon employees resigned from Aon and accepted employment with Howden.

108.    Montalvo also breached her agreement with Aon. Knowing she was resigning to work for Howden, Montalvo took Aon confidential information to use to compete against Aon at Howden. Montalvo did not return the Aon confidential information that she took and blatantly ignored Aon's requests for return of the information.

109.    As a direct and proximate result of the above-referenced breaches, Aon suffered and continues to suffer damages, including but not limited to, the cost and expense of investigating and recovering (or trying to recover) its stolen confidential information, damage to its goodwill and reputation, and other damages known and to be discovered. Aon also has the right to recover its attorneys' fees under the CNSA Agreement and Montalvo's agreement.

110.    Rampersaud's and Montalvo's above-described conduct supports that Rampersaud and Montalvo will continue to ignore the obligations in their agreements with Aon. Aon has no

adequate remedy at law. In the CNSA Agreement, Rampersaud agreed that his services were of a unique character, a breach of the above provisions will cause irreparable and continuing harm to the Company, and that in the event of breach, Aon "shall be entitled to injunctive relief." Montalvo's agreement contains similar terms. Injunctive relief is necessary to preserve the status quo and enjoin Rampersaud's and Montalvo's ongoing and continuing contractual breaches.

## COUNT III
## TORTIOUS INTERFERENCE WITH CONTRACT
## (AGAINST HOWDEN)

111.    Aon repeats and re-alleges Paragraphs 1-110 above as though set forth herein.

112.    Aon has a valid and enforceable CNSA Agreement with Rampersaud, which includes enforceable non-solicitation, non-inducement, non-servicing, and non-acceptance covenants. *See* Exhibit A.

113.    Howden is aware of Aon's covenants with Rampersaud. Michael Landa, Howden's US Vice Chairman and Member of the US Executive Committee, who worked with Rampersaud to coordinate the group departure, is himself a former Aon employee and aware that Aon enters into agreements with its employees that include covenants, including the above-referenced non-solicitation, non-inducement, non-servicing, and non-acceptance covenants. In addition, upon information and belief, Howden's recruiters and HR department are asking Aon recruits (like Rampersaud) to provide their Aon agreements to Howden prior to their hire. Howden itself requires its employees to sign materially similar covenants to those at-issue here. In addition, over the past few months, Aon sent numerous letters to Howden advising it of its agreements with its employees.

114.    Despite Howden's knowledge of Rampersaud's covenants with Aon, Howden intentionally, improperly, and unjustifiably interfered with Rampersaud's CNSA Agreement, procuring its breach. For example, Howden worked with Rampersaud to breach his CNSA

Agreement and lift-out an entire group of Aon employees from its New York office. Howden encouraged Rampersaud to provide it with the identities of key employees, their contact information, and upon information and belief, their compensation information, and then used that information to selectively target and solicit Aon employees to build out Howden's U.S./New York operations with customized job offers. Howden also permitted, induced, and encouraged Rampersaud to solicit and induce Aon employees to resign from Aon and join Howden, despite Rampersaud's contractual non-solicitation and non-inducement provision. Upon information and belief, Howden also openly accepted other Aon confidential information from Rampersaud, including client information. Upon information and belief, Howden is offering to indemnify Rampersaud in the event of litigation over his contractual breaches, and provided him with a three-year salary guarantee.

115.    As a direct and proximate result of Howden's tortious interference, Aon has suffered and will continue to suffer irreparable harm and injury to its business, including the further loss of employees, clients and client goodwill, and the value of its confidential and trade secret information. Aon has also sustained damages, in an amount to be determined at trial. Howden's misconduct was willful, wanton, and outrageous.

## COUNT IV
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
## (AGAINST HOWDEN AND RAMPERSAUD)

116.    Aon repeats and re-alleges Paragraphs 1-115 above as though set forth herein.

117.    Aon has and had a protectable business relationship with its employees that left Aon for Howden.

118.    Aon had a reasonable expectation that its employees would continue their employment with Aon. Many were Aon employees for over two decades. In their resignation emails,

the employees were complementary of Aon, and expressed how the decision to leave "was not made lightly."

119.    At all relevant times, Howden and Rampersaud were aware of these business relationships.

120.    Despite this, Defendants intentionally interfered with Aon's relationships with its employees, and induced, permitted, and encouraged Aon's employees to leave Aon.

121.    Defendants' conduct resulted in the severance of Aon's business relationships and prospective business relationships with its employees.

122.    Defendants' conduct was done purposefully and with malicious, wrongful, and unjustifiable intent, through improper means, and for an improper purpose. As described above, Defendants used wrongful actions, dishonest, and unfair means to sever Aon's business relationships with its employees.

123.    As a direct and proximate result of Defendants' conduct, Aon's relationship with its employees was injured, and Aon has suffered and will continue to incur actual damages, in an amount to be proven at trial.

124.    Aon is also irreparably harmed by Defendants' tortious interference with its business relationships. If not enjoined, Aon will continue to lose employees and suffer additional irreparable harm.

**COUNT V**
**BREACH OF FIDUCIARY DUTY/DUTY OF LOYALTY/**
**FAITHLESS SERVANT DOCTRINE**
**(AGAINST RAMPERSAUD AND MONTALVO)**

125.    Aon repeats and re-alleges Paragraphs 1-124 above as though set forth herein.

126.    As a Managing Director at Aon, Rampersaud owed fiduciary duties and a duty of loyalty to Aon. Rampersaud was a long-term, highly-paid Aon employee and acted in a managerial capacity. He occupied a position of trust and confidence, and was provided access to, and acquired,

Aon's confidential and trade secret information. Rampersaud owed a duty to Aon to, among other things, exercise good business judgment, act prudently in the operation of Aon's business, discharge his actions in good faith, act in the interests of Aon, and not use Aon's confidential information to compete against it.

127.    Similarly, as an Account Executive at Aon, Montalvo owed fiduciary duties and a duty of loyalty to Aon. Montalvo was a long-term Aon employee, with a six-figure salary; occupied a position of trust and confidence; and was provided access to, and acquired, Aon's confidential and trade secret information. Montalvo owed a duty to Aon to, among other things, exercise good business judgment, act prudently in the operation of Aon's business, discharge her actions in good faith, act in the interests of Aon, and not use Aon's confidential information to compete against it.

128.    Rampersaud breached his fiduciary duty and duty of loyalty to Aon by knowingly and intentionally acting directly adverse to Aon's interests during his employment with Aon, including by: (a) on Howden's behalf, soliciting and inducing Aon employees to leave Aon and join Howden; (b) working with Howden to orchestrate, plan, and execute a coordinated group departure from Aon, intending to cause harm to Aon and leave Aon understaffed; (c) misappropriating Aon's confidential and trade secret information, to use this information to compete against Aon at Howden; (d) using Aon resources to meet with Howden and solicit Aon employees; and (e) expensing to Aon the cost of Rampersaud's theft of boxes of Aon confidential and trade secret information. Rampersaud also lied to Aon to hide his fiduciary breaches and disloyal actions. Rampersaud engaged in the above conduct starting no later than September 2025—while Aon was substantially compensating him hundreds of thousands of dollars annually—to help Howden build a new U.S. retail insurance brokerage to compete against Aon.

129.    Montalvo similarly breached her fiduciary duty and duty of loyalty to Aon by knowingly and intentionally acting directly adverse to Aon's interests during her employment with

Aon, including by misappropriating Aon's confidential and trade secret information, to use this information to compete against Aon at Howden.

130.    Because of Rampersaud's and Montalvo's actions, Aon has suffered, and will continue to suffer, irreparable harm, as well as damages and losses in an amount to be determined at trial. In addition, Aon is entitled to disgorgement of all compensation paid to Rampersaud and Montalvo during their periods of disloyalty.

## COUNT VI
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY/DUTY OF LOYALTY
## (AGAINST HOWDEN)

131.    Aon repeats and re-alleges Paragraphs 1-130 above as though set forth herein.

132.    Rampersaud owed fiduciary duties to Aon (including a duty of loyalty), and breached his fiduciary duties to Aon.

133.    Howden knew that Rampersaud owed fiduciary duties to Aon (including a duty of loyalty), and breached his fiduciary duties to Aon.

134.    Howden knowingly induced, and substantially assisted and encouraged, Rampersaud to breach his fiduciary duties to Aon. Howden did this by working with Rampersaud to recruit a group of Aon employees to leave Aon and join Howden, while Rampersaud was still employed by Aon and owed a fiduciary duty to Aon. Howden openly accepted information from Rampersaud about Aon employees, while Rampersaud was employed by Aon as its Managing Director, and then used that information to target key Aon employees to solicit them to join Howden—without those individuals ever applying for a position with Howden, interviewing for a position with Howden, or sharing any personal information with Howden.

135.    Howden rendered its substantial assistance to Rampersaud despite its knowledge that Rampersaud was acting adversely to Aon's interests during his employment in a Managing Director position with Aon by soliciting Aon employees to leave Aon and join Howden, taking Aon

confidential and trade secret information to benefit Howden, and planning a group departure with

Howden. As set forth above, Howden benefited from these breaches.

136.    As a direct and proximate result of Howden's conduct, Aon has suffered irreparable

harm, as well as damages and loss, in an amount to be determined at trial.

## COUNT VII
## UNFAIR COMPETITION
## (AGAINST HOWDEN AND RAMPERSAUD)

137.    Aon repeats and re-alleges Paragraphs 1-136 above as though set forth herein.

138.    Defendants Howden and Rampersaud misappropriated Aon's labors, skill,

expenditures, and/or goodwill, by their actions described above. Aon invested labor, skill, and

expenditures (years and thousands of working hours and millions of dollars) developing its employee

and client relationships, and confidential information and proprietary tools and technology used to

develop the same. These Defendants misappropriated the fruits of Aon's investment by

orchestrating a lift-out of an entire group of Aon's New York employees (and with respect to

Howden, additional group lift-outs from Aon), and by taking Aon's strategies and other business

ideas to Howden. Rampersaud acted to further Howden's business and, upon information and

belief, with Howden's authority.

139.    Defendants Howden and Rampersaud acted in bad faith and to obtain a commercial,

competitive advantage. Rampersaud, acting as an agent of Howden, abused his position of trust at

Aon and used deception and misdirection to try and cover his tracks. Howden instigated this

activity, and utilized information provided by Rampersaud as part of a plan to directly compete

against Aon, including by soliciting Aon employees to leave Aon and join Howden based on

information provided by Rampersaud, and in order to gain a competitive advantage in the

marketplace. Howden, through Rampersaud and Montalvo, continues to retain Aon documents and

information.

140.     Defendants' conduct has conferred a commercial advantage on Defendants, as Defendants are exploiting the labors, skill, expenditures and/or goodwill of Aon for their benefit, and to directly compete against Aon.

141.     Because of Defendants' actions, Aon has suffered, and will continue to suffer, irreparable harm, as well as damages and losses in an amount to be determined at trial.

## COUNT VIII
## COMMON LAW MISAPPROPRIATION OF TRADE SECRETS
## (AGAINST HOWDEN, RAMPERSAUD, MONTALVO)

142.     Aon repeats and re-alleges Paragraphs 1-141 above, as though set forth herein.

143.     As set forth above, Aon possesses trade secrets, including in the form of compilations of information which are used in Aon's business and which give Aon an opportunity to obtain an advantage over competitors (like Howden, a new market entrant and now direct competitor of Aon) who do not know or use it. This information contains Aon's historical client information, compilations of client opportunities, confidential employee information, key client contacts, and financial information, described above. This information is not known outside Aon, Aon limits access to such information, Aon takes extensive measures to protect the secrecy of this information, the information is incredibly valuable to Aon's business, Aon expended years in developing the information, and this information cannot be easily acquired or duplicated by others outside of Aon's business.

144.     As set forth above, Defendants used Aon's trade secrets in breach of their agreements with Aon (in the case of Rampersaud and Montalvo), confidential relationship or duty (in the case of Rampersaud and Montalvo), and as the result of discovery of the trade secrets by improper means (in the case of Howden, which induced Rampersaud to disclose such information to Howden in order to enable Howden to target and solicit Aon employees, among other things).

