**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AON RISK SERVICES COMPANIES, INC. and AON RISK SERVICES NORTHEAST, INC., | Case No. 1:25-cv-10275 |
| Plaintiffs, | |
| v. | |
| ANTHONY RAMPERSAUD, NANCY MONTALVO, and HOWDEN US SERVICES, LLC, | |
| Defendants. | |

---

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION**

---

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ...................................................................................................... 1

STATEMENT OF FACTS ............................................................................................................... 3

ARGUMENT ................................................................................................................................. 10

I.      AON IS ENTITLED TO A TRO AND PI. .................................................................... 10

      A.      Aon Is Likely To Prevail On Its Trade Secret Claims ........................................ 11

            1.      Aon's Information Constitutes Trade Secrets. ......................................... 11

            2.      Defendants Misappropriated Aon's Trade Secrets. ................................. 13

            3.      Misappropriation Under New York Law. ................................................ 15

      B.      Aon Is Likely to Prevail On Its Contract Claims ............................................... 15

            1.      The Agreements Are Enforceable. ........................................................... 16

            2.      Rampersaud and Montalvo Breached Their Agreements. ....................... 19

            3.      Howden Tortiously Interfered with Rampersaud's Agreement. .............. 20

      C.      Aon Is Likely to Succeed on Its Fiduciary Duty Claims. ................................... 21

      D.      Aon Will Suffer Irreparable Harm. .................................................................... 23

      E.      The Equities and Public Interest Favor an Injunction. ...................................... 26

II.     A FORENSIC INSPECTION AND RETURN ORDER IS NECESSARY HERE. ........ 27

CONCLUSION ............................................................................................................................. 28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aon Risk Servs., N.E. v. Cusack,*
  34 Misc. 3d 1205(A) (N.Y. Supp. Ct. Dec. 20, 2011) .................................................................. 20, 22

*Arnold R. Leiboff, M.D., P.C. v. Pelaez,*
  249 A.D.2d 497 (1998) ................................................................................................................... 16

*Ayco Co., L.P. v. Frisch,*
  795 F. Supp. 2d 193 (N.D.N.Y. 2011) ................................................................................. 12, 14, 24

*BaseCap Analytics, Inc. v. Amenn,*
  No. 1:23-CV-09370-MKV, 2023 WL 8113524 (S.D.N.Y. Nov. 22, 2023) ..................................... 27

*BDO Seidman v. Hirshberg,*
  93 N.Y.2d 382 (1999) ..................................................................................................................... 16

*Benihana, Inc. v. Benihana of Tokyo, LLC,*
  784 F.3d 887 (2d Cir. 2015) ........................................................................................................... 10

*Capstone Logistics Holdings, Inc. v. Navarrete,*
  No. 17-cv-4819, 2018 WL 6786338 (S.D.N.Y. Oct. 25, 2018), *aff'd and remanded in*
  *part,* 796 F. App'x 55 (2d Cir. 2020) ..................................................................................... 14, 21, 24

*Computer Assocs. Int'l v. Bryan,*
  784 F.Supp. 982 (E.D.N.Y.1992) .................................................................................................... 24

*Continental Indus. Grp., Inc. v. Altunkilic,*
  788 F. App'x 37 (2d Cir. 2019) ...................................................................................................... 12

*Cortland Line Holdings LLC v. Lieverst,*
  2018 WL 8278554 (N.D.N.Y. Apr. 6, 2018) ................................................................................... 25

*Devos, Ltd. v. Record,*
  No. 15-CV-6916 (ADS)(AYS), 2015 WL 9593616 (E.D.N.Y. Dec. 24, 2015) .............................. 23

*Estee Lauder Companies Inc. v. Batra,*
  430 F. Supp. 2d 158 (S.D.N.Y. 2006) ....................................................................................... 17, 24

*ExpertConnect, L.L.C. v. Fowler,*
  2019 WL 3004161 (S.D.N.Y. July 10, 2019) ........................................................................ 12, 14, 15

*First Mfg. Co. v. Young,*
  45 Misc. 3d 1214(A), 3 N.Y.S.3d 284 (N.Y. Sup. 2014) ................................................................ 21

*FMC Corp. v. Taiwan Tainan Giant Indus. Co.*,
 730 F.2d 61 (2d Cir. 1984) .................................................................................................24

*HRB Res. LLC v. Schon*,
 2019 WL 4015256 (N.D.N.Y. Apr. 25, 2019) ......................................................................26

*Iannucci v. Segal Co., Inc.*,
 2006 WL 8407380 (S.D.N.Y. June 27, 2006) ......................................................................23

*IDG USA, LLC v. Schupp*,
 416 F. App'x 86 (2d Cir. 2011) .................................................................................... 22, 24

*IME Watchdog, Inc. v. Gelardi*,
 2022 WL 1525486 (E.D.N.Y. May 13, 2022), *reconsideration denied*, 2022 WL
 2316137 (E.D.N.Y. June 28, 2022) ......................................................................................27

*Int'l Bus. Machs. Corp. v. Papermaster*,
 2008 WL 4974508 (S.D.N.Y. Nov. 21, 2008) ......................................................................25

*Marsh & McLennan Agency, LLC v. Alliant Insurance Services, Inc.*,
 2025 WL 304500 (S.D.N.Y. Jan. 27, 2025) ..................................................................*passim*

*Marsh & McLennan Agency, LLC v. Alliant Insurance Services, Inc.*,
 Case No. 25-cv-6936 (RA), 2025 WL 3442819 (Dec. 1, 2025) ........................... 18, 20, 28

*Marsh USA Inc. v. Schuhreimen*,
 183 F. Supp. 3d 529 (2016) ..................................................................................................26

*Marsh USA LLC v. Parrish*,
 No. 25 Civ. 6208, 2025 WL 2676389 (S.D.N.Y. Sept. 18, 2025) ..................................*passim*

*Mercer Health & Benefits LLC v. DiGregorio*,
 307 F. Supp. 3d 326 (S.D.N.Y. 2018) ....................................................................... 18, 21, 22

*Mphasis Corp. v. Rojas*,
 No. 25-CV-3175 (JMF), 2025 WL 1640384 (S.D.N.Y. June 9, 2025) ...............................27

*N. Atl. Instruments, Inc. v. Haber*,
 188 F.3d 38 (2d Cir. 1999) ...................................................................................................12

*Nat'l Reprographics, Inc. v. Strom*,
 621 F. Supp. 2d 204 (D.N.J. 2009) .......................................................................................15

*Natsource LLC*, 151 F. Supp. 2d at 472 ....................................................................................25

*QBE Americas, Inc. v. Allen*,
 2022 WL 889838 (S.D.N.Y. Mar. 25, 2022) ........................................................................21

*Singas Famous Pizza Brands Corp. v. N.Y. Advert. LLC,*
 468 Fed. App'x 43 (2d Cir. 2012) ...................................................................23

*Stuart's, LLC v. Edelman,*
 196 A.D.3d 711 (N.Y. App. Div. 2d Dep't 2021) ................................... 15, 16

*Ticor Title Ins. Co. v. Cohen,*
 173 F.3d 63 (2d Cir. 1999) ..................................................................17, 23, 25

*USI Ins. Servs. LLC v. Miner,*
 801 F. Supp. 2d 175 (S.D.N.Y. 2011).................................................12, 17, 18

*Walter Boss, Inc. v. Roncalli Freight Co., Inc.,*
 210 A.D.3d 1124 (N.Y. App. Div. 2d Dep't 2022) ...........................................15

*Willis Re Inc. v. Herriott,*
 550 F. Supp. 3d 68 (S.D.N.Y. 2021)...............................................................23, 26

**Statutes**

18 U.S.C. § 1836(b)(1) & (b)(3)(A) ..........................................................................10

18 U.S.C. § 1836(b)(3)(A) ........................................................................................24

18 U.S.C. § 1839(3) ...................................................................................................11

18 U.S.C. § 1839(5) ...................................................................................................13

18.U.S.C. § 1839(6) ............................................................................................ 13, 14

Defend Trade Secrets Act...........................................................................................10

iv.