145.    Because of Defendants' actions, Aon has suffered, and will continue to suffer,

irreparable harm, as well as damages and losses in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Aon respectfully requests that the Court grant it the following relief:

A.    Enter a temporary, preliminary, and then permanent injunction against Defendants

as follows:

      i.    Enjoining Defendants from directly or indirectly soliciting or inducing, or causing any other person or entity to solicit or induce, any Aon employees with whom Rampersaud, Montalvo, or the Defecting Employees had material contact, supervised, or about whom they had access to confidential information, to work for Rampersaud or Howden (including by prohibiting Rampersaud or any Defecting Employee to hire or recruit, or be involved in any way in the hiring or recruiting process or decisions related to, Aon employees);

      ii.    Enjoining Defendants from directly or indirectly calling upon, soliciting, accepting, engaging in, servicing, or performing any business of the same type or kind as the business Defecting Employees performed for Aon, from or with respect to clients of Aon with respect to whom Rampersaud, Montalvo, or the Defecting Employees worked or became familiar, or supervised the servicing activities related to such clients during the 24 months prior to November 25, 2025 (provided such clients were Aon clients on November 25, 2025, or within 12-months prior to such date), or about whom Defendants had access to, or have accessed, confidential information (as defined in the Rampersaud and Montalvo agreements);

      iii.    Enjoining Defendants from using or disclosing any Aon confidential information (as defined in the Rampersaud and Montalvo agreements);

      iv.    Ordering the return of all copies of: (a) any document, file, or folder referenced in this Complaint; (b) any documents in Rampersaud's or the Defecting Employees' possession after they left Aon that contain Aon confidential information, including any document that contains Aon client, financial, or employee information; or (c) any document that was printed, emailed, or downloaded from, or contains information that was printed, emailed, or downloaded from, Aon's systems or databases, or that was shipped from Aon's offices, or that was emailed from Aon's email systems to an external email address, and that Defendants still have in their possession;

      v.    Ordering Rampersaud to return his Aon-issued cell phone, without destruction or tampering, along with the passcode to the Aon-issued cell phone; and

      vi.    Requiring Defendants to agree with counsel for Plaintiffs on a non-party neutral forensic vendor and forensic protocol to accomplish the immediate return and

remediation (that is, permanently removing the documents from Defendants' possession) of Aon documents and confidential information in Defendants' possession, custody, and control (including that of Howden's employees, such as the Defecting Employees), with Defendants bearing the cost of such forensic remediation, including Plaintiffs' reasonable attorneys' fees.

B.      Enter judgment in favor of Aon and against Defendants for monetary damages, including without limitation direct and consequential damages (including the cost of Aon's investigation), punitive damages, and attorneys' fees and costs, as allowed and provided for by law, in an amount to be determined as trial;

C.      Award pre- and post-judgment interest; and

D.      Grant any other and further relief the Court deems just and proper.


Dated: December 11, 2025                Respectfully submitted,

                                        LITTLER MENDELSON, P.C.

                                        By: */s/ Jessica Pizzutelli*

                                            James M. Witz, Esq. *(pro hac vice application forthcoming)*
                                            321 North Clark Street, Suite 1100
                                            Chicago, IL 60654
                                            (312) 795-3246
                                            jwitz@littler.com

                                            Jessica Pizzutelli, Esq.
                                            375 Woodcliff Drive, Suite 2D
                                            Fairport, NY 14450
                                            (585) 203-3414
                                            jpizzutelli@littler.com

                                        *Attorneys for Plaintiffs*

# Exhibit A

**CONFIDENTIALITY, NON-COMPETITION AND NON-SOLICITATION AGREEMENT**

This CONFIDENTIALITY AND NON-SOLICITATION AGREEMENT (this "Agreement") dated as of October 31, 2016, (the "Effective Date") between Aon Risk Services Companies, Inc., a Maryland corporation, including its affiliates, subsidiaries and parent companies (the "Company"), with its headquarters located at 200 East Randolph Street, Chicago, Illinois 60601, and Anthony Rampersaud, residing at 15 Merritt Avenue, Eastchester, NY 10709 (the "Employee").

R E C I T A L S

WHEREAS, this Agreement is entered into in consideration for the Employee's continued employment by the Company and in consideration of additional agreements provided to the Employee under that certain Letter Agreement between the Company and the Employee dated as of November 22, 2017; and

WHEREAS, the Letter Agreement provides additional elements of compensation to which Employee would not otherwise be entitled solely due to her continued employment by the Company, and the provision of these additional elements of compensation are expressly conditioned on, and serve as consideration for, the agreements and obligations that the Employee is making in this Agreement.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual promises contained herein, in addition to the Employee's employment by the Company and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties hereto covenant and agree as follows:

Section 1. **Recitals and Acknowledgements; Covenants.**

(a) **Recitals and Acknowledgments.** Aon Group, Inc., a Maryland corporation with its corporate and business headquarters in Chicago, Illinois, and its subsidiaries and affiliates (and divisions thereof) including the Company, and its parent Aon plc, (collectively "Aon") are in the business of providing conventional and alternative risk management products and services covering the businesses of insurance brokerage, reinsurance brokerage, benefits consulting, compensation consulting, human resources consulting, human resources and benefits outsourcing, management, investigatory and security consulting, managing underwriting and related services, including accounting, actuarial, claims management and handling, and information systems on behalf of commercial and individual clients which are national and international and are not confined to any geographic area (the "Business"). An essential element of the Business is the development and maintenance of personal contacts and relationships with clients and prospective clients. Aon invests considerable time and money to develop and maintain client relationships, including payment of employees' salaries, benefits, travel, entertainment and other business expenses and assistance in servicing clients by making available to its employees specially developed and researched industry data, client-specific information, legal advice, accounting support, marketing, advertising and other corporate services, as well as providing training and professional development and valuable confidential business and professional information, toward the development and maintenance of its client relationships and related goodwill. While these clients and prospective clients may be secured or serviced by Aon employees, including the Employee, the Employee acknowledges that such clients and prospective clients remain at all times the clients and prospective clients of Aon and that the goodwill engendered by the relationships is intended to inure only to the benefit of Aon; the goodwill is owned by Aon; and Aon shall be the sole beneficiary of such goodwill during and after termination of the Employee's employment with Aon.

In addition, the Employee acknowledges that he has acquired and will acquire, solely for the purpose of furthering the Business, knowledge of Aon's Confidential Information, as defined in Section 3 of this Agreement. Employee further acknowledges Aon's legitimate interest in safeguarding Confidential Information from disclosure.

The personal identification of clients of Aon with an Aon employee, including the Employee, creates the potential for the Employee's appropriation of the benefits of the relationships developed with clients on behalf of and at the expense of Aon. Since Aon would suffer irreparable harm if the Employee left its employ and solicited the Business of the clients and prospective clients of Aon, it is reasonable to protect Aon against certain competitive activities by the Employee for a limited period of time after the Employee leaves employment so that Aon may renew or restore its business relationship with its clients and prospective clients.

Consequently, the Employee is willing to enter into the covenants set forth herein in order to provide Aon with reasonable protection for its client and prospective client relationships and its investment therein as above-described, its goodwill, and its Confidential Information, and acknowledges and agrees that the covenants contained in Sections 1(b) and 1(c) below are necessary for the protection of Aon and are reasonably limited with respect to the activities prohibited, duration, geographical scope and their effect on the Employee and the public.

(b) **Covenant Not to Solicit**. The Employee hereby covenants and agrees that, except with the prior written consent of Aon, the Employee (on the Employee's own behalf or on behalf of any other person or entity) will not, during the course of employment, and for twenty-four (24) months after the end of employment, directly or indirectly, call upon, solicit, accept, engage in, service or perform, other than on behalf of Aon, any business of the same type and kind of business performed by Aon from or with respect to (i) clients of Aon with respect to whom the Employee provided services, either alone or with others, or had a business relationship, or on whose account he worked or became familiar, or supervised directly or indirectly the servicing activities related to such clients, during the twenty-four (24) months prior to the termination of the Employee's employment with the Company and, further provided, such clients were clients of Aon either on the date of termination of Employee's employment with the Company or within twelve (12) months prior to such termination and (ii) prospective clients of Aon which the Employee alone, in combination with others, or in a supervisory capacity, solicited during the six (6) months prior to the end of employment and to which a proposal for services was rendered by the Company during the six (6) months prior to the end of the Employee's employment with the Company.  "Client" means any person or entity listed on the books of Aon as such.

(c) **Non-Solicitation of Employees and Covenant Not to Hire**. The Employee hereby also agrees, for the duration of the term of the covenants set forth in Section 1(b) of this Agreement, not to, directly or indirectly, solicit or induce, or to cause any person or other entity to solicit or induce, any employee of Aon to work for Employee or for any third party or entity, or to leave the employ of Aon.

Section 2. **Company's Right to Injunctive Relief; Attorneys' Fees.**

The Employee acknowledges that the Employee's services to the Company are of a unique character which gives them a special value to the Company, the loss of which cannot reasonably or adequately be compensated in damages in an action at law, and that a breach of Section 1 or 3 of this Agreement will result in irreparable and continuing harm to the Company or Aon, or both, and that therefore, in addition to any other remedy which the Company or Aon, or both, may have at law or in equity, the Company and Aon shall be entitled to injunctive relief for a breach of this Agreement by the Employee. The parties acknowledge and agree that Aon plc and Aon Group, Inc. are intended third-party beneficiaries of this Agreement, and may be named plaintiffs in any subsequent suit brought by the Company to enforce the terms of this Agreement. In the event that any action is filed in relation to Section 1 or 3 of this Agreement, the prevailing party in the action shall recover from the non-prevailing party, in addition to any other sum that either party may be called upon to pay, a reasonable sum for the prevailing party's attorney's fees.

Section 3. **Trade Secrets and Confidential Information; Inventions.**

(a) **Trade Secrets and Confidential Information.** The Employee acknowledges that Aon's business depends to a significant degree upon the possession of confidential, proprietary and trade secret information which is not generally known to others, and that the profitability of the Business of Aon requires that this information remain proprietary to Aon. The Employee recognizes that, by virtue of his employment by the Company, and to assist him in the solicitation, production and servicing of client business, he will be granted otherwise prohibited access to such information. This information (hereinafter referred to as "Confidential Information") includes, without limitation: lists of clients and prospective clients; contract terms and conditions; client information relating to services, insurance, benefits programs, employees, finances, and compensation; copyrighted materials; corporate, management and business plans and strategies; compensation and revenues; methods and strategies of marketing; market research and data; technical know-how; computer software and manuals; policies and procedures; and the conduct of the affairs of Aon.

The Employee shall not, except as required in the course of employment hereunder, disclose or use during or subsequent to the course of employment, any Confidential Information which has not been publicly disclosed (other than by Employee in breach of this provision). All Confidential Information and all records and equipment and other materials relating in any way to Confidential Information shall be and remain the sole property of Aon during and after the end of employment.

2

Upon termination of employment, the Employee shall promptly return to the Company all Confidential Information and all materials and all copies or tangible embodiments of materials involving Confidential Information in the Employee's possession or control. The Employee agrees to represent in writing to the Company upon termination of employment that he has complied with the provisions of this Section 3.

(b) **Inventions.**  The Employee hereby assigns to the Company his entire right, title and interest in and to all discoveries and improvements, patentable or otherwise, trade secrets and ideas, writings and copyrightable material, which may be conceived by the Employee or developed or acquired by him during his employment and which may pertain directly or indirectly to the business of the Company or any of its affiliates, parent companies, or subsidiaries, and which the Employee agrees is work for hire performed in the scope of his employment. The Employee agrees to disclose fully all such developments to the Company upon its request, which disclosure shall be made in writing promptly following any such request. The Employee shall upon the Company's request, execute, acknowledge and deliver to the Company all instruments and do all other acts which are necessary or desirable to enable the Company or any of its affiliates, parent companies, or subsidiaries to file and prosecute applications for, and to acquire, maintain and enforce, all patents, trademarks, and copyrights in all countries.

Section 4. **Mergers and Consolidations; Assignability.**

The rights and obligations under this Agreement shall inure to the benefit of and be binding upon the Company and its successors and assigns. By way of explanation, and without limiting the generality of the foregoing sentence, if the Company or any entity resulting from any merger or consolidation referred to in this Section 4 is merged with or consolidated into any other entity or entities, or if substantially all of the assets of the Company or any such entity are sold or otherwise transferred to another entity, the provisions of this Agreement shall be binding upon and shall inure to the benefit of the continuing entity in or the entity resulting from such merger or consolidation or the entity to which such assets are sold or transferred. This Agreement shall not be assignable by the Employee.

Section 5. **Miscellaneous.**

(a) **Waiver and Modification.**  Waiver of any term or condition of this Agreement by any party shall not be construed as a waiver of a subsequent breach or failure of the same term or condition, or a waiver of any other term or condition of this Agreement. Any waiver must be in writing. This Agreement may not be amended, altered or modified without the prior written consent of both parties and such instrument must acknowledge that it is an amendment or modification of this Agreement.

(b) **Captions.**  The captions in this Agreement are not part of its provisions, are merely for reference and have no force or effect. If any caption is inconsistent with any provision of this Agreement, such provision shall govern.

(c) **Governing Law.**  The validity, interpretation, construction, performance, enforcement and remedies of or relating to this Agreement, and the rights and obligations of the parties hereunder, shall be governed by and construed in accordance with the substantive laws of the state of Employee's residence as indicated above, without regard to the conflict of law principles, rules or statutes of any jurisdiction.