## **PRELIMINARY STATEMENT**

This case involves a premeditated scheme by former Aon Managing Director Anthony Rampersaud ("Rampersaud"), Account Executive Nancy Montalvo ("Montalvo"), and new market entrant and Aon direct-competitor, Howden US Services, LLC ("Howden"), to lift-out a team of Aon[1] employees from Aon's New York office and misappropriate its most valuable assets—its employees, clients, and confidential and trade secret information.

While still employed by Aon and bound by fiduciary and contractual obligations, Rampersaud met with David Howden (Howden's namesake founder), on an Aon expensed-trip to London. Thereafter, he sent an Aon-employee's personal email address to Howden, and called the employee to pitch an "opportunity" at Howden. Howden used the information provided by Rampersaud to send a targeted and customized employment offer to the employee—sight-unseen, without the employee ever having spoken to Howden. Upon information and belief, Rampersaud engaged in this same conduct with each of the Aon employees that defected to Howden. He admittedly "talked to his team" about going to Howden.

Then, after having accepted an offer to join Howden, Rampersaud worked with his assistant and others to attempt to covertly ship boxes of Aon's confidential and trade secret materials to his home address—again at Aon's expense. A picture of Rampersaud's assistant shipping documents is worth a thousand words:

---

[1] Plaintiffs are collectively referred to as "Aon."



Several of the above-pictured boxes contained client strategies, renewal plans, financial data, client lists, and other proprietary information critical to Aon's competitive advantage and position. When confronted, Rampersaud and his team lied to Aon to conceal their actions, falsely claiming the boxes were for an internal office move (a mere few rows over on the same floor). Rampersaud and Montalvo also sent Aon's proprietary information to their personal emails on the eve of their resignations.

The timing and coordination of the misappropriation and resignations confirm its premeditated nature. On November 25, 2025, Rampersaud resigned at 12:02 p.m.; within an hour, six of his team members—longstanding Aon employees—resigned in lockstep within minutes of each other. Immediately after their departure, Rampersaud and others began contacting Aon clients whose information they took. When Aon asked for its property back, Rampersaud blatantly ignored this request. This misconduct mirrors a broader pattern of unlawful "lift-outs" by Howden, where an injunction order has already issued and contempt proceedings are underway.

Aon urgently requires immediate injunctive relief to preserve the status quo, and prevent Defendants from continuing to exploit Aon's confidential information and trade secrets, solicit its employees, and harm its client relationships and goodwill—all harms that cannot be remedied by monetary damages alone.

## STATEMENT OF FACTS

### I.    VERIFIED COMPLAINT.

Aon incorporates the facts set forth in its Verified Complaint (Dkt. 1, "Compl.") and the Declarations accompanying these papers.

### II.    TIMELINE OF SOLICITATION AND MISAPPROPRIATION.

Aon is a leading global professional services and insurance brokerage firm that has operated in the U.S. for decades. (Compl. ¶¶ 3, 26). By contrast, Howden was formed in March 2025. (*Id.*, ¶ 27). By July, Howden launched its U.S. operations by rapidly staffing its new entity with employees from a rival brokerage, Marsh. (*Id.* ¶¶ 5, 27). The insurance brokerage industry is highly-competitive. (*Id.* ¶ 28). Howden's aggressive U.S.-entry strategy underscores Howden's intent to shortcut organic growth or lawful M&A activity through coordinated and unlawful raids on its competitors, instead. (*Id.* ¶ 5). Howden's activities have already given rise to lawsuits alleging conduct similar to that present here; in one case, Howden's U.S. CEO, Michael Parrish, was already enjoined. (*Id.* ¶¶ 6-15).

Rampersaud began his Aon career in 2002. (Compl. ¶ 30). At the time of his resignation, he was a Managing Director. (*Id.* ¶ 19). In that role, Rampersaud supervised a team of employees who serviced a book of clients, developed through Aon and with Aon's financial support. (*Id.* ¶¶ 32–33). In 2017, Rampersaud, in exchange for significant compensation, executed a Confidentiality, Non-Competition and Non-Solicitation ("CNSA") Agreement with Aon. (*Id.* ¶ 42, Exhibit A). In the CNSA Agreement, Rampersaud agreed not to directly or indirectly solicit Aon employees or clients. (Compl. ¶¶ 43–44, Exhibit A, § 1(b)-(c)). He also agreed not to use or disclose Aon's confidential and trade secret information. (Compl. ¶ 45, Exhibit A, § 3(a)). He agreed he would return all Aon information at the termination of his employment, and "represent in writing to the Company" that he had done so. (*Id.*).

Montalvo, a twenty-five year Aon employee, was an Account Executive who reported to Rampersaud. (*Id.* ¶¶ 20, 34). Montalvo also signed a Confidentiality and Non-Solicitation Agreement with Aon, which contained similar terms. (Compl. ¶ 48, Exhibit B).

As set forth in the timeline below, Rampersaud and Montalvo breached their agreements with Aon (with Howden's inducement), misappropriated Aon's confidential and trade secret information (with Howden and as agents of Howden), and breached their fiduciary duties to Aon (with Howden aiding and abetting the same). Specifically:

i.   Between September 28, 2025 and October 2, 2025, Rampersaud traveled to London and expensed his trip to Aon. (Compl. ¶ 52; *see also* Declaration of Christine Williams ("Williams Decl."), attached as **Exhibit A**, ¶ 4). While on this Aon-expensed trip, Rampersaud met with David Howden, the CEO and founder of Howden. (Declaration of Regina Degnan-Steinborn ( "Degnan-Steinborn Decl."), attached as **Exhibit B**, ¶ 4).

ii.  Shortly thereafter, on November 4, 2025, Rampersaud suspiciously created 19 print jobs, including documents containing highly confidential and trade secret information, including without limitation a detailed excel spreadsheet containing a client account list, client opportunities, projected income, and team member responsible for the client opportunity. (Declaration of Jonathan Karchmer ("Karchmer Decl."), attached as **Exhibit C**, ¶ 7; Williams Decl., ¶ 7). Each of the team members listed on Rampersaud's spreadsheet have since resigned to join Howden. (Compl., ¶ 39).

iii. On November 18 or 19, 2025, Rampersaud told Aon employee Christopher Cogan about an "opportunity" at Howden. (Declaration of Christopher Cogan ("Cogan Decl."), attached as **Exhibit D**, ¶ 6). During the call, Rampersaud requested Cogan's personal email address, and

advised him to monitor it, stating that Cogan might soon receive "an offer" that he might "be impressed with." (*Id.*). Rampersaud assured Cogan that, at Howden, Cogan would perform the same job duties he currently performed for Aon, emphasizing that Cogan "always got great reviews by our clients." (*Id.*). Upon information and belief, Rampersaud— acting as Howden's agent—had similar discussions with his other Aon team members (all of whom resigned in unison with Rampersaud days later). (Degnan-Steinborn Decl., ¶ 5; Compl. ¶ 66).

iv.    At the same time, on November 18, 2025, Rampersaud created 23 print jobs for documents containing additional Aon confidential and trade secret business and client information. (Karchmer Decl., ¶ 10). The same day, Rampersaud's Executive Assistant created print jobs for several confidential "Client Lists" as well as print jobs for *five shipping labels*. (Williams Decl., ¶ 6, Ex. A).