(d) **Severability.**  To the extent that the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable for any reason, such word, phrase, clause or sentence shall be modified or deleted in such manner so as to afford the Company and Aon the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws, and the balance of this Agreement shall not be affected thereby, the balance being construed as severable and independent.

(e) **Employee-at-Will.**  Nothing in this Agreement shall be construed to create contractual employment rights other than as an employee terminable at-will.

*Signature Page Follows*

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year first above written.

**Aon Risk Services Companies, Inc.**

By: Todd Stevenson
Title: VP and Head of Human Resources - Aon Risk Solutions US

Accepted and Agreed:

Anthony Rampersaud

11-22-2017
Date

4

# Exhibit B

**CONFIDENTIALITY AND NON-SOLICITATION AGREEMENT**

CONFIDENTIALITY AND NON-SOLICITATION AGREEMENT ("Agreement") dated as of October 1, 2025 between Aon Risk Services Northeast Inc., (the "**Employer**") for the benefit of Employer, and any of its parents, subsidiaries, affiliates, successors, and assigns to or for which Employee provides services and about which Employee acquires Confidential Information, including Employer (collectively the "**Company**"), and Nancy Montalvo residing at 852 Malden Drive, Keyport NJ 07735 (the "Employee")

R E C I T A L S

This Agreement is entered into in consideration of the Employee's employment (or continued employment) by the Company, the compensation and benefits received as a result thereof, and the further mutual consideration and covenants by the parties as set forth herein.

NOW, THEREFORE, the Company and the Employee hereby agree to be bound by this Confidentiality and Non-Solicitation Agreement, as follows, subject to any state-specific modifications in **Appendix A**:

Section 1. **Business Considerations**; **Restrictive Covenants; Other Covenants; Acknowledgements.**

(a) **Business Considerations**. Aon plc and its subsidiary, Aon Corporation, a Delaware corporation with its corporate and business headquarters in Chicago, Illinois, and Aon Corporation's subsidiaries and affiliates (and divisions thereof) including the Company (collectively, with Aon plc, "Aon"), are in the business of providing conventional and alternative risk management products and services covering the businesses of insurance brokerage, reinsurance brokerage, benefits consulting, compensation consulting, human resources consulting, human resources and benefits outsourcing management, investigatory and security consulting, retirement and investment consulting, investment management, intellectual property, managing underwriting and related services, including accounting, actuarial, claims management and handling, and information systems on behalf of commercial and individual clients which are national and international and are not confined to any geographic area (the "**Business**"). The Employee acknowledges that over the course of their career, Aon's business may expand beyond its current lines of business, and therefore, the definition of "Business" also includes any product or service that Aon is developing, marketing, or selling or has plans to develop, market or sell, on the Employee's last day of employment with Aon. The Employee further acknowledges that the Employee's material employment duties and responsibilities, including without limitation with respect to Aon clients, prospective clients, referral sources and other employees, span geographic areas that extend well beyond the state in which the Employee is physically employed and resides. An essential element of the Business is the development and maintenance of personal contacts and relationships with clients and prospective clients. Aon invests considerable time and

money to develop and maintain client relationships and referral sources, including payment of employees' salaries, benefits, travel, entertainment and other business expenses and assistance in servicing clients by making available to its employees specially developed and researched industry data, client-specific information, legal support, accounting support, marketing, advertising and other corporate services, as well as providing training and professional development and valuable confidential business and professional information, toward the development and maintenance of its client relationships and related goodwill. While these clients, prospective clients and referral sources may be secured or serviced by Aon employees, including the Employee, the Employee acknowledges that such clients and prospective clients remain at all times the clients and prospective clients of Aon and that the goodwill engendered by the relationships is intended to inure only to the benefit of Aon; the goodwill is owned by Aon; and Aon shall be the sole beneficiary of such goodwill during and after termination of the Employee's employment with Aon.

In addition,  in reliance upon the promises made by the Employee in this Agreement, Aon will entrust (or has entrusted) the Employee, for the purpose of furthering the Business, access to and knowledge of Aon's confidential and proprietary information, as defined in Section 3 of this Agreement. Employee further acknowledges Aon's legitimate interest in safeguarding confidential and proprietary information from disclosure.

The personal identification of clients or referral sources of Aon with an Aon employee, including the Employee, creates the potential for the Employee's appropriation of the benefits of the relationships developed with clients and referral sources on behalf of and at the expense of Aon. Since Aon would suffer irreparable harm if the Employee left its employ and solicited the Business of the clients, prospective clients and referral sources of Aon, or solicited employees of Aon, it is reasonable to protect Aon against certain competitive activities by the Employee for a limited period of time after the Employee leaves employment so that Aon may renew or restore its business relationship with its clients, prospective clients and employees.

Consequently, the Employee is willing to enter into the covenants set forth herein in order to provide Aon with reasonable protection for its client, prospective client, referral sources and employee relationships and its investment therein as above-described, its goodwill, and its confidential and proprietary Information.

(b) **Covenant Not to Solicit Clients**. The Employee hereby covenants and agrees that, except with the prior written consent of Aon, the Employee (on the Employee's own behalf or on behalf of any other person or entity) will not, during the course of employment, and for a period of two (2) years after the Employee's termination of employment with Aon (the "**Restricted Period**"), other than on behalf of Aon, directly or by directing or assisting others, call upon or solicit any business of the same type or kind as the business performed by Aon from or with respect to a Covered Client(collectively "**Client Nonsolicit Obligations**").

"**Covered Client**" means (i) any client of Aon with respect to whom the Employee provided services, either alone or with others, or had a business relationship, or on whose account the Employee worked or became familiar, supervised directly or through the

direction or control of others performing the servicing activities related to such clients, or about whom they acquired Confidential Information during the twenty-four (24) months prior to the Employee's termination of employment (or such shorter period as Employee was employed) (the "**Look Back Period**") and, further provided, such clients were clients of Aon either on the date of the Employee's termination of employment or within twelve (12) months prior to such termination of employment; and (ii) where allowed by law, any prospective client of Aon which the Employee alone, in combination with others, or in a supervisory capacity, solicited during the six (6) months prior to the Employee's termination of employment and to which a proposal for services was rendered by Aon during the six (6) months prior to the Employee's termination of employment. Employee acknowledges that with respect to Aon's reinsurance Business, the foregoing reference to clients shall include all risk protection buyers, cedents and retrocedents (a/k/a reinsureds), and, in respect of facultative reinsurance Business, the original policyholders (a/k/a underlying insureds) and wholesale and retail brokers. "**Solicit**", for the purposes of this Agreement, is understood to include any knowing direct or indirect interaction between Employee and another person or entity that takes place in an effort to develop or further a business relationship, irrespective of which party first initiates contact, and expressly includes notifying a client that Employee has left Company's employ to go to a competitor. It shall be presumed that Employee had a business relationship or became familiar with a client if Employee received commissions, bonuses, or other beneficial financial credit or attribution for business done with the client or Employee participated in or supervised communications with the client (but not merely a mass mailing or "cold call" telephone or email solicitation) that is intended to result in, lead to, maintain, increase, facilitate or otherwise aid the sale or provision of products or services sold by Aon. Employee further acknowledges that if a Covered Client is a special purpose vehicle, acquisition company, bidco or other special purpose or finite duration entity (collectively, "Nominal Clients"), the definition of "Covered Client" shall also include all parent companies, subsidiaries, other affiliates and portfolio companies of such Nominal Client (collectively, "Related Entities") to the extent that the same management group or other decision-making entity effectively controls or materially influences the procurement decisions of such Related Entities for business of the same type or kind as the business performed by Aon for or on behalf of the Nominal Client. Employee agrees that the inclusion of such Related Entities within the definition of "Covered Client" is reasonable and necessary because should Employee develop a business relationship with a Nominal Client, the goodwill developed on behalf of Aon with the Nominal Clients will extend to the Related Entities when the same management group or other decision-making entity effectively controls or materially influences the procurement decisions of the Related Entities for business of the same type or kind as the business performed by Aon for or on behalf of the Nominal Client.

(c) **Covenant Not to Solicit Employees**. The Employee hereby also agrees, for the duration of the Restricted Period, not to, directly or by assisting or directing others: (i) solicit or cause any person or other entity to solicit any Covered Employee to work for the Employee or for any third party or entity, or to leave the employ of Aon; or on behalf of a competing business; (ii) induce, attempt to induce, or cause any person or other entity to induce any Covered Employee to leave the employ of Aon; or (iii) on behalf of a competing business, assist with hiring or attempting to hire any Covered Employee (collectively "**Employee Nonsolicit Obligations**").

"**Covered Employee**" means any employee of Aon with whom Employee had material contact, whom Employee supervised, or about whom Employee had access to Confidential Information during the twenty-four (24) months prior to the Employee's termination of employment without limitation to a restricted geographic area, unless required by applicable law as provided in Section (1)(i).  Nothing herein is intended or to be construed as a prohibition against general advertising such as "help wanted" ads that are not targeted at Aon's employees.

(d) **Covenant Not to Solicit Referral Sources.** The Employee hereby covenants and agrees that, except with the prior written consent of Aon, the Employee (on the Employee's own behalf or on behalf of any other person or entity) will not, during the Restricted Period, directly or by assisting or directing others: call upon or solicit any Referral Source for the purposes of engaging in any business of the same type or kind as the business performed by Aon (collectively "**Referral Source Nonsolicit Obligations**"). "**Referral Source**" means (i) each and every entity from whom Aon has received referrals with regard to its products and services at any time during the Look Back Period, and about whom Employee had gained Confidential Information or with whom Employee had personal contact during the Look Back Period; and (ii) each and every entity that is a source of referrals for business and to whom Employee submitted or assisted in a proposal for services, or otherwise solicited or assisted in the solicitation of referrals from such entity, at any time during the Look Back Period.

 (e) **Other Non-Interference with Clients and Referral Sources Obligations**. The Employee hereby covenants and agrees that, except with the prior written consent of Aon, the Employee (on the Employee's own behalf or on behalf of any other person or entity) will not, during the duration of the Restricted Period, other than on behalf of Aon, directly or by assisting or directing others, within the Client and Referral Source Restricted Area (defined below): (i) accept, engage in, service or perform any business of the same type or kind as the business performed by Aon from or with respect to a Covered Client; (ii) knowingly engage in any conduct that is intended to cause, or could reasonably be expected to cause a Covered Client to stop or reduce doing business with Aon, or that would involve diverting business opportunities away from Aon; or (iii) accept, engage in, service or perform any business from or with a Referral Source that involves the same type or kind of business performed by Aon with respect to the Referral Source (collectively "**Client and Referral Source Noninterference Obligations**").

(f) **Entire Agreement; Other Covenants**.  This instrument (including the state-specific modifications in Appendix A) contains the entire agreement between the parties with respect to the subject matter hereof.  All representations, promises, and prior or contemporaneous understandings are merged into, and expressed in this instrument; however, should the Employee be subject to a prior agreement with Aon containing confidentiality, nonsolicitation, and/or invention assignment provisions and this Agreement is found to be unenforceable, for any reason, then such prior agreement(s) shall remain in place and survive to afford Aon the greatest protection allowed by law. Notwithstanding any other language in the Agreement, should Employee be subject to an equity agreement, fixed-term employment agreement or incentive compensation agreement with the Company containing confidentiality, non-solicitation, noncompetition

and/or invention assignment provisions, the restrictive covenants in this Agreement shall supplement (rather than supersede) the covenants in such equity or incentive compensation agreements ("**Other Covenants**"), and the Other Covenants shall remain in full force and effect.  Further, no Other Covenant precludes the enforceability of any provision contained in this Agreement.  To the extent any conflict exists between the restrictions set forth in this Agreement and the Other Covenants, the Company shall be provided the greatest protection set forth in either agreement. No subsequent agreement entered into by the Employee may amend, supersede, or override the covenants contained herein unless such subsequent agreement specifically references subsections (b), (c), (d) or (e) of this Section. Nothing in this Agreement limits or reduces any common law or statutory duty Employee owes to the Company, nor does this Agreement limit or eliminate any remedies available to the Company for a violation of such duties.

(g) **Duty of Loyalty and Conflicts of Interest**. Employee agrees that during the period of their employment by Company, Employee will not, without Aon's express written consent, directly or through the direction or control of others engage in any employment or business activity which is directly or indirectly competitive with, or would otherwise conflict with, their employment by the Company. By way of example and not limitation, Employee will not solicit any of the clients, prospective clients or referral sources of Aon for the purpose of diverting or attempting to divert any business away from the Company, solicit employees to terminate their employment relationship with Aon or divert any business opportunities away from Aon. In addition, Employee will not engage in personal business activities outside of Aon, including holding a significant direct investment (as defined in Aon's Personal Conflicts of Interest policy) in an outside entity, involving Aon clients, prospective clients, or business partners, without prior written approval from the Company.