v.    On November 19, 2025, Rampersaud emailed from his Aon email to his personal email a detailed PowerPoint presentation containing an employee organizational chart, historical and projected revenue from 2022 through 2028, a client account list (identifying opportunities, projected income, and responsible team members), and 2026 projected revenue itemized by account. (Karchmer Decl., ¶ 11; Williams Decl., ¶ 8). Rampersaud also continued his atypical printing activity, creating print jobs for 6 additional documents, including Aon revenue projections, other financial data, and another client list. (Karchmer Decl., ¶ 12; Williams Decl., ¶ 9). Rampersaud's Executive Assistant created print jobs for *nine more shipping labels* that same day. (*Id.*, Ex. A).

vi.    On November 20, 2025, Cogan received an unsolicited job offer from Howden, with a

"target start date" of December 15, 2025. (Cogan Decl. ¶ 7). Cogan had not spoken to

Howden prior to receiving this unsolicited job offer. (*Id.* ¶ 8). The offer was sent to Cogan's

personal email address that he provided to Rampersaud and exceeded Cogan's base salary at

Aon. (*Id.*). After receiving the offer, Cogan called Rampersaud and stated he needed to

"think about the offer," to which Rampersaud replied: "***We would love to have you***." (*Id.* ¶

9). Cogan initially accepted the offer, but then later rescinded his acceptance. (*Id.* ¶ 11).

vii.   During this same time period, Rampersaud asked Aon employee Regina Degnan-Steinborn

if she would be interested in working with Howden in a consulting capacity. (Degnan-

Steinborn Decl., ¶ 4).

viii.  On November 20, 2025, one of Rampersaud's Account Executives, Blackman, suspiciously

generated ***three shipping labels*** and emailed them to Rampersaud. (Williams Decl., ¶ 16,

Ex. C). The shipping labels were addressed to a personal address for Rampersaud. (*Id.*).

ix.    Aon later learned that, by noon on November 20, 2025, seven Aon employees had accepted

offers of employment from Howden: Rampersaud, Montalvo, Mathew Gelman, Michael

Kovach, Paige Stapleton, Martha Blackman, and Dawn Crabb. (Degnan-Steinborn Decl., ¶

5). Prior to these individuals resigning, Rampersaud "talked to his team" about going to

Howden. (*Id.*)

x.     Then, the morning of Friday, November 21, 2025, Rampersaud, Crabb, Stapleton, and

Blackman were observed in Aon's New York City office. (Compl. ¶ 69; Williams Decl., ¶

10). Rampersaud and Crabb were suspiciously packing large shipping boxes. (*Id.*).

Rampersaud's, Crabb's, and Blackman's presence in the office on Friday was highly unusual.

(*Id.*; Compl., ¶ 70).

xi.　After observing Rampersaud packing boxes, his manager and manager's manager confronted him about his activities. (Williams Decl., ¶ 11). Rampersaud falsely claimed that he was packing to move into another employee's office just a few rows over. (*Id.*). This was untrue. In actuality, Rampersaud had already accepted an offer from Howden and was packaging documents to take with him when he left. (*Id.*, ¶¶ 12-15; Degnan-Steinborn Decl., ¶¶ 5–8).

xii.　That same day, November 21, 2025, Crabb generated print jobs for ***eight more shipping labels***. (Williams Decl., Ex. A). Both Rampersaud and Crabb then left the office at lunchtime and never returned. (*Id.* ¶ 12)

xiii.　In the afternoon of November 21, 2025, and after noticing that Rampersaud did not return from lunch, Rampersaud's managers searched for the boxes but were unable to locate them. (*Id.* ¶ 12). It was ultimately discovered through security footage that Crabb delivered a cart of boxes to the Aon mailroom (as depicted above). (*Id.*; Compl. ¶ 73). By the time the boxes were traced to the mailroom, they had already shipped. (Williams Decl., ¶ 13). The shipping records revealed that seven (7) boxes were sent to Rampersaud's home address, at Aon's expense. (*Id.*). Five (5) of the shipping labels inexplicably listed another Aon employee, Ms. Degnan-Steinborn, as the recipient (at Rampersaud's home). (*Id.*). Ms. Degnan-Steinborn was not aware of these shipments, and did not authorize them. (Degnan-Steinborn Decl., ¶

9). Rampersaud and Crabb were trying to hide that Rampersaud was the true recipient of the boxes.

xiv.    Aon immediately contacted FedEx to intercept the shipment. (*See* Williams Decl., ¶ 14). The boxes were successfully recovered at a FedEx distribution center before reaching Rampersaud's home address. (*Id.*). Upon inspection, Aon's concerns were confirmed: several of the boxes contained thousands of pages of documents containing Aon's confidential and trade secret materials, including client lists and client information, Aon business opportunities, client renewal strategy proposals, and client renewal presentations, among other things. (*Id.*).

xv.    On November 24, 2025, Montalvo emailed a document entitled "2023 Client Holiday List - Tony Rampersaud.xlsx" from her Aon email address to her personal email address. (*Id.* ¶ 15, Ex. B). The Excel spreadsheet contained a compilation of 55 names of client contact persons for key clients (including for clients whose information was in the boxes shipped to Rampersaud's home address), along with the mailing addresses for the contacts and, in a few cases, notes about the contact. (*Id.*; *see also* Compl. ¶ 77).

xvi.    On November 25, 2025, at 12:02 pm, Rampersaud resigned from Aon. (*Id.* ¶ 78). Approximately one hour later, Rampersaud's reports also resigned from Aon in unison, most within minutes of each other, despite most of them having told Aon's HR in the preceding minutes and hours that they planned to stay at Aon. (*Id.* ¶¶ 78, 82).

xvii.   That same day, November 25, 2025, Aon sent Rampersaud a letter demanding the return of its information and property, including his Aon-issued mobile device. (Declaration of Jessica Pizzutelli ("Pizzutelli Decl."), attached hereto as **Exhibit E**, ¶ 5, Ex. 1). While Aon had successfully intercepted some boxes Rampersaud attempted to ship to himself, Aon was unable to intercept the information shipped with the shipping labels that Blackman sent to Rampersaud on November 20, 2025. (Williams Decl., ¶ 16). Aon was also unable to track the shipments for the other shipping labels printed by Crabb in the days immediately preceding the resignations—Crabb generated print jobs for *22 shipping labels total,* but Aon was only able to intercept the above-referenced boxes. (*Id.* ¶ 14, Ex. A). In response to Aon's letter, Rampersaud told Aon he was out of town for the Thanksgiving holiday until December 1, 2025. (Compl., ¶ 79).

xviii.  On December 1, 2025, Aon sent a courier to Rampersaud's home address to retrieve its property and information. (*Id.* ¶ 80). Rampersaud did not return his Aon-issued mobile device, nor did he return any Aon documents despite Aon's demand. (Pizzutelli Decl., ¶ 6; Williams Decl., ¶¶ 16-17). Rampersaud also did not respond to Aon's request to "understand the contents" of the boxes shipped via the Blackman shipping labels. (*Id.*, ¶ 16).

xix.    Aon also sent Montalvo a letter demanding the return of its property. (Pizzutelli Decl., Ex. 2; Compl. ¶ 81). To date, Montalvo has not returned Aon's client list, and lied to Aon about possessing it. (*Id.*).

xx.     After resigning from Aon, Rampersaud called at least three Aon clients with whom he formerly worked, and about whom he and Crabb exfiltrated Aon confidential and trade

secret information. (Cogan Decl., ¶ 12; Degnan-Steinborn Decl., ¶ 11). One client was identified in the PowerPoint that he emailed to his personal email address, along with "2026 projected revenue" for the client. (Williams Decl., ¶ 8). Stapleton likewise called an Aon client. (Degnan-Steinborn Decl., ¶ 10).