(h) **Acknowledgments**.  Aon and the Employee acknowledge and agree that the covenants contained in subsections (b), through (f) of this Section are necessary and reasonable for the protection of Aon and are reasonably limited with respect to the activities prohibited, duration, geographical scope and their effect on the Employee and the public. The parties acknowledge that the purpose and effect of the covenants simply are to protect Aon for a limited period of time from unfair competition by the Employee.

(i) The Employee acknowledges that there is no general geographical restriction contained in the preceding paragraphs because the restrictions apply only to the specified clients, referral sources and employees of Aon and because the Employee's material duties, responsibilities and relationships with Aon clients, prospective clients, referral sources and employees are not limited to any particular geographic area.  However,  to the extent additional geographic limitations are required to make the restrictions in Sections 1(b) and (d) enforceable, they shall be deemed limited to the Client and Referral Source Restricted Area. "**Client and Referral Source Restricted Area**" means (i) the state where Employee resides and/or works; and (ii) any geographic area in which Employee provided services for Covered Clients or Referral Sources, or had responsibilities for Covered Clients or Referral Sources, at any time during the Look Back Period. To the extent additional geographic limitations are required to make the restrictions in Section 1(c) enforceable, they shall be deemed limited to the Employee Restricted Area. "**Employee Restricted Area**" means (i) the state where Employee

resides and/or works; and (ii) any geographic area in which Employee worked with Covered Employees. Nothing in this Agreement shall prohibit the Employee from obtaining a livelihood for the Employee or the Employee's family by being engaged in the Business.

Section 2. **Aon's Right to Seek Injunctive Relief; Attorneys' Fees and Costs.**

a. **Right to Seek Injunctive Relief**. The Employee acknowledges that the Employee's services to Aon are of a unique character which gives them a special value to Aon, the loss of which cannot reasonably or adequately be compensated in damages in an action at law, and that a breach of this Agreement may result in irreparable and continuing harm to Aon, and that therefore, in addition to any other remedy which Aon may have at law or in equity, Aon shall be entitled to seek temporary, preliminary and permanent injunctive relief for a breach or threatened breach of this Agreement by the Employee. The parties acknowledge and agree that each Aon entity, including the Company, is an intended third-party beneficiary of this Agreement, and may be a named plaintiff in any subsequent suit brought by Aon to enforce the terms of this Agreement.

In the event that Employees violate Section 1(c) causing (in whole or part) a Covered Employee to leave the employment or consultancy of Aon before injunctive relief to stop such a violation can issue, Employee shall pay Company a sum equal to 30% of all wages that were paid to the employee or consultant in the preceding twelve (12) months. This liquidated damage remedy covers only part of the damages caused by a violation. It is not a complete remedy and shall be in addition to and not in lieu of the issuance of injunctive relief to prevent further violations or secure specific performance.

(b) **Attorneys' Fees**. If the Company must pursue legal action to secure Employee's compliance with this Agreement and prevails, Employee will pay all reasonable attorneys' fees, costs and expenses incurred by the Company in enforcing this Agreement against Employee.   If under applicable law, the foregoing cannot be enforced without also giving Employee the right to recover attorneys' fees and costs if deemed the prevailing party, then the foregoing sentence shall not apply and both parties shall bear their own attorney's fees and costs instead. The Company shall be deemed the prevailing party if it is awarded any part of the legal or equitable relief it seeks, irrespective of whether some of the relief it seeks is denied or modified.

(c) **Fairness Extension**. If Employee violates one of the post-employment restrictions in this Agreement on which there is a specific time limitation, the time period for that restriction will be extended by one day for each day Employee violates it, up to a maximum extension of one year, so as to give the Company the full benefit of the bargained-for length of forbearance, not to exceed a period of two years from the date Employee's employment with the Company terminated.

Section 3. **Trade Secrets and Confidential Information; Proceedings with Government Agencies; Inventions.**

(a) **Trade Secrets and Confidential Information; Proceedings with Government Agencies.**

i. The Employee acknowledges that Aon's business depends to a significant degree upon the possession of confidential, proprietary and trade secret information which is not generally known to others outside of Aon through proper means, and that the profitability of such Business requires that this information remain proprietary to Aon. The Employee recognizes that, in reliance upon the Employee's covenants in this Agreement, and to assist the Employee in the solicitation, production and servicing of client Business, the Employee will be granted otherwise prohibited access to Confidential Information. For purposes of this Agreement, "**Confidential Information**" means an item of information or data, or compilation of information or data, in any form (tangible or intangible) related to Aon's business that the Employee acquires or gains access to in the course of the Employee's employment with the Company that Aon has not authorized public disclosure of, and that is not readily available to the public or persons outside of Aon through proper means. By way of example and without limitation, Confidential Information is understood to include: lists of clients and prospective clients; customer lists and records of customers and customer contact information, as well as customer communications, private customer contract terms, unique customer preferences and historical transaction data, risk characteristics and tolerances, coverage structures, policy terms, conditions, rates and expiration dates; contract terms and conditions; lists of referral sources (including, without limitations law firms and private equity companies); unpublished referral source contact information; referral source communications and historical referrals data; private bids, proposals, quotes, requests for proposal, and related analyses; financial records and analysis, and related non-public data regarding the Company's financial performance; business plans and strategies, forecasts and analyses; client information relating to services, insurance, benefits programs, employees, finances, and compensation; copyrighted materials; corporate, management and business plans and strategies; compensation (unless Employee's own) and revenues; internal business methods, procedures, techniques, processes, know how, systems and innovations used to improve the Company's performance and operations; marketing plans, research, data and analyses; unpublished pricing information, and underlying pricing-related variables such as costs, volume discounting options, and profit margins; methods and strategies of marketing; market research and data; trade secrets; Company Inventions (as defined in Section 3(b)); technical know-how; computer software and manuals; policies and procedures; and the conduct of the affairs of Aon. Confidential Information shall be understood to include any and all Company trade secrets (as defined under applicable state or federal law), but an item need not be a trade secret to qualify as Confidential Information. Confidential Information does not include any information that lawfully is or has become generally or publicly known other than through the Employee's breach of this Agreement or a breach by another person who was or is under confidentiality obligations as to the item or items involved or improvements or new versions thereof. Further, Confidential Information does not include information lawfully acquired by a non-management employee (laborer) about wages, hours or other terms and conditions of employment if used by them for purposes protected by §7 of the National Labor Relations Act (the NLRA) such as joining or forming a union, engaging in collective bargaining, or engaging in other concerted activity for their mutual aid or protection. Employee understands

that under the NLRA, covered employees have a right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and to refrain from any or all of such activities.

ii. During or subsequent to Employee's employment with the Company, the Employee shall not, except as required in the course of employment by Aon or as otherwise provided by applicable law or in this Section 3, (x) copy, upload, transfer, delete, transmit, download, disclose or use any Confidential Information, or (y) reverse engineer, disassemble or decompile, misappropriate or otherwise attempt to gain unauthorized access to any Confidential Information (each of the foregoing a "**Prohibited Act**"). Further, Employee understands that they should not have any records (containing Confidential Information) of any kind in their possession or control with which to refresh their memory after their employment with the Company ends.

The restrictions provided for in this Section 3 shall not be construed to prohibit the use of general knowledge and experience customarily relied upon in the Employee's trade or profession that is not specific to the particular business matters of Aon (such as its business transactions, customers, referral sources, employees, or products (existing or under development)).

If, and only if, the controlling state law applicable to the Employee requires a time limit to be placed on restrictions concerning Prohibited Acts post-employment for the restriction to be enforceable, then this restriction on Prohibited Acts in relation to any Confidential Information that is not a trade secret will expire two (2) years after Employee's employment or other association with the Company ends. This time limit will not apply to (a) Confidential Information that qualifies as a trade secret, or (b) third party information. The Company's trade secrets will remain protected for as long as they qualify as trade secrets under applicable law. Items of third-party information will remain protected for as long as allowed under the laws and/or separate agreements that make them confidential. An item of Confidential Information will ordinarily constitute a trade secret under state or federal law if (a) it derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (b) it is the subject of efforts that are reasonable under the circumstances (or under federal law, using reasonable measures) to maintain its secrecy. Something is not acquired through proper means if acquired through theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy by contract or otherwise, or espionage through electronic or other means.

iii. The Employee understands that nothing contained in this Agreement limits the Employee's ability to oppose or report possible violations of law or regulation to, or file a charge or complaint with, the Securities and Exchange Commission, the Equal Employment Opportunity Commission, the National Labor Relations Board, the Occupational Safety and Health Administration, the Department of Justice, Congress, any Inspector General, or any other federal, state or local governmental

agency or commission ("**Government Agencies**"), around violations in the workplace or at a work-related event.  In addition, nothing in this Agreement prohibits the Employee from discussing a possible violation of law with law enforcement or their attorney. The Employee further understands that this Agreement does not limit the Employee's ability to disclose sexual harassment or sexual assault (that occurred in the workplace, at work-related events, between employees, or between an employer and an employee or otherwise) or their ability to participate in any investigation or proceeding that may be conducted by any Government Agency, without notice to Aon. Further, nothing requires notice to or approval from Aon before engaging in any of the protected activities in this paragraph.

Nothing in this Agreement shall limit the Employee's ability under applicable United States federal law to (i) disclose in confidence trade secrets to federal, state, and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law or (ii) disclose trade secrets in a document filed in a lawsuit or other proceeding, but only if the filing is made under seal and protected from public disclosure. Federal law also provides that an individual who pursues a lawsuit for retaliation by an employer for reporting a suspected violation of the law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding if the individual files any document containing the trade secret under seal and does not disclose the trade secret except as permitted by court order.

 iv. Upon termination of employment or upon Aon's request (whichever is earlier), the Employee will promptly return to Aon all Confidential Information and all materials and all copies or tangible embodiments of materials involving Confidential Information, and all other Aon property, in the Employee's possession or control, except as otherwise provided by law or in this Section 3. The Employee agrees to represent in writing to Aon upon termination of employment that Employee has complied with the provisions of this Section 3.

(b) **Company Inventions.** The Employee hereby assigns to Aon the Employee's entire right, title and interest in and to all discoveries and improvements, patentable or otherwise, trade secrets and ideas, writings and copyrightable material, which may be conceived by the Employee or developed or acquired by the Employee during their employment and which may pertain directly or indirectly to the Business, and which the Employee agrees is work for hire performed in the scope of his employment (herein referred to as **"Company Inventions"**). The Employee agrees to disclose fully all such developments to Aon upon its request, which disclosure will be made in writing promptly following any such request. The Employee will upon Aon's request, execute, acknowledge and deliver to Aon all instruments and do all other acts which are necessary or desirable to enable Aon to file and prosecute applications for, and to acquire, maintain and enforce, all patents, trademarks, and copyrights in all countries.  The Employee acknowledges and agrees that the Employee hereby is and has been notified by Aon, and understands, that Company Inventions do not include, and the foregoing provisions of this subsection (3)(b) do not apply to, an invention for which no equipment, supplies, facilities, or Confidential Information was used and which was developed entirely on the Employee's own time, unless:  (x) the invention relates (i) to the Business or (ii) to Aon's actual or demonstrably anticipated research and development, or (y) the invention results

from any work performed by the Employee for Aon.  This Agreement's assignment provisions are limited to only those inventions that can be lawfully assigned by an employee to an employer.  Some examples of state laws limiting the scope of assignable inventions are: Delaware Code Title 19 Section 805;  Illinois 765ILCS1060/1-3, "Employee Patent Act"; Kansas Statutes Section 44-130; Minnesota Statutes 13A Section 181.78;  New Jersey Rev. Stat. §34:1B-265; N.Y. LAB. LAW § 203-f; North Carolina General Statutes Article 10A, Chapter 66, Commerce and Business, Section 66-57.1; Utah Code Sections 34-39-l through 34-39-3, "Employment Inventions Act"; Washington Rev. Code, Title 49 RCW:  Labor Regulations, Chapter 49.44.140.

Section 4. **Mergers and Consolidations; Assignability.**

The rights and obligations under this Agreement shall inure to the benefit of and be binding upon the Company and its successors and assigns, and may be enforced by any one or more of same who have a legitimate business interest that would be protected by enforcement of this Agreement. Employee expressly consents to such assignment. For example, Employee consents to the assignment of this Agreement by Employer at its discretion in relation to Employee's transfer of employment to another entity affiliated with or otherwise part of the Employer's corporate family, and further recognizes that if this Agreement is not formally assigned in relation to such transfer, that the new employing entity is a successor in interest to Employer and shall have the right to enforce this Agreement. By way of further explanation, and without limiting the generality of the foregoing sentence, if the Company or any entity resulting from any merger or consolidation referred to in this Section 4 is merged with or consolidated into any other entity or entities, or if substantially all of the assets of the Company or any such entity are sold or otherwise transferred to another entity, the provisions of this Agreement shall be binding upon and shall inure to the benefit of the continuing entity in or the entity resulting from such merger or consolidation or the entity to which such assets are sold or transferred. The Company shall have the right to assign this Agreement at its sole election without the need for further notice to or consent by Employee. Employee's obligations under this Agreement are of a personal nature and shall not be assignable by the Employee.