As set forth above, Defendants' solicitation of Aon clients and employees is actively underway. Without immediate injunctive relief, Aon stands to lose client relationships and goodwill—in which it has significantly invested, including through significant financial investment provided by Aon to develop client relationships on Aon's behalf. (*See, e.g.*, Compl., ¶¶ 28–29, 32, 37, 84–87 (describing hundreds of thousands of dollars of expense reimbursements); Williams Decl., ¶¶ 18-19). Howden's track record demonstrates that it is entering the U.S. market through unfair means. (*See* Compl., ¶¶ 6–15 (Marsh alleges it lost 150 employees and over 60 clients as a result of Howden raid)). A temporary restraining order ("TRO") and preliminary injunction ("PI") are necessary to preserve the status quo, protect Aon's confidential and trade secret information, compel its return, and enjoin further unlawful solicitation of Aon's employees and clients.

## ARGUMENT

## I.    AON IS ENTITLED TO A TRO AND PI.

Aon is entitled to a TRO and PI because it has established: (1) "a likelihood of success on the merits, or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardship tipping decidedly in [Aon's] favor"; (2) "a likelihood of irreparable injury in the absence of an injunction"; (3) "the balance of hardships tips in [Aon's] favor"; and (4) "that the public interest would not be disserved by the issuance of an injunction." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (internal quotations

omitted); *3M Co. v. Performance Supply, LLC*, 458 F. Supp. 3d 181, 191 (S.D.N.Y. 2020) (same standard governs TROs and PIs). Each of these elements is met here.

### A.    Aon Is Likely To Prevail On Its Trade Secret Claims.

A court may enjoin misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA") where: (1) the information is a trade secret, and (2) it has been, or is threatened to be, misappropriated. *See* 18 U.S.C. § 1836(b)(1) & (b)(3)(A). Both elements are met here.

### 1.    Aon's Information Constitutes Trade Secrets.

Under the DTSA, a trade secret is "all forms and types of financial, [or] business . . . information, including . . . compilations" provided that: (a) the owner has taken "reasonable measures to keep such information secret"; and (b) the information "derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." *Id.* § 1839(3).

Here, the information taken by Defendants easily qualifies as trade secrets, including:

- Multiple client lists (including compilations of client names, companies, mailing addresses, and contact email addresses, coverage types, insurer information, policy information, and financial data);

- "2025 and 2026 Revenue Projections" spreadsheets, containing account name, opportunity with that client account, projected income for the client account, and team member responsible;

- Lists of "2025 New Business Opportunities," including account names, opportunities, and projected income;

- Renewal strategy plans for clients, many marked "Proprietary & Confidential," containing client-specific information, including the client's schedule of insurance, insurance program summaries, renewal strategies, loss summaries, proprietary peer benchmarking data, renewal results, and other client information;

- Multiple spreadsheets containing Aon's financial information, including its revenues, and actual and projected new business from 2022 through 2028;

- A detailed PowerPoint presentation containing "team production" over "25 years"; historical new business and renewal revenue; a list of client accounts and opportunities; "notable" clients; and "team member" 2024 bonuses and "projected" 2025 bonuses; and

- Employee information, such as their bonuses, projected bonuses, and unique client relationships.

(Williams Decl., ¶¶ 5-18; Compl. ¶¶ 54–60, 76).

New York courts agree that such information constitutes "trade secrets": "A customer list developed by a business through substantial effort and kept in confidence may be treated as a trade secret and protected…." *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 44, 46 (2d Cir. 1999). Indeed, "client lists," "client preferences," "contract details," "performance criteria," and "renewal" proposals qualify as trade secrets, *ExpertConnect, L.L.C. v. Fowler*, 2019 WL 3004161, at *4 (S.D.N.Y. July 10, 2019), as do "employee data" and "pricing" information. *Continental Indus. Grp., Inc. v. Altunkilic*, 788 F. App'x 37, 40-41 (2d Cir. 2019); *see also Ayco Co., L.P. v. Frisch*, 795 F. Supp. 2d 193, 208 (N.D.N.Y. 2011) (in case involving financial services company/insurance planning, entering preliminary injunction on trade secret claim based on then-employees' unusual printing activity and taking client contact lists, the names of corporate and individual clients, confidential information regarding client accounts, and client pricing and fee information); *USI Ins. Servs. LLC v. Miner*, 801 F. Supp. 2d 175, 195 (S.D.N.Y. 2011) (insurance brokerage case holding that "lists of USI clients," "revenue associated with USI clients," and "documents concerning USI clients' coverage and insurance policies" forwarded to personal email are "protectable as trade secrets").

Aon takes reasonable measures to safeguard this information, including confidentiality agreements, information security policies and training, and robust IT and physical security protocols. (Compl. ¶¶ 40-41). Indeed, Rampersaud and Montalvo's agreements expressly prohibit the use or disclosure of Aon's confidential client information and mandate its immediate return upon the

termination of their employment. (*Id.* ¶ 45; Exs. A and B § 3(a)). *See North Atl. Instruments,* 188 F.3d at 45 (confidentiality agreements, password-protections, restricted access are reasonable measures).

Nor is there any question that this information derives economic value, and provides Aon with a critical competitive advantage, because it is not readily ascertainable to competitors through proper means. (Williams Decl., ¶ 18). If this information was not valuable, Defendants would not have taken it, and Aon would not have acted swiftly to intercept it. Indeed, the client-specific materials reveal Aon's current and historical proprietary strategies for structuring client insurance programs, negotiating renewals, and peer benchmarking to deliver tailored client solutions. (*Id.* ¶¶ 5-18). The financial, client, historical, and pipeline data also reflect years of accumulated knowledge and planning, enabling Aon to forecast revenue, identify growth opportunities, and develop growth strategies. (*Id.*). Similarly, employee compensation and account assignment information are critical information a competitor could use to poach Aon's talent, disrupt cohesive service teams, and interfere with Aon's client relationships. (*Id.*) Competitors cannot replicate this information without investing the years and countless dollars Aon has expended (through expense reimbursements, employee compensation, and investment in its proprietary data and technology, among other things) in developing this information.

### 2.    Defendants Misappropriated Aon's Trade Secrets.

Under the DTSA, a trade secret is misappropriated when it is acquired "by a person who knows or has reason to know that the trade secret was acquired by improper means;" or when the trade secret is disclosed or used "by a person who...used improper means to acquire knowledge of the trade secret" or "knew or had reason to know that" the trade secret was derived through a person who used improper means to acquire it, acquired it under a duty to maintain its secrecy, or was derived through a person who owed a duty to maintain its secrecy. 18 U.S.C. § 1839(5).

"Improper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy." *Id.* § 1839(6).

Aon is likely to succeed in establishing misappropriation here. Just before their coordinated resignations, Rampersaud secretly transferred, uncharacteristically printed, and shipped Aon's trade secret information to his personal home address without authorization in violation of his confidentiality and fiduciary duties to Aon, and for the improper purpose of using that information at Howden. *See supra* at pp. 4-9. Montalvo and Rampersaud also improperly emailed themselves Aon client lists and client information, for the same improper purpose. *Id.* There was no legitimate business reason for this conduct. *Id.* Aon still has not recovered, or received any information from Rampersaud about, all of the packages that were shipped to Rampersaud's home address. (Williams Decl., ¶ 16). Rampersaud knew his possession of these materials was unlawful as evidenced by the false pretenses he offered when questioned (*id.*, ¶ 11), and neither Rampersaud nor Montalvo have returned Aon's trade secrets when demanded by Aon (including the documents emailed and printed). (Pizzutelli Decl., ¶¶ 5-6, Exs. 1, 2; Karchmer Decl., ¶¶ 7–13; Williams Decl., ¶ 16). If the information they took was not Aon's confidential and trade secret information then they would have stated such in response to Aon's demand. Their actions of keeping the information support that they are using, and continuing to use, such information on behalf of Howden, including to solicit clients and bolster Howden's New York operations. *See ExpertConnect,* 2019 WL 3004161, *6 (misappropriation supported by allegation that defendant tried to "conceal the fact that she took files"). This constitutes textbook misappropriation.[2]