Section 5. **Miscellaneous.**

(a) **Waiver and Modification**. Waiver of any term or condition of this Agreement by any party shall not be construed as a waiver of a subsequent breach or failure of the same term or condition, or a waiver of any other term or condition of this Agreement. Any waiver must be in writing and signed by the party against which the waiver is to be enforced. Except as provided by Section 5(d), this Agreement may not be amended, altered or modified without the prior written consent of both parties and such instrument must acknowledge that it is an amendment or modification of this Agreement.

(b) **Captions**. The captions in this Agreement are not part of its provisions, are merely for reference and have no force or effect. If any caption is inconsistent with any provision of this Agreement, such provision shall govern.

(c) **Governing Law.** The validity, interpretation, construction, performance, enforcement and remedies of or relating to this Agreement, and the rights and obligations of the parties hereunder, shall be governed by and construed in accordance with the substantive laws of the state in which the Employee last regularly resided when working for the Company, without regard to the conflict of law principles, rules or statutes of any jurisdiction.  Employee acknowledges that portions of this Agreement may be modified or overridden by the laws of the state in which Employee is based for work, and that these modifications or overrides are set forth in Appendix A hereto, which constitutes part of the Agreement and which Employee has read and understands.

(d) **Severability**. Each of Employee's obligations under this Agreement shall be considered a separate and severable obligation. To the extent that the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable for any reason (such as to time, scope or geography), unless prohibited by law, such word, phrase, clause or sentence shall be modified or deleted in such manner so as to afford Aon the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws, and the balance of this Agreement shall not be affected thereby, the balance being construed as severable and independent. If, however, a court of competent jurisdiction finds that any such term, word, phrase, clause or sentence cannot be so modified and thus made enforceable, or otherwise declines for any reason to do so, such term, word, phrase, clause or sentence shall be deemed severed from this Agreement and of no force and effect, and the balance of this Agreement will not be affected thereby, the balance being construed as severable and independent.

(e) **Continuing Effect.**  This Agreement shall remain in full force and effect throughout Employee's entire employment, regardless of any change in Employee's employment relationship with the Employer, whether through promotions, demotions, transfers, changes in compensation, changes in benefits, changes in job duties, changes in responsibilities, changes in title, or otherwise.

(f) **Employee-at-Will.** Nothing in this Agreement shall be construed to create contractual employment rights other than as an employee terminable at-will.

(g) **Notices.** Any notices required or permitted under this Agreement will be given to Company at its headquarters location at the time notice is given, labeled "Attention Employment Law Department" and to Employee at their address as listed on Company payroll, or at such other address as Company or Employee may designate by written notice to the other.  Notice will be effective upon receipt or refusal of delivery.  If delivered by certified or registered mail, notice will be considered to have been given five (5) business days after it was mailed, as evidenced by the postmark.  If delivered by courier or express mail service, notice will be considered to have been given on the delivery date reflected by the courier or express mail service receipt.

(h) **Effective Date**. The effective date of this Agreement shall be the date signed by Employee below unless this Agreement is entered into as a condition of initial employment or promotion in which case the effective date is the first day of Employee's employment in such new position (whether reduced to writing on that date or not).

(i) **Electronic Signature**. Employee and the Company agree that an electronic signature of the Employee included in this Agreement is intended to authenticate this writing and to have the same force and effect as an original signature by hand in ink. The Company assents to and accepts this Agreement upon the Employee providing their signature either electronically or by hand, and Employee and the Company agree that this Agreement will be binding and enforceable without the Company's signature.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year first above written.

Aon Risk Services Northeast Inc.

**By:**

*Lisa Stevens*

Lisa Stevens, Chief People Officer

I, the undersigned employee, acknowledge that prior to executing this agreement, I received a copy of this agreement, including state-specific modifications in the Appendix, in advance of the date I was expected to sign it.  I read all the provisions contained herein, and all questions I had about the Agreement were answered to my satisfaction. I understand that I have a right to consult with an attorney and acknowledge that I have been instructed to consult with an attorney and provided an opportunity to seek the advice of an attorney of my choice before signing this Agreement. I understand that this agreement affects important rights.  By signing below, I certify that I have read it carefully and am satisfied that I understand it completely.

Signed by:
*Nancy Montalvo*
D4E0837C1264455...
9/24/2025

# APPENDIX A

## STATE SPECIFIC MODIFICATIONS

***Please note: this Appendix A explains how various state law requirements may modify or override certain provisions in the Agreement. Appendix A is an important part of the Agreement. By signing the Agreement, Employee is confirming that they have read and understand both the Agreement and Appendix A.***

### Alabama

If Employee resides in Alabama, so long as Employee resides in Alabama and is subject to its laws, then (a) the Employee Nonsolicit Obligations in Section 1(c) will be limited to

the solicitation of a Covered Employee who is in a Sensitive Position.  An employee in a "Sensitive Position" refers to an employee of the Company who is uniquely essential to the management, organization, or service of the business; (b) the definition of "Restricted Period" shall be modified to include the period of Employee's employment with the Employer and the eighteen (18) month period that follows the end of Employee's employment with the Employer; and (c) the definition of "Covered Client" shall be understood not to include prospective clients.

## California

If Employees resides in California, so long as Employee resides in California and is subject to its laws, then the Client Nonsolicit Obligations, Employee Nonsolicit Obligations, Referral Source Nonsolicit Obligations, and Client and Referral Source Noninterference Obligations in Sections 1(b) through (e) shall not apply after Employee's employment with the Employer ends. However, for avoidance of doubt, Employee's obligations under Section 3 will continue to apply after Employee's employment with the Employer ends. Section 3. shall be modified to add the following language: "In addition to the other forms of protected conduct (set forth in Section 3(a)(iii), nothing in the Agreement shall be construed to prohibit the Employee from disclosing information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct that the Employee has reason to believe is unlawful. Further, any conduct relating to the solicitation of Company's clients, referral sources or employees that involves the misappropriation of the Company's trade secret information, such as its protected client information, will remain prohibited conduct at all times. In addition, the Attorneys' Fees provision in Section 2(b) shall be replaced with the following: "In the event that the Company is successful in securing any temporary, preliminary, and/or permanent injunctive relief, and/or an award of damages or other judicial relief against the Employee in connection with any breach of this Agreement, the Employee agrees that the Company shall also be entitled to recover all remedies that may be awarded by a court of competent jurisdiction or arbitrator and any other legal or equitable relief allowed by law."

## Colorado

If Employee resides in Colorado, so long as Employee resides in Colorado and is subject to its laws:

(a) Client and Referral Source Nonsolicit and Noninterference Obligations. If Employee does not earn an amount of annualized cash compensation equivalent to or greater than sixty-percent of the threshold amount for highly compensated workers, $76,255 (or the earnings threshold in effect as adjusted annually after August 10, 2022, by the Colorado Division of Labor Standards and Statistics in the Department of Labor and Employment), then the Client Nonsolicit Obligations and Referral Source Nonsolicit Obligations in Sections 1 (b) and 1(d) shall not apply after Employee's employment with the Company ends. If Employee does not earn an amount of annualized cash compensation equivalent to or greater than the threshold amount for highly compensated workers, $127,091 (or the earnings threshold in effect as adjusted annually after August 10, 2022, by the Colorado Division of Labor Standards and Statistics in the Department of Labor and Employment), then nothing in the Client Non-Solicit Obligations, Referral Source Non-Solicit Obligations and Client and Referral Source Noninterference Obligations shall restrict Employee from accepting business from a Covered Client or Referral Source so long as the Employee did not solicit, assist in soliciting, facilitate the solicitation of, provide, or offer to provide

services to the Covered Client or Referral Source (regardless of who first initiated contact) or use Confidential Information to encourage or induce the Covered Client or Referral Source to withdraw, curtail or cancel its business with the Company or in any other manner modify or fail to enter into any actual or potential business relationship with the Company.

The definitions of "Covered Client" and "Referral Source" shall be modified to cover only those clients or referral sources with respect to which Employee would have been provided trade secret information during the Look Back Period. Employee stipulates that the Client Nonsolicit Obligations, Referral Source Nonsolicit Obligations and Client and Referral Source Noninterference Obligations in Sections 1(b), 1(d), and 1(e)  are reasonable and necessary for the protection of trade secrets within the meaning § 8-2-113(2)(b) (the "Colorado Noncompete Act").

(b) Notice. Employee acknowledges that they received notice of the covenant not to compete and its terms before Employee accepted an offer of employment, or, if a current employee at the time Employee enters into this Agreement, at least fourteen (14) days before the earlier of the effective date of the Agreement or the effective date of any additional compensation or change in the terms or conditions of employment that provides consideration for the covenant not to compete. If a current employee at the time the Employee enters into this Agreement, under no circumstances will Sections 1(b), 1(d) or 1(e) go into effect until at least fourteen (14) days have passed since the Employee received this Agreement.

(c) Limitations. In addition to the other forms of protected conduct set forth in Section 3(a)(iii), nothing in the Agreement prohibits disclosure of information that arises from the Employee's general training, knowledge, skill, or experience, whether gained on the job or otherwise, information that is readily ascertainable to the public, or information that the Employee otherwise has a right to disclose as legally protected conduct. Nothing in this Agreement or a Company policy limits or prevents the Employee from disclosing information about workplace health and safety practices or hazards. Further, nothing in the Agreement shall be construed to prohibit the Employee from disclosing or discussing (either orally or in writing) information about unlawful acts in the workplace, such as any alleged discriminatory or unfair employment practice.

 **District of Columbia**

If Employee performs a majority of their work in the District of Columbia or is based in District in Columbia and does not perform the majority of their work in any other jurisdiction, then the Agreement will be modified as follows: nothing in this Agreement or any Company policy restricts Employee from having additional employment or contract work in addition to their employment with the Employer so long as the employment or work does not violate Employee's duty of loyalty or create a conflict of interest and would not result in the Employee's disclosure or use of Confidential Information.  Employee shall adhere to the Company's Conflict of Interest policy and process prior to accepting any such additional employment or contract work so Employer may determine whether such employment violates or would likely violate this D.C. Appendix.

## Georgia

If Employee resides in Georgia, so long as Employee resides in Georgia and is subject to its laws, the definition of Confidential Information will be understood to exclude information voluntarily disclosed to the public by Aon (excluding unauthorized disclosures

by me or others), information that is the result of independent development by others, and information that is otherwise available in the public domain through lawful means. Nothing in this Agreement, including the definition of Confidential Information, limits or alters the definition of what constitutes a trade secret under any federal or state law designed to protect trade secrets. In addition, nothing in this Agreement shall restrict Employee from accepting business from a Covered Client so long as the Employee did not solicit, assist in soliciting, facilitate the solicitation of, provide, or offer to provide services to the Covered Client (regardless of who first initiated contact) or use Confidential Information to encourage or induce the Covered Client to withdraw, curtail or cancel its business with the Company or in any other manner modify or fail to enter into any actual or potential business relationship with the Company. In addition, the Fairness Extension in the last sentence of Section 2(c) shall not apply.

**Illinois**

If Employee resides in Illinois, so long as Employee resides in Illinois and is subject to its laws: (a) the Client Nonsolicit Obligations, Employee Nonsolicit Obligations, Referral Source Nonsolicit Obligations, and Client and Referral Source Noninterference Obligations in Sections 1(b) through (e) shall not apply if Employee earns equal or less than $45,000 annually ("**Nonsolicit Earnings Threshold**")(with the Nonsolicit Earnings Threshold increasing by $2,500 every five years from January 1, 2027 through January 1, 2037); (b) if, at the time Employee signs the Agreement, Employee's earnings do not meet the Nonsolicit Earnings Threshold, then the Client Nonsolicit Obligations, Employee Nonsolicit Obligations, Referral Source Nonsolicit Obligations, and Client and Referral Source Noninterference Obligations in Sections 1(b) through (e) will automatically become enforceable against Employee if and when Employee begins earning an amount equal to or greater than the Nonsolicit Earnings Threshold; and (c) Employee acknowledges they received a copy of the Agreement with Appendix A at least 14 calendar days before the effective date.

**Indiana**

If Employee resides in Indiana, so long as Employee resides in Indiana and is subject to its laws, the definition of "**Covered Employee**" shall be modified to be further limited to employees who have access to or possess any Confidential Information that would give a competitor an unfair advantage.