---

[2] *See, e.g., Capstone Logistics Holdings, Inc. v. Navarrete*, No. 17-cv-4819, 2018 WL 6786338, at *31-32 (S.D.N.Y. Oct. 25, 2018) (finding misappropriation where employees forwarded confidential information to personal emails, secretly worked with competitor before departures while accessing trade secret information, transferred a contact list before leaving employer, and contacted plaintiff employees knowing salaries and wages), *aff'd and remanded in part*, 796 F. App'x 55 (2d Cir. 2020);

Howden, for its part, worked with Rampersaud to obtain information to target Aon employees with tailored offers. (Cogan Decl., ¶¶ 6–8). Rampersaud disclosed Aon-employee information to Howden. (*Id.*). Upon information and belief, Howden also utilized detailed client and financial information prepared by Rampersaud and disclosed to Howden during their discussions. (Compl., ¶ 56). Further, the documents that Rampersaud printed, emailed, and shipped, and that Montalvo sent to her personal email—including client lists, renewal strategies, revenue forecasts, and employee data—relate to clients that Rampersaud and others on his recruited "team" are now calling (indeed, one such client is identified in the presentation Rampersaud emailed to his personal email address, along with "projected revenue" for the client in 2026, Williams Decl., ¶ 8), further supporting that Defendants are using Aon's trade secret information. Aon is likely to prevail on its DTSA claim against all Defendants.

### 3.    Misappropriation Under New York Law.

Under New York law, trade secret misappropriation occurs when the plaintiff: (1) "possessed a trade secret," and (2) the defendants "used that trade secret in breach of an agreement, confidential relationship, or duty, or as a result of discovery by improper means." *ExpertConnect,* 2019 WL 3004161, at *6-7. For the same reasons above, Aon will succeed on its common law claim for misappropriation.

### B.    Aon Is Likely to Prevail On Its Contract Claims.

Aon will also succeed on its breach of contract and tortious interference with contract claims. In New York, breach of contract requires "the existence of a contract, the plaintiff's performance under the contract, the defendant's breach of the contract, and resulting damages."

---

*Ayco Co.,* 795 F. Supp. 2d at 208 (finding misappropriation based on unauthorized printing of client-related materials).

*Walter Boss, Inc. v. Roncalli Freight Co., Inc.*, 210 A.D.3d 1124, 1127 (N.Y. App. Div. 2d Dep't 2022).[3]

Tortious interference with contract requires: (1) the existence of a valid contract with a third-party, (2) defendant's knowledge of that contract, (3) defendant's intentional and improper procurement of a breach of that contract, and (4) damages. *See Stuart's, LLC v. Edelman*, 196 A.D.3d 711, 712 (N.Y. App. Div. 2d Dep't 2021).

### 1.    The Agreements Are Enforceable.

Rampersaud and Montalvo signed binding agreements with Aon that are no greater than necessary to protect Aon's legitimate business interests. They should be enforced as written, and Defendants should be enjoined from violating them further. Specifically, Rampersaud and Montalvo agreed to the following:

- **Confidentiality:** "The Employee shall not, except as required in the course of employment … disclose or use during or subsequent to the course of employment, any Confidential Information which had not been publicly disclosed…." (Compl., Exhibit A, § 3(a); *see also* Exhibit B, § 3(a) ("Employee shall not… copy, upload, transfer, delete, transmit, download, disclose or use any Confidential Information"). Confidential Information includes: lists of clients; client information relating to services, insurance, employees, finances, and compensation; business plans and strategies; compensation and revenues; and market research and data. *Id.*

- **Return-of-Property:** "Upon termination of employment, the Employee shall promptly return to the Company all Confidential Information and all materials and all copies or tangible embodiments of materials involving Confidential Information in the Employee's possession or control. The Employee agrees to represent in writing to the Company… that he has complied with the provisions of this Section 3." (Exhibit A, § 3(a); *see also* Exhibit B, § 3(a)).

- **Employee Non-Solicitation**: "The Employee hereby also agrees, for [course of employment and 24-months after the end of his employment], not to, directly or indirectly, solicit or induce, or to cause any person or other entity to solicit or induce, any employee of Aon to work for the Employee or for any third party or entity, or to leave the employ of Aon." (Exhibit A, § 1(c); *see also* Exhibit B (containing similar terms)).

---

[3] "Under New Jersey law, the following elements are necessary in a breach of contract claim: (1) a contract; (2) a breach of that contract; (3) damages flowing therefrom; and (4) plaintiff performed its own contractual duties." *Nat'l Reprographics, Inc. v. Strom*, 621 F. Supp. 2d 204, 222 (D.N.J. 2009).

- **Customer Non-Solicitation:** "The Employee hereby covenants and agrees that… the Employee (on the Employee's own behalf or on behalf of any other person or entity) will not, during the course of employment, and for [24 months after the end of employment], directly or indirectly, call upon, solicit, accept, engage in, service or perform, other than on behalf of Aon, any business of the same type or kind as the business performed by Aon from or with respect to (i) clients of Aon with respect to whom the Employee provided services, either alone or with others, or had a business relationship….." (Exhibit A, § 1(b); *see also* Exhibit B (containing similar terms)).

The above covenants are reasonable and enforceable. Under New York law, such covenants are enforced where "reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee." *Arnold R. Leiboff, M.D., P.C. v. Pelaez*, 249 A.D.2d 497, 498 (1998); *see also BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 388–389 (1999). New York courts "recognize the legitimate interest an employer has in safeguarding that which has made [its] business successful and to protect [itself] against deliberate surreptitious commercial privacy." *Estee Lauder Companies Inc. v. Batra*, 430 F. Supp. 2d 158, 177 (S.D.N.Y. 2006) (quotations omitted).

Here, the Aon covenants protect Aon's legitimate interests in its confidential and trade secret information—a recognized legitimate business interest under New York law. (*See* Exhibits A and B; Williams Decl., ¶¶ 18-19); *USI,* 801 F. Supp. 2d at 187 ("USI has a legitimate interest in seeking the return of any trade secrets or confidential information defined in the Employment Agreement"). This Court should also "join[] the great weight of authority" in concluding that Aon "undeniably has a legitimate interest" in "protecting its client relationships and good will," in which it has significantly invested. *Marsh & McLennan Agency, LLC v. Alliant Insurance Services, Inc.,* 2025 WL 304500, at *7 (S.D.N.Y. Jan. 27, 2025) (quotation omitted). It also, relatedly, has "a legitimate interest in limiting the solicitation of its employees to depart for its direct competitors." *Id.; accord Marsh USA LLC v. Parrish,* No. 25 Civ. 6208, 2025 WL 2676389, *2 (S.D.N.Y. Sept. 18, 2025)

("Multiple courts have held… that employers have a legitimate interest in protecting their workforce from targeted solicitation").

The covenants are also reasonable in duration and customary in the highly-competitive insurance brokerage industry. In fact, Howden's own agreements contain similar two-year covenants, and likewise prohibit the disclosure and use of customer information. (*See* Compl., Exhibit C).

The covenants also are not unreasonably burdensome. Rampersaud and Montalvo are free to work for Howden. They must simply refrain from unlawful contact with Aon's employees and clients, and the use, disclosure, or retention of Aon's confidential information. This imposes no unreasonable burden on their ability to "earn[] a livelihood." *See Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 71 (2d Cir. 1999). To the contrary, it is Aon's understanding that Howden has offered Rampersaud and Montalvo at least a three-year salary guarantee. (*See* Cogan Decl., ¶ 9).