**Louisiana**

If Employees resides in Louisiana, so long as Employee resides in Louisiana and is subject to its laws, the restrictions in Sections 1(b), (d) and (e) shall be limited to the Client and Referral Source Restricted Area. "**Client and Referral Source Restricted Area**" shall be understood to include the parishes (and equivalents) in the following list so long as Company continues to carry on business therein:  Acadia, Allen, Ascension, Assumption, Avoyelles, Beauregard, Bienville, Bossier, Caddo, Calcasieu, Caldwell, Cameron, Catahoula, Claiborne, Concordia, Desoto, East Baton Rouge, East Carroll, East Feliciana, Evangeline, Franklin, Grant, Iberia, Iberville, Jackson, Jefferson Davis. Jefferson, Lafayette, Lafourche, LaSalle, Lincoln, Livingston, Madison, Morehouse, Natchitoches, Orleans, Ouachita, Plaquemines, Pointe Coupee, Rapides, Red River, Richland, Sabine, St. Bernard, St. Charles, St. Helena, St. James, St. John the Baptist, St. Landry, St. Martin, St. Mary, St. Tammany, Tangipahoa, Tensas, Terrebonne, Union,

Vermillion, Vernon, Washington, Webster, West Baton Rouge, West Carroll, West Feliciana, Winn; and, for each of the states that are within the Employee's Client and Referral Source Restricted Area, the list of counties (or their equivalents) published by the U. S. Census Bureau found at https://en.wikipedia.org/wiki/List_of_counties_by_U.S._state (summarizing data from www.census.gov  incorporated herein by reference.  Employee agrees that the foregoing provides Employee with adequate notice of the geographic scope of the restrictions contained in the Agreement by name of specific parish or parishes (and equivalents), municipality or municipalities, and/or parts thereof. In addition, the definition of "Covered Client" shall be understood not to include prospective clients.

## Missouri

If Employee resides in Missouri, so long as Employee resides in Missouri and is subject to its laws, the definition of "**Covered Employee**" shall be modified to exclude from the definition of Covered Employee any employee who provides only secretarial or clerical services.

## Minnesota

If Employee resides in Minnesota, so long as the Employee resides in Minnesota and is subject to its laws, then: The Employee acknowledges that they were aware that execution of an agreement with nonsolicit restrictions was a requirement of receiving the benefits provided for in this Agreement when Participant accepted the Company's offer. In addition, the Referral Source Nonsolicit Obligations in Section 1 (d) and the Client and Referral Source Noninterference Obligations in Section 1 (e) shall end after the Employee's employment with the Company ends. Further, the definition of "Covered Client" shall be understood not to include prospective clients.

## Montana

If Employee resides in Montana, so long as Employee resides in Montana and is subject to its laws, then: (a) the at-will provision in Section 5(f) shall not apply; and (b) the definition of "Covered Client" shall be understood not to include prospective clients.

## Nebraska

If Employee resides in Nebraska, so long as Employee resides in Nebraska and is subject to its laws, then: (a) the Client Nonsolicit Obligations and the Client and Referral Source Noninterference Obligations in Sections 1(b) and (e) shall be limited to clients with which Employee, alone or in combination with others, did business and had personal business-related contact during the Look Back Period; and (b) the restrictions applying to referral sources in Section 1(d) and (e) shall be limited to referral sources with which Employee, alone or in combination with others, did business and had personal business-related contact during the Look Back Period.

## Nevada

If Employee resides in Nevada, so long as Employee resides in Nevada and is subject to its laws, then: (a) nothing in Sections 1(b) or (e) shall preclude Employee from providing services to any former client of the Company if: (i) Employee did not solicit the former client; (ii) the client voluntarily chose to leave and seek services from Employee; and (iii) Employee is otherwise complying with the limitations in this Agreement as to time and

scope of activity to be restrained; and (b) nothing in Sections 1(d) or (e) shall preclude Employee from conducting business with any former referral source of the Company if: (i) Employee did not solicit the former referral source; (ii) the referral source voluntarily chose to leave and conduct business with Employee; and (iii) Employee is otherwise complying with the limitations in this Agreement as to time and scope of activity to be restrained.

## New York

If Employee resides in New York, so long as Employee resides in New York and is subject to its laws, the definition of "**Covered Client"** shall be modified to exclude those clients who became a client of the Company as a result of Employee's independent contact and business development efforts with the client prior to and independent from Employee's employment with Company. However, Employee agrees that after a period of two years from the effective date, Aon will have invested sufficient time, financial support and effort in developing and serving any such client to support the application of the obligations of Section 1(b) and (e) to those clients. Accordingly, two years following the effective date of this Agreement, this modification shall not apply.

## North Carolina

If employee resides in North Carolina, so long as Employee resides in North Carolina and is subject to its laws, then: (a) the Look Back Period shall be calculated looking back one year from the date the employment ends or two years from the date of enforcement and not from the date employment ends, whichever provides the Company the greatest protection and is enforceable under applicable law. (b) The definition of "Covered Client" shall be understood not to include prospective clients. (c) Employee acknowledges that the Client and Referral Source Restricted Area shall apply to their obligations in Sections 1 (b), (d) and (e) and the Employee Restricted Area shall apply to their obligations in Sections 1 (c).

## North Dakota

If Employee resides in North Dakota, so long as Employee resides in North Dakota and is subject to its laws, then the Client Nonsolicit Obligations, Referral Source Nonsolicit Obligations and Client and Referral Source Noninterference Obligations shall not apply after Employee's employment with the Company ends. However, for avoidance of doubt, Employee's obligations under Section 3 will continue to apply after Employee's employment with the Employer ends. Further, any conduct relating to the solicitation of Company's clients, referral sources or employees that involves the misappropriation of the Company's trade secret information, such as its protected client information, will remain prohibited conduct at all times.

## Oklahoma

If Employees resides Oklahoma, so long as Employee resides in Oklahoma and is subject to its laws, then the Client Nonsolicit Obligations, Referral Source Obligations, and Client and Referral Source Noninterference Obligations shall all be amended to provide that notwithstanding anything in it to the contrary, Employee shall be permitted to engage in the same business as that conducted by Aon or in a similar business as long as Employee does not directly solicit the sale of goods, services or a combination of goods and services from the established clients or referral sources of Aon.

## Oregon

If Employee resides in Oregon, so long as Employee resides in Oregon and is subject to its laws, the definition of "**Covered Client**" shall be modified to exclude prospective clients.

## South Carolina

If employee resides in South Carolina, so long as Employee resides in South Carolina and is subject to its laws, then: (a) The definition of "Covered Client" shall be understood not to include prospective clients. (b) Employee acknowledges that the Client and Referral Source Restricted Area shall apply to their obligations in Sections 1 (b), (d) and (e) and the Employee Restricted Area shall apply to their obligations in Sections 1 (c).

## South Dakota

If Employee resides in South Dakota, so long as Employee resides in South Dakota and is subject to its law, the definition of "Covered Client" shall be understood not to include prospective clients.

## Virginia

If Employee resides in Virginia, so long as Employee resides in Virginia and is subject to its laws: (a) the parties agree that the Client Nonsolicit Obligations, Referral Source Nonsolicit Obligations, and Client and Referral Source Noninterference Obligations are reasonably limited in nature and do not prohibit employment with a competing business in a non-competitive position.  If Employee resides in Virginia and their average weekly earnings calculated as provided for under Code of Virginia §40.1-28.7:7 (the "Virginia Act"), are less than the average weekly wage of the Commonwealth as determined pursuant to subsection B of §65.2-500 or Employee otherwise qualifies as a "low-wage employee" under the Virginia Act then nothing that constitutes a "covenant not to compete" as defined by the Virginia Act shall restrict Employee from providing a service to a client or conducting business with a referral source of Aon if Employee does not initiate contact with or solicit the client or referral source. Employee shall not be considered a "low-wage employee" if Employee's earnings are derived, in whole or in predominant part, from sales commissions, incentives, or bonuses paid to the employee by the Company.

## Washington

If Employees resides in Washington, then so long as Employee resides in Washington and is subject to its laws:

(a) Unless the Employee's earnings from the Company in the prior year (or any portion thereof for which the Employee was employed), when annualized, exceed $123,395 in Box 1 W-2 annual compensation, as adjusted annually for inflation by the Washington State Department of Labor & Industries ("Washington Earnings Threshold"), after the Employee's employment with the Company ends:

(1) the Client Nonsolicit Obligations in Section 1(b) are modified to only prohibit solicitation by the Employee of any Covered Client (which is then a current client) to cease or reduce the extent to which it is doing business with the Company, in

accordance with the definition of a "Nonsolicitation agreement" under the Washington Act (Rev. Code of Wash. (RCW) §§49.62.005 - 900);

(2) the Employee Nonsolicit Obligations in Section 1(c) are modified to only prohibit solicitation by the Employee of any Covered Employee, to leave their employment with the Company, in accordance with the definition of a "Nonsolicitation agreement" under the Washington Act (Rev. Code of Wash. (RCW) §§49.62.005 – 900; and

(3) the Referral Source Nonsolicit Obligations in Section 1(d), the Client and Referral Source Noninterference Obligations in Section 1(e), and definition of "solicit" shall not apply.

(b) If, at the time the Employee signs the Agreement, their earnings do not meet the Washington Earnings Threshold, then the modifications in Section (a) of the Washington section of this Appendix shall no longer apply and Sections 1(b) through 1(e) of the Agreement and the definition of "solicit" will automatically become enforceable against the Employee as originally drafted if and when the Employee begins earning an amount that, when annualized, is more than the Washington Earnings Threshold annually.

(c) The Company further agrees that if Employee's employment with the Company is terminated as the result of a layoff, the modifications in Section (a) of the Washington section of the Appendix shall apply unless, during the period of enforcement, the Company pays Employee compensation equivalent to their final base pay at the time of the termination of Employee's employment with the Company, minus the amount of any compensation Employee earns through employment after the end of their employment with the Company, which Employee agrees to promptly and fully disclose. For purposes of this section, "layoff" means termination of Employee's employment by the Company for reasons of the Company's insolvency or other purely economic factors, and specifically excludes termination of my employment for any other reason, either with or without cause;

(d) The definition of "Restricted Period" shall be modified to include the period of the Employee's employment with the Company and the eighteen (18) month period that follows the end of the Employee's employment with the Company.

(e) Employee acknowledges and agrees that Employee has the opportunity to review and consider the terms of the Agreement, including this Appendix A, before accepting a verbal or written offer of employment with the Company; and

(f) Nothing in this Agreement shall restrict Employee from having an additional job, supplementing their income by working for another employer, working as an independent contractor, or being self-employed if Employee does not earn at least twice the Washington minimum hourly wage, though Employee will still be subject to the common law duty of loyalty.

(g) Employee understands that In addition to the other forms of protected conduct set forth in Section 3(a)(iii), nothing in the Agreement prohibits disclosure or discussion of conduct Employee reasonably believes to be illegal discrimination, illegal harassment,

illegal retaliation, a wage and hour violation, or sexual assault, or that is recognized as against a clear mandate of public policy.

## **Wisconsin**

If Employee resides in Wisconsin, so long as Employee resides in Wisconsin and is subject to its laws, then: (a) the definition of "Covered Client" shall be modified to exclude prospective clients; (b) the Employee Nonsolicit Obligations in Section 1(c) will be limited to the solicitation of a Covered Employee who is in a Sensitive Position. "Sensitive Position" refers to an employee of Company who is in a management, supervisory, sales, research and development, or similar role where the employee is provided Confidential Information or is involved in business dealings with Company clients; (c) Employee acknowledges that the Client and Referral Source Restricted Area shall apply to their obligations in Sections 1 (b), (d) and (e) and the Employee Restricted Area shall apply to their obligations in Sections 1 (c); and (d) the Fairness Extension in Section 2(c) shall not apply.

Exhibit C

## <u>CONFIDENTIALITY AND NON-SOLICITATION AGREEMENT</u>

THIS CONFIDENTIALITY AND NON-SOLICITATION AGREEMENT ("<u>Agreement</u>") is made on July 22 2025 by and between Howden US Services, LLC, a Delaware limited liability company (the "<u>Company</u>"), and Gregory Abboud ("<u>Employee</u>").

## <u>RECITALS</u>

**WHEREAS**, Employee acknowledges that Employee will be employed in a position of trust and confidence and will have access to and will become familiar with the products, methods, technology, services and procedures used by the Company and its parent companies, subsidiaries, affiliates, or other persons and entities controlled by, controlling, or under common control with any such entities (collectively, with the Company, the "<u>Company Entities</u>").