Lastly, there is no public harm posed by Rampersaud's and Montalvo's covenants. The public has an interest in upholding the sanctity of contracts, and parties abiding by their agreements. *See MMA LLC*, 2025 WL 304500 at *9 (quoting *Mercer Health & Benefits LLC v. DiGregorio*, 307 F. Supp. 3d 326, 351 (S.D.N.Y. 2018) (cleaned up)).

Numerous courts have found materially similar covenants, including "similar twenty-four month restrictions on solicitation of former clients in the insurance industry" to be enforceable and "reasonable." *USI,* 801 F. Supp. 2d at 188 (citing industry cases). This includes:

- A case decided just ten days ago. *See Marsh & McLennan Agency, LLC v. Alliant Insurance Services, Inc.,* Case No. 25-cv-6936 (RA), 2025 WL 3442819, at *1 (Dec. 1, 2025) (granting PI and enforcing non-solicitation and non-servicing covenant, reasoning "New York courts routinely find non-solicitation provisions similar to those in the NSAs to be reasonably enforceable" because insurance brokerage "has a legitimate business interest to prevent competitive use, for a time, of information or relationships which pertain peculiarly to [plaintiff] and which the [former employees] acquired in the course of the employment").

- Departures to Howden. *See Marsh USA LLC v. Parrish, et al,* 2025 WL 2676389, at *2 (granting injunction finding evidence that defendants solicited employees in violation of employee non-solicitation covenant, breached confidentiality agreement that defined confidential information to include both "personnel information" and "client information," and prohibited "directly or indirectly using, disseminating or disclosing Marsh's confidential information").

- Other industry cases. *See MMA LLC,* 2025 WL 304500, at *7 ("With respect to non-solicitation of clients, the Agreement is not overbroad. It is limited to clients… of MMA with whom the employee had contact during the last two years of his employment with MMA. The prohibition on soliciting such clients… is reasonable, lasting only two years after the employee's separation from MMA. As many courts reviewing similar agreements have concluded, this limited restriction fits comfortably within MMA's legitimate business interest[s]…" and also finding MMA established likelihood of success on enforceability and breach of "non-servicing" covenant, reasoning "numerous courts that have considered restrictive covenants prohibiting the servicing of an employee's former clients have found them to be enforceable…").

Rampersaud and Montalvo even stipulated that the covenants "provide Aon with reasonable protection for its client and prospective client relationships and its investment therein…, its goodwill, and its Confidential Information," and that the covenants "are necessary for the protection of Aon and are reasonably limited with respect to the activities prohibited, duration, geographical scope and their effect on [Rampersaud/Montalvo] and the public." (Exhibit A, § 1(a); *see also* Exhibit B, § 1(a), 1(h)).

### 2.    Rampersaud and Montalvo Breached Their Agreements.

Rampersaud and Montalvo breached their agreements:

1) **By misappropriating Aon's Confidential Information:** As described above, *supra* pp. 4–9, Rampersaud and Montalvo removed, used, disclosed, and retained (and lied about it all) Aon's Confidential Information, in violation of Section 3(a) of their agreements.

2) **By failing to return Aon's company property and certify its return:** Rampersaud and Montalvo, despite Aon's demands, refused to return Aon's Confidential Information upon termination of their employment. Rampersaud also retained his Aon-issued cell phone and refused to provide its passcode despite Aon's demand, in violation of Section 3(a) of the Agreement. (Williams Decl., ¶¶ 16-17; Pizzutelli Decl., ¶¶ 5-6). Rampersaud and Montalvo retain the Aon Confidential Information that they emailed to their personal email addresses. Rampersaud is also believed to continue to possess additional boxes of Aon Confidential Information and the information that he printed. He has blatantly ignored Aon's requests for information. (*Id.*).

3) **By soliciting Aon's employees:** Rampersaud solicited Aon employees to leave Aon and coordinated the mass resignation of six additional team members for Howden, in violation of the 24-month employee non-solicitation and non-inducement covenant in Section 1(c) of his CNSA Agreement. (Cogan Decl., ¶¶ 5–10; Degnan-Steinborn Decl., ¶¶ 4–5).

4) **By soliciting Aon's clients:** Rampersaud and others on his "team" called and solicited Aon clients after resigning, in violation of the 24-month client non-solicitation and confidentiality covenants in Sections 1(b) and 3(a) of his CNSA Agreement. (Cogan Decl., ¶ 12; Degnan-Steinborn Decl., ¶¶ 10–11; Williams Decl., ¶¶ 8, 19).

Again, New York courts have found likelihood of success on nearly identical facts:

- Involving departures to Howden: *See Marsh USA LLC v. Parrish, et al,* 2025 WL 2676389 (finding breach of employee non-solicitation covenant where individual defendant contacted colleagues, announced departure to Howden, shared higher compensation and promotions offered by Howden, and offered to connect them with Howden; plaintiff also likely to succeed on claim that individual defendant breached confidentiality agreement by "accessing Marsh's confidential client and employee information in relation to their anticipated move from Marsh to Howden," including "pricing models, renewal timelines, growth strategies, and detailed employee compensation and benefits").

- In cases involving Aon's agreements: *See Aon Risk Servs., N.E. v. Cusack,* 34 Misc. 3d 1205(A) (N.Y. Supp. Ct. Dec. 20, 2011) (finding likelihood of success on breach of employee and customer non-solicitation claims, where former Aon employee and new employer: (i) secretly met (on Aon-expensed trip); (ii) orchestrated abrupt same-day resignations of numerous Aon employees to join a "newly formed business"; (iii) the employee told Aon employees that the competitor had a position "similar to the position [the solicited employee] held at Aon," and the Aon employees were offered jobs without interviewing; (iv) employee forwarded confidential client and financial information to personal email addresses; and (v) employee called Aon clients saying he was leaving Aon and joining a competitor).

- And, in other industry cases: *See MMA LLC,* 2025 WL 304500, at *7 (finding likelihood of success that employee breached confidentiality provision when he suspiciously compiled two "personal" spreadsheets including MMA client names, main points of contact for each client, types of client policies, policy expiration dates and renewal dates—which MMA submitted the former employee took).

### 3.    Howden Tortiously Interfered with Rampersaud's Agreement.

Aon is also likely to succeed on its tortious interference claim against Howden. Indeed, (a)

Rampersaud's covenants are valid and enforceable; (b) Howden knew about the covenants (Aon

previously sent Howden and its attorneys numerous letters notifying it of Aon's covenants with its

employees that Howden hired, (Compl., ¶ 113)), (c) Howden induced Rampersaud to breach the

non-solicitation and confidentiality covenants by encouraging him to solicit Aon employees and take

information for use at and by Howden, and by offering him at least a 3-year salary guarantee

insulating him from the consequences of his conduct (Cogan Decl., ¶ 9); and (d) Rampersaud

breached his Agreement causing the departure of Aon colleagues.

Again, New York courts have found such conduct to constitute tortious interference with

contract. *See, e.g., MMA LLC,* 2025 WL 304500, at *7 (finding likelihood of success where

competitor's offer incentivized employee to breach his obligations); *Marsh & McLennan Agency,* 12-

cv-6936, 2025 WL 3442819 (Dec. 1, 2025) (finding tortious interference when employees breached

agreement "while working for" competitor); *Aon Risk Servs.,* 34 Misc. 3d 1205(A) (finding tortious

interference where competitor encouraged employee to breach covenants by providing him with a

contractual provision entitling him to full compensation even if he were enjoined).

### C.     Aon Is Likely to Succeed on Its Fiduciary Duty Claims.

Aon is also likely to succeed on its fiduciary duty claims against Rampersaud and Howden.