**WHEREAS**, Employee acknowledges that the Company Entities and their respective officers, directors, partners, principals, members, employees, agents, and representatives (collectively, with the Company Entities, the "<u>Company Parties</u>") have expended significant time, money, and resources on promotion, advertising, and the development of goodwill and a sound business reputation; have developed relationships with customers and clients (collectively, "<u>Clients</u>"), including developing lists of Clients and potential Clients, and have spent considerable time and resources to learn the actual and potential Clients' needs for the Company Entities' services and products; and have entered into business relationships designed to discover likely future Clients.  Employee acknowledges that the Company Entities also have expended significant time, money, and resources on technology, research, and development, and have developed, modified, and improved products, processes, technologies, and services, which are valuable, special, and unique assets of the Company Entities' business.

**WHEREAS**, Employee acknowledges that the disclosure to or use by third parties of any of the Company Parties' Confidential Information (as defined below), or Employee's unauthorized use of such information, would irreparably harm the Company Entities' business and cause significant monetary losses that would be difficult to measure.  Employee acknowledges that the Company Parties have taken reasonable measures to preserve the secrecy of their Confidential Information, including, but not limited to, requiring Employee to execute this Agreement and comply with its terms.

**WHEREAS,** Employee acknowledges that the Company Entities also have expended significant time, money, and resources hiring, contracting, training, and managing their employees, and that these individuals are critical to the Company's ongoing business.

**WHEREAS**, Employee wishes to enter into an employment relationship with the Company through which Employee receives the compensation and benefits set forth in Employee's offer letter ("<u>Offer Letter</u>"), along with the independent consideration offered in this Agreement, including access to Confidential Information.

**WHEREFORE**, the parties hereby agree as follows:

1.     **<u>Consideration.</u>**  Employee acknowledges that the Company's offer to hire and

Confidentiality Agmt.

employ Employee, and pay the compensation set forth in Employee's Offer Letter, are expressly pre-conditioned upon Employee's execution of, and compliance with, this Agreement.

    2.    **Confidential Information**.

        (a)    "Confidential Information," as the term is used in this Agreement, means nonpublic information, confidential information, proprietary information, trade secrets, or other sensitive information (whether in oral, written, electronic, or any other form) concerning, created by, or relating to any of the Company Parties, including, but not limited to, information relating to personnel; financial cost and sales; supply sources and resources; contracts; office policies and practices; financial information; financial projections; marketing plans; business plans; recruiting plans; strategic plans; prospect names and lists; lists of potential recruits or hires; existing and potential business opportunities; confidential reports; actual and anticipated litigation and other legal matters; product information, including but not limited to actual or potential product lines, product formulations, and new and innovative product ideas; methods; procedures; devices; data processing programs; software; software codes; computer models; research and development; and Client information, such as the identity of the Company Entities' Clients, the amount of revenue derived from such Clients, specific Client needs and requirements, and lists of actual or potential Clients.  Confidential Information also includes information the Company Parties receive from third parties to the extent that such information is subject to a non-disclosure agreement with such parties.  Notwithstanding the foregoing, Confidential Information does not include any information that has become publicly known and made generally available through no wrongful act of any employee or former employee of the Company Entities.  The Company Entities' Work Product (as defined below) shall also be considered Confidential Information hereunder. Information may be Confidential Information under this Agreement regardless of whether it has been specifically labeled or otherwise designated as Confidential Information.

        (b)    Protection of Confidential Information.  Employee agrees that, both during Employee's employment with the Company and at all times following the termination of such employment (regardless of whether Employee resigns or is terminated or the reason for any such resignation or termination), Employee will maintain all Confidential Information as confidential, and shall not use any Confidential Information or disclose any Confidential Information to any other person or entity, except (i) as permitted or directed by the Company, through prior written consent of the Company; (ii) as necessary in the ordinary course of performing Employee's duties; or (iii) as provided in Section 2(d), below.  Employee also shall protect the Company Entities' Confidential Information and prevent unauthorized access to, or disclosure of, any Confidential Information that is in Employee's possession, custody, or control. Employee may not disclose Confidential Information to anyone not employed by the Company Entities, or to anyone employed by the Company Entities who is not authorized to receive such information. Employee will not remove or copy, or cause to be removed from the Company's premises or copied, any original or copy of any Confidential Information except in furtherance of Employee's proper duties to the Company and in accordance with the terms of this Agreement and all of the Company Entities' applicable policies and procedures.  Employee further agrees to avoid the unnecessary disclosure of non-confidential internal information about the Company Parties and/or the Company Entities' Clients and suppliers, except as provided in Section 2(d), below.

(c) <u>Unauthorized Disclosure</u>. Except as provided in Section 2(d), below, Employee shall immediately notify the Company of any intended or unintended unauthorized disclosure or use of any Confidential Information by Employee or any other person or entity of which Employee becomes aware. Employee shall cooperate fully with the Company Parties in the procurement of protection of the Company Parties' rights to, or in any of, the Confidential Information.

(d) <u>Non-Interference with Protected Rights</u>. Notwithstanding any other provision of this Agreement or any Company policy, Employee is free to communicate or file a charge or complaint with the Equal Employment Opportunity Commission, the National Labor Relations Board, the Occupational Safety and Health Administration, the Securities and Exchange Commission, law enforcement, or any other federal, state or local governmental agency or commission (collectively, "<u>Government Agencies</u>"). Employee further understands that this Agreement does not limit Employee's ability to (i) speak with Employee's attorney(s), (ii) report possible violations of law or regulation to Government Agencies or make other disclosures that are protected under the whistleblower provisions of any law or regulation, or (iii) otherwise participate in any investigation or proceeding that may be conducted by any Government Agency, including providing documents or other information (including Confidential Information) (except information protected by the Company Parties' attorney-client or attorney work product privilege), without notice to the Company. In accordance with the Defend Trade Secrets Act, 18 U.S.C. § 1833(b) ("<u>DTSA</u>"), Employee shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that (x) is made (A) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (B) solely for the purpose of reporting or investigating a suspected violation of law; or (y) is made in a complaint or other document filed in a lawsuit or other proceeding, so long as such filing is made under seal. Further, nothing herein shall prevent Employee from discussing or disclosing information related to Employee's general job duties or responsibilities and/or employee compensation, or be construed in a manner that would violate any applicable law, including but not limited to any laws restricting the scope of non-disclosure agreements or the penalties for breaches thereof.

(e) <u>Return of Confidential Information and Other Company Property</u>. Employee agrees that upon termination of employment with the Company, regardless of the reason, Employee shall return to the Company: (i) any and all Confidential Information (including, for avoidance of doubt, any and all Work Product), and all copies or extracts of such information, whether in electronic, hard copy, or any other form; and (ii) all other property of the Company Entities, including but not limited to all computers, laptops, smartphones, tablets, hard drives, and other equipment, and all manuals, books, blank forms, documents, letters, memoranda, e-mails, notes, notebooks, reports, data and other material in any form, including in electronic form. Once Employee has returned all Confidential Information and all other Company Party property, Employee agrees to so advise the Company and, unless otherwise advised by the Company in writing, then permanently delete all copies of any Confidential Information remaining in Employee's (or any of Employee's family members') possession, custody, or control, including on any computers, laptops, disks, drives, email accounts (including gmail, yahoo, and any other email accounts, systems, or applications), instant messaging accounts (including iMessage, text, iChat, SnapChat, Signal, Instagram, Facebook, LinkedIn, WhatsApp, WeChat, WeeChat, Line, and any other messaging accounts, systems, or

applications), storage clouds, photos, voice mails, paper files, and any and all other repositories or locations in which such information may be stored, so that Employee no longer has access to any such property or information. If so requested by the Company, Employee agrees to promptly (x) sit for an exit interview with the Company in connection with Employee's departure and the transition of Employee's role, knowledge, and responsibilities, and (y) execute and return a sworn affidavit, as prepared by the Company, confirming Employee's compliance with the terms of this Section 2(f).

   (f) <u>Subpoena or Process</u>. Except as provided in Section 2(d), above, Employee agrees that in the event Employee receives a subpoena, document request, information request, interrogatory, or any other legal process that will or may require Employee to disclose any Confidential Information, whether during Employee's employment or thereafter (regardless of whether Employee resigns or is terminated, or the reason for such resignation or termination), Employee will immediately notify the Company's Senior Vice President Marine, both by email and by Fed Ex or UPS overnight delivery, and provide a copy of such subpoena, document request, information request, interrogatory, or other legal process, unless such subpoena, document request, interrogatory, or other legal process both is from a court or governmental agency and explicitly prohibits Employee from doing so. Except as provided in Section 2(d), above, Employee further agrees to cooperate with the Company Parties in any lawful response to such subpoena, document request, information request, interrogatory, or legal process, including in connection with any Company Party's application for a protective order or effort to obtain other confidentiality protections.

   3. **<u>Inventions/Intellectual Property</u>**. Employee agrees that any and all developments, improvements, inventions, discoveries, creations, formulae, algorithms, processes, systems, interfaces, protocols, concepts, programs, products, investment strategies, valuation models, risk management tools, methods, designs, and works of authorship, and any and all documents, information (including Confidential Information), or things relating thereto, whether patentable or not, within the scope of or pertinent to any business, research, or investment in which the Company or any other Company Entity is engaged or (if such is known to or ascertainable by Employee) considering engaging, which Employee may conceive, make, author, create, invent, develop, or reduce to practice, in whole or in part, during Employee's employment with the Company or affiliation with any of the Company Parties, whether alone or working with others, whether during or outside of normal working hours, whether inside or outside of the Company's offices, and whether with or without the use of the Company's computers, systems, materials, equipment, or other property, shall be and remain the sole and exclusive property of the Company (the foregoing, individually and collectively, "<u>Work Product</u>"); provided that "Work Product" will not include any invention that satisfies each of the following prongs: (a) Employee developed the invention entirely on Employee's own time without using the Company's equipment, supplies, facilities, or trade secret information, (b) the invention does not relate, at the time of conception or reduction to practice, to the Company Entities' business or actual or demonstrably anticipated research or development, and (c) the invention does not result from any work Employee has performed for the Company Entities. To the maximum extent allowable by law, any Work Product subject to copyright protection shall be considered "works made for hire" for the Company under U.S. copyright law. To the extent that any Work Product that is subject to copyright protection is not considered a work made for hire, or to the extent that Employee otherwise has or retains any ownership or other rights in any

Work Product (or any intellectual property rights therein) anywhere in the world, Employee hereby assigns and transfers all such rights to the Company, including the intellectual property rights therein, effective automatically as and when such Work Product is conceived, made, authored, created, invented, developed, or reduced to practice. The Company shall have the full worldwide right to use, assign, license, and/or transfer all rights in, with, to, or relating to Work Product (and all intellectual property rights therein). Employee shall, whenever requested to do so by the Company (whether during Employee's employment or thereafter), execute any and all applications, assignments, and/or other instruments, and do all other things (including cooperating in any matter or giving testimony in any legal proceeding) which the Company may deem necessary or appropriate in order to (a) apply for, obtain, maintain, enforce, or defend patent, trademark, copyright, or similar registrations of the United States or any other country for any Work Product; (b) assign, transfer, convey, or otherwise make available to the Company any right, title, or interest which Employee might otherwise have in any Work Product; and/or (c) confirm the Company's right, title, and interest in any Work Product. Employee shall promptly communicate and disclose all Work Product to the Company and, upon request, report upon and deliver all such Work Product to the Company. Employee hereby irrevocably appoints the Company as Employee's attorney-in-fact to so execute such documents and take such actions necessary to protect the rights of the Company Entities in any Work Product. Employee shall not use or permit any Work Product to be used for any purpose other than on behalf of the Company Entities, whether during Employee's employment or thereafter.