<u>***First***</u>, Rampersaud violated his fiduciary duties of loyalty. "Under New York law, at-will

employees owe their employers a fiduciary duty of loyalty, including a duty not to use the employer's

confidential information to compete with the employer." *Mercer,* 307 F. Supp. 3d at 353-54. "It is a

'firmly established principle in the law of [New York] that [an employee] is prohibited from acting in

any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost

good faith and loyalty in the performance of his duties.'" *Capstone Logistics Holdings, Inc.,* 2018 WL

6786338, at *33. An employee's competitive use or diversion of his employer's confidential and

proprietary information normally gives rise to an actionable breach of the duty of loyalty for which

injunctive relief is proper. *First Mfg. Co. v. Young*, 45 Misc. 3d 1214(A), 3 N.Y.S.3d 284 (N.Y. Sup.

2014) (finding plaintiff sustained burden of proof for injunction where presented evidence that then-employees surreptitiously took confidential information for purposes of competing).

This is a textbook case of breach of fiduciary duty. Rampersaud—while employed by Aon—conspired with Howden (on Aon's dime) to raid Aon's team and used confidential information for the benefit of Howden. That is definitionally disloyal. *See, e.g.*, *QBE Americas, Inc. v. Allen*, 2022 WL 889838, at *15 (S.D.N.Y. Mar. 25, 2022) (holding plaintiff likely to succeed on duty of loyalty claim when defendant breached confidentiality and secretly met with and began work for a competitor while still under duty to plaintiff); *see First Mfg. Co.,* 45 Misc. 3d 1214(A) ("Where it is shown that trade secrets or other proprietary or confidential material belonging to the employer were used or there was other wrongful conduct by the employee, including the use of fraudulent methods or the engagement in a physical taking or copying of the employer's documents, lists or files, such conduct is actionable in tort . . . ." (internal citations omitted)).

**<u>Second</u>**, Aon is also likely to succeed on its claim that Howden aided and abetted Rampersaud's breach of the fiduciary duty of loyalty. "A claim for aiding and abetting a breach of fiduciary duty requires: (1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that [the] plaintiff suffered damages as a result of the breach." *Cusack*, 34 Misc.3d at 1205(A) (finding competitor aided and abetted breach of fiduciary duty where it encouraged defecting employees to solicit employees while still employed and encouraged disclosure of confidential information for use in solicitation). Knowing Rampersaud was a fiduciary and senior client-facing employee, Howden collaborated with him during his Aon employment to gather data on long-tenured staff and orchestrate a mass resignation. Aon is therefore likely to prevail on this claim.

### D.    Aon Will Suffer Irreparable Harm.

Absent injunctive relief, Aon will continue to suffer immediate irreparable harm, including: (1) "the risk of Defendants' use and disclosure of its confidential [and trade secret] information" (*Parrish,* 2025 WL 2676389, at *3); and (2) "damage to its client relationships" (*id.*). "To establish irreparable harm, a plaintiff must establish both that an injury is likely absent the injunction and that the injury cannot be adequately remedied with money damages." *IDG USA, LLC v. Schupp,* 416 F. App'x 86, 88 (2d Cir. 2011).

Here, as a threshold matter, Rampersaud and Montalvo admit that their contractual violations constitute irreparable harm and that Aon has a right to injunctive relief. (*See* Compl., Exhibit A, § 2; Exhibit B, § 2). Contractual provisions acknowledging the inadequacy of money damages support a finding of irreparable harm. *See Mercer,* 307 F. Supp. 3d at 348 (finding irreparable harm, in part, because former employee acknowledged that a breach of his agreement would cause "irreparable injury" to the employer); *Devos, Ltd. v. Record,* No. 15-CV-6916 (ADS)(AYS), 2015 WL 9593616, at *10 (E.D.N.Y. Dec. 24, 2015) (finding irreparable harm where agreement stated that a breach would result in irreparable injury). At minimum, "[a] movant's demonstration of irreparable harm is strengthened significantly where the employee has previously acknowledged—most often in an employment agreement—that his or her own breach of a restrictive covenant entitles the employer to injunctive relief because of the irreparable injury the movant would incur." *Iannucci v. Segal Co., Inc.*, 2006 WL 8407380, at *3 (S.D.N.Y. June 27, 2006). The Second Circuit has repeatedly held that comparable language is "arguably . . . viewed as an admission . . . that plaintiff will suffer irreparable harm were [defendant] to breach the contract's non-compete provision." *Ticor Title*, 173 F.3d at 69; *Singas Famous Pizza Brands Corp. v. N.Y. Advert. LLC*, 468 Fed. App'x 43, 46 (2d Cir. 2012). In fact, Howden's own agreements also concede that breach of similar covenants "would cause irreparable harm." *See* Compl., Exhibit C, § 5(a).

Even without Defendants' admissions, "[i]t is well established in the Second Circuit that a loss of client relationships and customer goodwill that results from the breach of a restrictive covenant generally constitutes irreparable harm." *MMA, LLC*, 2025 WL 304500 at *10. As the Second Circuit has held, a plaintiff who stands to lose its business relationships due to breach of restrictive covenants suffers irreparable harm because "it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." *Ticor Title*, 173 F.3d at 69. As the former employees' own resignation emails support (Compl., ¶ 78), "insurance company clients [like Aon's] tend to develop long-term relationships with their… brokers, placing coverage through them year after year . . . [t]hus, [t]he total monetary value of [Aon's] loss of client[s] would be very difficult, if not impossible, to calculate with any exactitude. Nor could the lost goodwill that [Aon] has built with these clients be easily quantified and compensated." *Willis Re Inc. v. Herriott*, 550 F. Supp. 3d 68, 105–06 (S.D.N.Y. 2021) (quoting *Karasaki*, 2008 WL 4778239 at *14); (Williams Decl., ¶ 19).

Likewise, irreparable harm is presumed where trade secrets are misappropriated because a "trade secret once lost is, of course, lost forever." *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984) (finding irreparable harm from misappropriation of customer list). "[I]t is clear that the loss of trade secrets cannot be measured in money damages." *Id.*; *Computer Assocs. Int'l v. Bryan*, 784 F.Supp. 982, 986 (E.D.N.Y.1992) (granting preliminary injunction, finding loss of trade secrets is not measurable in terms of money damages and is thus considered irreparable harm). Even the *threat* of disclosure constitutes irreparable harm. *Estee Lauder,* 430 F. Supp. 2d at 162 (explaining irreparable harm found where trade secrets will inevitably be disclosed when "the movant competes directly" with the new employer and former employee "possesses highly confidential" knowledge); *see also IDG,* 416 F. App'x at 88 (even "threatened dissemination" of trade secret creates

24

presumption of irreparable harm). The DTSA expressly calls for an injunction to prevent "any actual or threatened misappropriation." 18 U.S.C. § 1836(b)(3)(A).

Even if the Court were to find that the misappropriated information should not be afforded trade secret protection (it should be), "[u]nder New York law, the use and disclosure of an employer's confidential customer information and the possibility of loss of customers through such usage, constitutes irreparable harm." *Capstone Logistics Holdings*, 2018 WL 6786338, at \*33; *Ayco Co.,* 795 F. Supp. 2d at 205 (entering preliminary injunction after then-employees printed substantial amounts of client information, noting "the loss of an employer's confidential customer information also constitutes irreparable harm"). Indeed, irreparable harm may be established where, as here, there is a substantial risk that a defendant will use and/or disclose the plaintiff's confidential information. *Estee Lauder,* 430 F. Supp. 2d at 179; *Ayco Co.,* 795 F. Supp. 2d at 210 ("Absent injunctive relief, Plaintiff is threatened with the imminent, irretrievable disclosure to competitors of confidential information…."); *see also Int'l Bus. Machs. Corp. v. Papermaster*, 2008 WL 4974508 at \*7 (S.D.N.Y. Nov. 21, 2008); *MMA LLC*, 2025 WL 304500 (finding misappropriation of confidential information justifies preliminary injunction enforcing non-solicitation and confidentiality agreements).