4. **Restrictive Covenants.**

(a) During the Employment Period and the Post-Employment Non-Solicit Period (as defined below), Employee shall not, whether on Employee's own behalf or on behalf of or in concert with any other person or entity, directly or indirectly (i) induce, encourage, canvass, or enable any Service Provider (as defined below) to leave, depart, or cease rendering services to any of the Company Entities, or interfere in any way with the relationship between any of the Company Entities and any Service Provider; (ii) solicit, recruit, retain, or hire any person or entity who was a Service Provider of any of the Company Entities at any time during the twelve (12) months preceding such solicitation, recruitment, retention, or hiring; (iii) solicit, induce, or encourage any Covered Client or Active Prospect (each as defined below), or any supplier, licensee, licensor, franchisee, or other business relation of any of the Company Entities, to cease doing business (or reduce its volume of business) with any of the Company Entities, or interfere in any way with the relationship between any Covered Client, Active Prospect, supplier, licensee or business relation, on the one hand, and any Company Entity, on the other hand (including, without limitation, by making any negative or disparaging statements or communications about any of the Company Parties); (iv) service, engage in business with, or provide any products or services to any Covered Client or Active Prospect to the extent that such products or services are similar to any product or service that any of the Company Entities provided, rendered, or marketed to such Covered Client or Active Prospect, or are then actively planning to provide, render, or market to such Covered Client or Active Prospect; (v) acquire or attempt to acquire any business that any of the Company Entities have identified as a potential acquisition target (an "Acquisition Target"), or take any action to induce or attempt to induce any Acquisition Target to consummate any acquisition, investment or other similar transaction with any person or entity other than the Company Entities; (vi) appropriate, seize, solicit, divert, or usurp any other business, commercial, investment, financial, strategic, or other opportunity of

any of the Company Entities, or any opportunity or project of which Employee became aware or on which Employee worked during the Employment Period; or (vii) aid, assist, direct, or encourage any other person or entity to do any of the foregoing clauses (i)-(vi). For purposes of this Agreement, the "Post-Employment Non-Solicit Period" means a period of twenty-four (24) months following the Termination Date (regardless of whether Employee resigns or is terminated or the reason for such resignation or termination), provided that in the event Employee is subject to a mandatory non-working garden leave or non-working notice period prior to the Termination Date, the Post-Employment Non-Solicit Period shall be reduced on a day-for-day basis by any days of such non-working garden leave or non-working notice period; the term "Service Provider" shall include all employees, consultants, independent contractors, and other persons providing any services to any of the Company Entities; the term "Covered Client" shall include any Client of the Company Entities with which Employee has had business-related contact, or about which Employee has had access to Confidential Information, during the Employment Period; provided that following the Employment Period, "Covered Client" shall not include any person or entity that Employee had no contact with and no access to Confidential Information about during the two (2) year period preceding the Termination Date; and the term "Active Prospect" shall include any person or entity for which Employee has provided (or is preparing to provide) a bid or proposal to provide products or services; provided that following the Employment Period, "Active Prospect" shall not include any person or entity that Employee had no contact with and no access to Confidential Information about during the two (2) year period preceding the Termination Date.

(b)     Employee agrees that should Employee breach any of the provisions of this Section 4, the running of the Post-Employment Non-Solicit Period shall be tolled during the period of such breach, and shall be extended by a period equal to the length of any violation. If, at the time of enforcement of this Section 4, a court holds that the restrictions stated herein are unreasonable under circumstances then existing, the parties hereto agree that the court may "blue pencil" or otherwise modify such restrictions to the maximum period, scope or geographical area reasonable under such circumstances.

(c)     During the Post-Employment Non-Solicit Period, at least five (5) business days prior to Employee becoming an employee, independent contractor, service provider, consultant, owner, partner, member, principal, volunteer, or other affiliate or associate of any employer, person or entity other than the Company, Employee shall provide in writing to the Company the name, address, telephone number and email address of an appropriate contact person of such employer, person, or entity with whom the Company can address Employee's continuing obligations and restrictions under this Agreement.

(d)     Except as provided in Section 2(d), above, Employee agrees that both during Employee's employment with the Company and at all times following the termination of such employment (regardless of whether Employee resigns or is terminated or the reason for any such resignation or termination), Employee will not directly or indirectly make, publish, encourage, ratify, or authorize, or aid, assist, or direct any other person or entity in making or publishing, whether orally, in writing, in electronic/digital form, or otherwise, whether in public or in private, any statements, comments, postings, or other communications that (i) in any way defame, criticize, malign, impugn, reflect negatively on, or disparage any of the Company Entities' products or services, or (ii) are maliciously false about any of the Company Parties.

Confidentiality Agmt.

(e)     Employee agrees that the terms of this Section 4 are reasonable, including in connection with the duration, geographical area, and scope of the covenants set forth in Section 4(a), above. Employee agrees that the restrictions in this Agreement are necessary to protect the goodwill and Confidential Information of the Company Entities.

5.     **Remedies**.

(a)     Employee acknowledges that Employee's breach or threatened breach of Section 2, 3, 4, 6, 14, or 15 of this Agreement would cause irreparable harm to the Company Parties which would not be fully remediable via monetary damages. Therefore, the Company Parties shall be entitled to emergency injunctive relief, including a temporary restraining order and/or preliminary injunction, from any state or federal court of competent jurisdiction (without posting a bond), to restrain such breach.  Any injunctive relief sought by the Company Parties shall be in addition to, and not lieu of, of any monetary relief or other remedies or rights to which the Company Parties may be entitled.

(b)     In addition to any other relief available to the Company Parties, the Company Entities shall be entitled to an accounting, and to the disgorgement of all profits, compensation, commissions, fees, bonuses, or other remuneration which Employee or any of Employee's current or future affiliates (including any new employer) directly or indirectly receives as a result of Employee's breaches of this Agreement or tortious conduct.  In addition to the foregoing, the Company Parties shall be entitled to an award including their attorneys' fees and costs in connection with litigation hereunder, as well as in connection with the collection of any judgments in the Company Parties' favor.

6.     **Employee's Representations**. Employee hereby represents and warrants that (a) Employee is not a party to or bound by any employment agreement or other agreement containing non-competition provisions, non-solicitation provisions, garden leave provisions, or other restrictive covenants except as have been provided in writing to the Company prior to the execution of this Agreement; (b) Employee's execution and delivery of this Agreement, and Employee's performance of Employee's responsibilities to the Company Entities, will not breach, violate, or cause a default under any contract, agreement, instrument, order, judgment or decree by which Employee is bound; (c) Employee will not bring to the Company Entities or transfer onto the Company Entities' computers, devices, drives or technology systems any confidential or proprietary information or trade secrets belonging to any other person or entity (including but not limited to any prior employer); (d) Employee has conducted a diligent search of Employee's home, files computers, tablets, smartphones, disks, drives, computing clouds, and all other locations and equipment within Employee's possession, custody, or control, for any documents or information belonging to any prior employer or other entity; and (e) Employee has returned all such documents and information to Employee's prior employer and does not have possession, custody, or control of any such documents or information.  The Company disclaims any interest in any confidential or proprietary information belonging to any other person or entity and instructs Employee not to maintain, bring, use or disclose any such confidential or proprietary information in any manner.  Employee shall fully indemnify the Company Parties for any losses they incur if they are subjected to actual or threatened legal action following Employee's breach of this Section 6/the foregoing clauses (c), (d), or (e).

7. **No Strict Construction**. The parties are both sophisticated commercial parties. The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction shall be applied against any party, regardless of which party drafted this Agreement or any provision hereof.

8. **Entire Agreement; No Waiver**. This Agreement, together with Employee's Offer Letter, contains the entire agreement and understanding of the parties with respect to Employee's employment. Employee specifically acknowledges and agrees that notwithstanding any discussions or negotiations Employee may have had with any of the Company Parties prior to the execution of this Agreement, Employee is not relying on any promises or assurances other than those explicitly contained in this Agreement and/or the Offer Letter. No provision of this Agreement may be amended modified, waived, or discharged except as agreed to in a writing signed by both Employee and an officer of the Company. The failure of a party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver thereof or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

9. **Severability**. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to render it effective and valid under applicable law. If any provision of this Agreement is determined to be unenforceable as a matter of governing law, a court of appropriate jurisdiction shall have the authority to "blue pencil" or otherwise modify such provision so as to render it enforceable while maintaining the parties' original intent to the maximum extent possible. Each provision of this Agreement is severable from the other provisions hereof, and if one or more provisions hereof are declared invalid, the remaining provisions shall nevertheless remain in full force and effect.

10. **Survival**. The terms of this Agreement shall survive the termination of Employee's employment with the Company Entities and/or the termination of the Offer Letter, regardless of whether Employee resigns or is terminated or the reason for any such resignation or termination.

11. **Assignment**. This Agreement may not be assigned by Employee, but may be assigned by the Company Entities.

12. **Dispute Resolution; Choice of Law; Forum**.

(a) The parties agree that this Agreement is clear and enforceable as written. Nevertheless, should Employee later claim that any provision is unclear, unenforceable, or overbroad, or is inapplicable to any activity in which Employee intends to engage, Employee agrees to so notify the Company, in writing, at Mark.Karrenbauer@howdengroup.com, at least fourteen (14) calendar days before engaging in such activity and/or filing any lawsuit, petition, or other court action. During the fourteen (14) day period, the Employee agrees to meet face-to-face with the Company, in good faith, to try to amicably resolve the issue. **If Employee fails to comply with this Mandatory Conflict Resolution Process, Employee waives Employee's right to challenge the scope, clarity, applicability, breadth or enforceability of the Agreement or any of its covenants.** So long as Employee complies with this provision,

however, all of Employee's (and the Company Parties') rights will be reserved, even if no Agreement is reached between them.

(b)      All disputes arising under this Agreement or the Offer Letter, or otherwise arising between the Employee, on the one hand, and any of the Company Parties, on the other hand, including but not limited to any disputes that the parties cannot resolve through the Mandatory Dispute Resolution Process shall be governed by, and construed in accordance with, the laws of the State of Florida, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Florida or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Florida. The parties hereby consent to the exclusive jurisdiction of the state and federal courts sitting in New York to resolve any disputes arising hereunder or otherwise arising between them; agree to exclusive venue in that jurisdiction; and waive any claim that such jurisdiction is an inconvenient or inappropriate forum.

(c)      **EMPLOYEE VOLUNTARILY AND KNOWINGLY WAIVES ANY RIGHTS EMPLOYEE MAY HAVE TO A TRIAL BY JURY IN ANY COURT ACTION RELATING TO OR CONCERNING ANY OF THE COMPANY PARTIES, EXCEPT AS OTHERWISE PROHIBITED BY LAW.**

13.    **At-Will**.  Employee understands that Employee's employment is at-will, meaning that Employee's employment may be terminated at any time, for any reason or no reason, by either the Company or Employee, subject only to any advance notice provisions set forth in a governing agreement between Employee and the Company, if applicable.

14.    **Corporate Opportunity**. During the Employment Period, Employee shall submit to the Company's Board of Directors ("<u>Board</u>") all business, commercial and investment opportunities or offers presented to Employee or of which Employee becomes aware which relate to the business of the Business at any time during the Employment Period ("<u>Corporate Opportunities</u>"). Unless approved by the Board, Employee shall not accept or pursue, directly or indirectly, any Corporate Opportunities on Employee's own behalf.

15.    **Employee's Cooperation**. During the Employment Period and thereafter, Employee shall cooperate with the Company in any internal investigation or administrative, regulatory or judicial proceeding as reasonably requested by the Company (including, without limitation, Employee being available to the Company upon reasonable notice for interviews and factual investigations, appearing at the Company's request to give testimony without requiring service of a subpoena or other legal process, volunteering to the Company all pertinent information and turning over to the Company all relevant documents which are or may come into Employee's possession, all at times and on schedules that are reasonably consistent with Employee's other permitted activities and commitments).

16.    **ACKNOWLEDGMENTS. EMPLOYEE ACKNOWLEDGES THAT EMPLOYEE HAS BEEN EXPRESSLY ADVISED OF EMPLOYEE'S RIGHT TO SEEK AND OBTAIN COUNSEL TO REVIEW THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO THE NON-SOLICITATION PROVISIONS IN SECTION 4, ABOVE. EMPLOYEE ACKNOWLEDGES THAT EMPLOYEE HAS BEEN PROVIDED AT**

**LEAST SEVEN (7) DAYS TO REVIEW THIS AGREEMENT BEFORE SIGNING IT. EMPLOYEE ALSO ACKNOWLEDGES THAT EMPLOYEE WILL RECEIVE CONFIDENTIAL INFORMATION AND WILL BE PROVIDED WITH ACCESS TO IMPORTANT CLIENT RELATIONSHIPS AS A RESULT OF EMPLOYEE'S EMPLOYMENT HEREUNDER. EMPLOYEE HAS READ THIS AGREEMENT CAREFULLY, UNDERSTANDS EACH OF ITS TERMS AND CONDITIONS, AND SIGNS THIS AGREEMENT KNOWINGLY AND OF EMPLOYEE'S OWN FREE WILL.**

The Company:

**HOWDEN US SERVICES, LLC**

By: _____

Jim Hays, Vice Chairman, Howden US Services LLC

Employee:

_____

Gregory Abboud

## VERIFICATION

I, Christine Williams, am the Northeast Region Leader at Aon, am the authorized representative of Plaintiffs Aon Risk Services Companies, Inc. and Aon Risk Services Northeast, Inc. (collectively, "Plaintiffs"), for the purposes of verifying the foregoing Complaint. I have personal knowledge of the matters set forth in the Complaint or the information contained therein has been collected and made available to me by counsel and employees of Plaintiffs. I affirm that the factual information and statements made therein are true and correct to the best of my knowledge and belief.

_____
Christine Williams

STATE OF New Jersey     )
                        ) ss.:
COUNTY OF Bergen        )

CYNTHIA FULLER
Notary Public, State of New Jersey
Comm. # 50187325
My Commission Expires 3/1/2027

Personally appeared, Christine Williams, before me and subscribed and swore to the foregoing on this 10 day of December, 2025.

_____
Notary Public
My Commission Expires: 3/1/2027