Defendants siphoned away voluminous confidential and trade secret information, including client information, in their final days at Aon, intending to use that information to compete against Aon. The preliminary record shows Defendants continue to unlawfully possess Aon confidential and trade secret information, likely possess volumes more, and have utilized Aon's information to solicit its employees and clients. *See supra* pp. 4-9. Further, the only reasonable inference is that the information was taken by Aon's decades-long employees (now Howden employees) in order to be used at Howden (and on its behalf) where they intend to occupy the exact same positions they

previously held at Aon to bolster Howden's newly-established operations. (Cogan Decl., ¶ 6). There is no other credible explanation.

Absent Aon's requested injunctive relief, it is indisputable that Aon will continue to suffer irreparable harm.

### E.    The Equities and Public Interest Favor an Injunction.

A balancing of the equities also tips decidedly in Aon's favor. When balancing hardships, "the Court 'must weigh the need to protect the employer's legitimate business interests against the employee's concern regarding the possible loss of livelihood.'" *Natsource LLC v. Paribello*, 151 F. Supp. 2d 465, 472 (S.D.N.Y. 2001) (quoting *Ticor Title*, 173 F.3d at 69). Here, Aon will suffer irreparable harm without injunctive relief. Aon will also be denied the benefit of its bargain with Defendants, a factor weighing in Aon's favor. *See Cortland Line Holdings LLC v. Lieverst*, 2018 WL 8278554 at *9 (N.D.N.Y. Apr. 6, 2018) ("Failing to receive the benefit of its bargain would create a hardship to the Plaintiffs"). In material contrast, the requested inunction simply requires compliance with Aon's agreements. This does not affect the Individual Defendants' livelihoods. Quite to the contrary, it is Aon's understanding that Howden has offered the Individual Defendants at least 3-year salary guarantees. (Cogan Decl., ¶ 9). Individual Defendants may continue to earn a living, and Howden may continue to fairly compete with Aon. That Howden consented to a similar injunction underscores the lack of hardship on Howden. (Compl., ¶ 15). Thus, the balance of the equities favors Aon. *See Marsh USA Inc. v. Schuhriemen*, 183 F. Supp. 3d 529, 536–37 (S.D.N.Y. 2016) (granting PI and observing, with respect "to the balance of equities," that the individual defendant was unlikely to suffer "great hardship" if he was prevented from soliciting plaintiffs' clients, where plaintiff could have "face[d] the prospect of losing business to a major competitor, transported by a high-level company official").

Further, Aon's requested injunction does not injure the public interest—to the contrary, it protects the public interest by upholding the sanctity of bargained-for contracts and protecting confidential information. *See HRB Res. LLC v. Schon*, 2019 WL 4015256, at *3 (N.D.N.Y. Apr. 25, 2019) ("There is undoubtedly a public interest in enforcing valid contracts including such restrictive covenants as they may contain."). Enforcement of Defendants' agreements furthers New York's interest in "encourag[ing] parties to abide by their agreements" and in discouraging unfair competition. *See Willis Re Inc.*, 550 F. Supp. 3d at 104 (quotation omitted).

## II.    A FORENSIC INSPECTION AND RETURN ORDER IS NECESSARY HERE.

Given the egregious facts here, the Court should order a forensic inspection of Defendants' devices and accounts, and the immediate return and remediation of Aon's business information, at Defendants' expense. Rampersaud and Montalvo each retained Aon confidential and trade secret information. They have not returned these materials, and have ignored Aon's request for their return. They have not certified the return of this information, despite their contractual duty to do so. The record supports that they have utilized, and will continue to utilize, Aon's confidential and trade secret information if an injunction is not entered. What's more, Rampersaud acted deceitfully in order for Aon to avoid detection of his misappropriation. Howden is currently involved in contempt proceedings in another, somewhat similar, case for failure to comply with a Court's return order—underscoring why a forensic neutral should oversee the remediation here. *See Marsh USA LLC, v. Parrish, et al.*, No. 25-cv-6208, Dkt. 163.

For these reasons, a Court-ordered forensic remediation of Defendants' accounts and devices is necessary to prevent further irreparable harm to Aon, and also identify and remedy any further acts of dissemination. In *IME Watchdog*, the Court found that defendants emailed themselves plaintiff's confidential information and that of plaintiffs' clients, in order to further their competing

business. *IME Watchdog, Inc. v. Gelardi*, 2022 WL 1525486, at *3-4 (E.D.N.Y. May 13,

2022), *reconsideration denied*, 2022 WL 2316137 (E.D.N.Y. June 28, 2022). The Court ordered:

> Within fourteen (14) days… the parties are directed to meet and confer regarding the
> retention of an independent forensic analyst who will conduct an analysis of all of
> Defendants' records and electronic accounts. Defendants will provide complete and
> unrestricted access to their records and electronic accounts to the forensic analyst.

*Id.* at *11. The same should be ordered here, at Defendants' expense. *See also Mphasis Corp. v. Rojas*,

No. 25-CV-3175 (JMF), 2025 WL 1640384, at *1 (S.D.N.Y. June 9, 2025) ("Rojas shall cooperate in

full with Mphasis' counsel to arrange for a neutral forensic examiner selected by Mphasis to conduct

an immediate forensic examination of Rojas' personal Mac computer, including all email accounts,

cloud accounts, and other relevant software/hardware utilized by Rojas since March 13, 2025.");

*BaseCap Analytics, Inc. v. Amenn,* No. 1:23-CV-09370-MKV, 2023 WL 8113524, at *5 (S.D.N.Y. Nov.

22, 2023) (providing instructions on the execution of an independent, third-party forensic analysis to

be completed within a short timeframe). On this record, there is irrefutable evidence to support a

forensic inspection and purge using a forensic neutral.

## **CONCLUSION**

For these reasons, Aon respectfully requests a TRO and PI, in the form submitted herewith.

Multiple courts have entered similar injunctions in the past three months:

- *Marsh USA LLC v. Parrish, et al.,* Case No. 1:25-cv-6208, Dkt. 129 (Sept. 19, 2025):
  Enjoining Howden's U.S. CEO and other employees from "directly or through others,
  soliciting [Marsh employees with whom defendants came in contact or about whom they
  obtained confidential information] to leave employment with Marsh or Marsh's affiliates
  or regarding employment with [Howden]" and from "[d]irectly, or through others,
  soliciting such clients or prospective clients for the purpose of selling or providing
  services or products by Howden," and prohibiting each defendant from "directly or
  indirectly using, disseminating, or disclosing to any third party… Confidential
  Information and Trade Secrets," and requiring the return of all Marsh property.

- *Marsh & McLennan Agency,* 2025 WL 3442819, at *1: Enjoining competitor and former
  employees from "soliciting or accepting business from clients covered by the RCA and
  NSAs… that have not already moved their business to Alliant."

This Court should do the same here.

Dated: December 11, 2025                          LITTLER MENDELSON, P.C.

                                                  By: */s/ Jessica Pizzutelli*

                                                  James M. Witz, Esq. *(pro hac vice application forthcoming)*
                                                  321 North Clark Street, Suite 1100
                                                  Chicago, IL 60654
                                                  (312) 795-3246
                                                  jwitz@littler.com

                                                  Jessica Pizzutelli, Esq.
                                                  375 Woodcliff Drive, Suite 2D
                                                  Fairport, NY 14450
                                                  (585) 203-3414
                                                  jpizzutelli@littler.com

                                                  *Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that the foregoing contains 8,716 words, excluding the parts of the document that are exempted by Local Civil Rule 7.1(c). The undersigned relied on the word count of the word-processing program used to prepare this document.

Dated: December 11, 2025

By: */s/ Jessica Pizzutelli*

Jessica Pizzutelli, Esq.